FILED
FEB 23 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DAVID HILL DEVELOPMENT, LLC, an
Oregon limited liability company,

                Plaintiff,

     v.

CITY OF FOREST GROVE, an Oregon
municipal corporation, STEVE A. WOOD,
individually and in his capacity as Project
Engineer for the City of Forest Grove,
ROBERT A. FOSTER, individually and in his
official capacity as Engineering Director and
Public Works Director for the City of Forest
Grove,

                Defendants.

Civ. No. 08-266-AC

OPINION AND
ORDER

CITY OF FOREST GROVE, an Oregon
municipal corporation, STEVE A. WOOD,
individually and in his capacity as Project
Engineer for the City of Forest Grove,
ROBERT A. FOSTER, individually and in his
official capacity as Engineering Director and
Public Works Director for the City of Forest
Grove,

                    Counter-Plaintiffs,

         v.

DAVID HILL DEVELOPMENT, LLC, an
Oregon limited liability company,

                    Counter-Defendant.

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff David Hill Development, LLC ("Plaintiff") alleges five claims against Defendants

City of Forest Grove ("the City"), Steve Wood ("Wood"), and Robert Foster ("Foster") (collectively

"Defendants"): inverse condemnation in violation of the Oregon Constitution, Article I, Section 18;

inverse condemnation in violation of the Fifth and Fourteenth Amendments to the United States

Constitution in conjunction with 42 U.S.C. § 1983 ("section 1983"); retaliation under the First

Amendment and section 1983; violation of equal protection rights under the Fourteenth Amendment

and section 1983; and violation of substantive and procedural due process rights under the

Fourteenth Amendment and section 1983.

Defendants move for summary judgment on all claims. Plaintiff opposes this motion and

moves for partial summary judgment on certain of Defendants' affirmative defenses. Plaintiff

specifically challenges Defendants' affirmative defenses based on the statute of limitations;

OPINION AND ORDER                    2                    {KPR}

mandatory arbitration; exhaustion of administrative remedies; notice requirements of the Oregon Tort Claims Act; compliance with the Development Agreement; and the exculpatory clause in Exhibit B to the Development Agreement. Defendants only partially oppose Plaintiff's motion, conceding that certain of its affirmative defenses do not apply. Finally, Defendants assert a general objection to Plaintiff's declarations and affidavits, and specifically move to strike the affidavits of Fruits and Hankins. The court will address the motions in turn.[1]

For the reasons set forth below, Defendants' motion for summary judgment is granted with respect to Plaintiff's state takings claim, and granted in part and denied in part with respect to Plaintiff's federal takings claim. Defendants' motion is denied with respect to Plaintiff's First Amendment retaliation, equal protection, substantive due process, and procedural due process claims. Plaintiff's motion for summary judgment is denied in its entirety.[2]

*Overview*

Plaintiff purchased several acres of farmland with the intention of creating a residential subdivision. Plaintiff successfully petitioned the City for annexation of the property within the urban growth boundary and received preliminary plat approval for its development. The development ran into problems, however, involving disagreements between Plaintiff and Defendants over the sewer line, easements, trees, and phasing. Plaintiff alleges that Defendants actively frustrated and delayed its development efforts, at least in part, due to a preference in favor of other area developers and personal animus toward one of its principals, Timothy McDonald ("McDonald"). In the meantime,

---

[1] For citation purposes, the record citations will refer to the record associated with the motion currently being discussed, unless otherwise specified.

[2] The parties have consented to jurisdiction by magistrate judge pursuant to 28 U.S.C. § 636(c)(1).

the residential real estate market declined and Plaintiff received less money on the sale of lots within the development than originally anticipated. Plaintiff also incurred additional development costs as a result of specific actions and demands by Defendants.

*Factual Background*

Plaintiff was formed in 2004 as a single purpose entity to develop "The Parks," a residential subdivision in Forest Grove, Oregon. (Defendants' ("Defs.'") Concise Statement of Material Facts ("CSMF") ¶ 1.) Plaintiff's intent was to develop the property by creating an infrastructure to support a subdivision and subsequently sell lots to other developers who would then construct and sell homes in the subdivision. *Id.* To this end, Plaintiff purchased almost sixty acres of farm property in Washington County for approximately $6.9 million. (Defs.' CSMF ¶ 2.) Prior to purchase, Plaintiff sought annexation of the property within the City, in part to make use of the City's "services and utilities." (Defs.' CSMF ¶ 3.) According to McDonald, an owner of David Hill Development, at the time of purchase annexed property, i.e., property inside the urban growth boundary ("UGB"), sold for approximately $100,000 per acre more than unannexed property. Plaintiff "paid an average of $120,600 per acre for The Parks property." (McDonald Affidavit ("Aff.") ¶ 2.) Plaintiff's efforts to annex the property were successful and annexation was approved on January 10, 2005, at which point Plaintiff began submitting permit applications to the relevant agencies. (Defs.'s CSMF ¶ 5.) McDonald claims that Plaintiff "had a contractor under contract to finish the project in 4-5 months (December 2005 or January 2006) and with the market at its peak." (McDonald Aff. ¶ 3.) In addition, McDonald stated that in order to sell lots to builders, Plaintiff "need[ed] platted lots that [were] ready for building permits[,]" and thus it would not "be in a good position to sell the development to a home builder until the final plat was recorded and the City was ready to issue

building permits." (McDonald Aff, ¶ 4.)

In early 2004, McDonald and Dennis Yarchenko, both owners of David Hill, met with the City, Washington County ("the County") and Clean Water Services ("CWS") for an informational meeting to discuss the trunk sewer line[3] that would serve the development and which entity, the City or the County, would take over the portion of David Hill Road that connected with Highway 47.

From the outset, the property was burdened with access issues. At the time of purchase, the property lacked access from Highway 47 and access from the north. There was emergency access from the east, however. (Kuhn Aff., Def.'s Memo., Exhibit ("Ex.") A at 2.) Another property owner, Lyle Spiesschaert ("Spiesschaert"), who had been an active resident and participant in the Forest Grove community for many years, owned property to the south of The Parks. This property was being developed by Dave Huttala ("Huttala"), a developer, into a subdivision named "Oak Hill Settlement." (Plaintiff's Response ("Pl.'s Resp.") CSMF ¶ 18, 20.) Plaintiff claims that in constructing the Oak Hill Settlement, the developer was required to provide sewer access all the way to David Hill Road. Thus, Plaintiff seeks compensation from the City, in part, for failure to enforce this condition. McDonald testified at deposition that, although the City could not force Huttala to complete the phase of development that would have resulted in sewer access that reached to David Hill Road, "they could have conditioned [Huttala] to give right-of-way, and [McDonald felt] that [Huttala] was conditioned in phase one to give right-of-way." *Id.* at 3.

"Washington County issued its recommendations . . . on April 27, 2005." (Pl.'s Resp. CSMF ¶ 44.) Notably, the recommendations called for the installation of a traffic signal, but did not require

---

[3] A trunk sewer is a sewer that receives sewage from multiple sources and serves a large area.

an alignment modification, i.e., that the road be "straightened out[,]" to accommodate that signal. (Morasch Declaration ("Decl."), Ex. B at 7-8.)  The alignment modification requirement was imposed later in the City's Transportation System Plan ("TSP"). *Id.* at 8. Foster testified that the need for such modification could have been identified by the County or could have been brought to their attention by the City.  Foster identified Wood as someone who may have notified the County. (Morasch Decl., Ex. B at 8.)

The City knew that Plaintiff wanted to expedite development of The Parks and that Plaintiff disagreed with another developer, Steve Matiaco ("Matiaco"), about the location of the sewer route. (Pl.'s Resp. CSMF ¶ 15.) For its part, the City inquired in August 2005 whether it could legally route the sewer outside the UGB if that turned out to be the most beneficial route.  (Morasch Decl., Pl.'s Opp., Ex. B at 14.) On September 2, 2005, Plaintiff received preliminary plat approval, subject to a set of appealable conditions. (Kuhn Aff., Ex. I.) Ryan O'Brien, founder and consultant for LDC Design, Inc. ("LDC"), the engineering firm employed by Plaintiff to address engineering issues associated with The Parks development, testified that "[o]nce the City issues preliminary plat approval and all appeal periods expire, the preliminary plat approval conditions become binding on both the City and the applicant for the term of the permit," (O'Brien Aff. ¶ 7.) He went on to state his opinion that, subsequent to the preliminary plat approval, "[t]he City's treatment of [Plaintiff] was by far the most unfair and reckless disregard for people's rights [he had] witnessed any City treat an individual or developer in [his] 37 years in the land use planning business." (O'Brien Aff. ¶ 13.)

On September 12, 2005, the City approved "an early grading permit . . . [allowing] Plaintiff to get development underway even though it had not obtained all of the necessary permits to begin full construction." (Defs.' CSMF ¶ 6.) The permit stated: "Construction activity allowed by the

Grading Permit will not include excavation for or the installation of private or public utilities. Additionally, the Grading Permit will not allow for the placement of aggregate base materials within public roadway areas." (Kuhn Aff., Ex. H at 6-7.) The permit allowed, specifically, "(a) installation of ESC provisions, including aggregate site entrances and provisions for noise and dust control; (b) site clearing and grubbing; and (c) mass grading and shaping of the development site." *Id.* at 7. Furthermore, under "Special Provisions," the permit stated: "Developer agrees to comply with any and all subsequent requirements, as may be established by the City or other jurisdictional agency of authority, pertaining to this development project." *Id.* at 11.

With regard to Plaintiff's proposed sewer alignment, CWS told the City that Plaintiff's plan was "'well thought out,' and met all requirements." (Pl.'s Resp. CSMF ¶ 13 (citing Huttala Aff., Ex. A at 5-7.).) At deposition, Foster admitted that it was clear in an email between CWS and Wood, Project Engineer for the City of Forest Grove, that "Wood agreed at the time with Clean Water Services' assessment regarding LDC's primary proposal, that it met the Clean Water Services requirements and was in compliance . . . ." (Morasch Decl., Ex. B at 3.) He stated that he did not know why Wood later characterized Plaintiff's proposed sewer plan as a "problem," when in fact Plaintiff "had a primary option that was actually the solution and met all the criteria . . . ." *Id.* Foster later testified that Defendants were not impressed by some of Plaintiff's ideas regarding the sewer routing. However, he was unable to explain why CWS "[thought] [Plaintiff's] primary option was so good[,]" or why Wood seemed to agree with this assessment. (Morasch Decl., Ex. B at 6.) Foster also testified that a fifteen-foot utility easement that housed both sewer and water routes would comply with applicable codes and could potentially be granted on a temporary basis, up to ten years. (Morasch Decl., Ex. B at 11.) He also admitted that if the City did not think the fifteen-foot

easement would be sufficient, they typically would have raised the issue prior to the preliminary plat review. (Morasch Decl., Ex. B at 12.) James Reitz ("Reitz"), a city employee, testified that the engineering department did not comment in the preliminary planning period about the fifteen-foot easement described in the application materials. (Morasch Decl., Ex. C at 2.) Terry Keyes ("Keyes"), formerly the Development Services Manager for CWS, testified that, in general, sewer routing within a development was not a concern of the City "unless a route cause[d] maintenance problems." (Keyes Aff. ¶ 4.) He also stated that it was his understanding that developers of property to the west of The Parks, and specifically Matiaco, were "not supportive of the sewer routing as put forth in the master sewer plan," and that this issue was discussed in a meeting between Keyes, Wood, and Foster. *Id.* In a November 2, 2005, email, Keyes wrote: "The proposed route for the trunk line appears well thought out and should minimize construction costs and easement issues," despite the fact that other developers were not "currently supportive of a sewer extension traversing their property." (Keyes Aff. Ex. B.) Keyes again stated that the location proposed by Plaintiff was the best option. *Id.* In an email written later that day, Wood acknowledged that the routing proposed by LDC on Plaintiff's behalf "is the route that ensures that The Parks development has met the CWS obligation for extending the trunk sewer through its development . . ," and admits that "the LDC plan actually provides City, or (better said) the next Developer, with two potential alignment options . . . which is good." (Keyes Aff. Ex. C.)

On September 21, 2005, the City issued a stop work order. (McDonald Depo. 160:9-13.) Plaintiff did not comply with the order, and another Stop Work Notice was issued on September 26, 2005. The notice stated that Plaintiff was in violation of special provisions to the early grading permit and not in compliance with a requirement of the Bonneville Power Administration. Further,

Plaintiff was "installing public improvements" without approval, a permit, or appropriate "provisions for inspection by" the City. (Kuhn Aff., Ex. K. at 1-2.) This order delayed the project for approximately thirty days, reportedly because the City was concerned about contamination. The project recommenced when Plaintiff agreed to clean up any damage done. (McDonald Depo. 161:24-162:8.)

On September 30, 2005, there was a meeting attended by McDonald, Wood, Foster, and Rick Vanderkin ("Vanderkin"), among others. One of the city employees, Derek Robbins, wrote Bill Cox's name on the sign up sheet as "Bill Cocks." (Pl.'s CSMF ¶ 36.)

With regard to the wetlands issue, environmental consultant Julie Wirth ("Wirth") was tasked with "identifying wetland mitigation opportunities for the extension of David Hill Road (DHR) . . . ." (Wirth Aff. ¶ 3.) She testified that the City was unresponsive to Plaintiff's efforts to find a solution to the wetlands issue. Due to this unresponsiveness, Plaintiff "ordered [Wirth] to prepare a letter for Mr. Holan's signature for the city to send to the regulatory agencies on their own letterhead." (Wirth Aff. ¶ 4.) This letter was given to Holan, the Community Development Director for the City, but was never signed or forwarded to the regulatory agencies. (Wirth Aff, Ex. A.)

In a December 20, 2005, email to Wood, Vanderkin wrote: "Another item of concern is the relationship with Tim McDonald. In several different meetings with Tim he has made various statements regarding the subject project which have been proven untrue. It has become very hard for City staff to believe anything [from] the mouth of Mr. McDonald." (Morasch Decl., Ex. D at 1.) Wood testified that he had the same general opinion of McDonald. (Morasch Decl., Ex. A at 6.) In the same email Vanderkin expressed the concern of an LDC engineer, Roy Hankins ("Hankins"), who feared that his association with The Parks development would harm his relationship with the

City. *Id.* at 2. Christopher Kittredge, the engineer who took over for Patrick Martin ("Martin") and Hankins in 2006, testified at deposition, despite his concerns that such testimony would endanger his relationships with Wood and Vanderkin, that "when [he] first got involved in the project, [the two men] expressed their unhappiness with both Tim and the previous engineers. [He] knew they were frustrated and irritated . . . [and] that there wasn't any love lost between them and the developer." (Kittredge Deposition ("Depo.") 152:19-25.) Martin was the "designated project engineer" for The Parks and Hankins worked with him on the project. (Morasch Decl., Ex. A at 7.) Wood testified that he had no personal problems with Hankins, but that he did question his judgment on certain occasions, particularly with regard to the trunk sewer alignment. *Id.*

In January 2006, City employees exchanged emails about whether Plaintiff had been billed for time spent by a city attorney on issues associated with The Parks development. Up to that point, the City had not billed The Parks but, as Wood wrote: "If, City chooses to pass applicable direct costs for legal counsel along to Developer (as billed to City by City Attorney or legal counsel) all such billings should be paid prior to City's *acceptance* of the project." (Morasch Decl., Ex. I at 1-2.) A few weeks later, the City expressed its intent to bill Plaintiff for the legal fees incurred up to that point. (Morasch Decl., Ex. I at 3.) In an email string that began in October 2005 regarding The Parks development, Wood referred to Plaintiff as having been "a [pain]," pointed out to his colleagues that The Parks' attorney had been included on the email string and contemplated "forwarding any such communications to [the] City's legal counsel[.]" *Id.* at 4-5. In a January 3, 2006, email string between Vanderkin and Wood, Wood wrote that he may be "fishing," but believes the City was correct in "not issuing building permits . . . until *all* required improvements have been completed and respectively accepted[.]" (Morasch Decl., Ex. D at 3.) He also wrote that he was

thinking about whether the City could legally "hold up building permits if off-site (Thatcher Rd to be specific) public improvements are not completed." *Id.* Vanderkin agreed that the City was correct in withholding the permits until the completion of improvements. *Id.*

On March 3, 2006, Wood sent an email to McDonald in which he made four specific representations. First, Wood wrote that "[o]nly *one* utility (assuming sanitary sewer) can be located into a 15-foot wide easement. If *two* utilities are installed the minimum easement width would increase to 20-feet. . . . A 10-foot wide utility easement (substituting as the PUE) is required for dry utilities. Altogether, this translates to a minimum easement width of 30-feet for public utility installation." (Morasch Decl., Ex. A at 20.) Second, Wood informed McDonald that the fire department requires a right of way on top of the utility easement, including a turn around, "with a minimum travel-way width of 20-feet (excluding support shoulders)." *Id.* Third, Wood told McDonald that the "City will need your design proposal for constructing an interim half-street improvement, along David Hill Road, that will have sufficient width to structurally and safely support two lanes of traffic." *Id.* at 21. Fourth, Wood pointed out that the "current traffic study" assumed that a second public access would be available at the intersection of David Hill Road and Brooke Street. In the event that only one public access was actually available, Wood informed McDonald that an updated traffic study would be required. *Id.*

According to Plaintiff, the March 3, 2006, email was the first time the City communicated its demand for a twenty-foot emergency access on Brooke Street; it was also the first time the City could have approved a fifteen-foot temporary emergency access instead. (Pl.'s CSMF ¶ 29.) Charles Marble testified by affidavit that when he was employed by the City as assistant fire chief, "the City approved, on a temporary basis, a 15-foot-wide secondary emergency access road that was over

1,600 feet long and had 20-foot-wide pullouts every 300 feet for the Summit Pointe subdivision." (Marble Aff. ¶ 3.) The email was also the first mention that the City required a twelve-foot-wide median in the center of David Hill Road. (Pl.'s CSMF ¶ 32.) Foster testified that it did not seem fair that Plaintiff was required to dedicate thirty-seven feet for median width, while Oak Hill Settlement was required to dedicate only thirty-three. (Morasch Decl., Ex. B at 5.) At deposition, Wood testified that the decision had been by "people above [him]," though he could not recall the identities of those people. *Id.* Also, according to the testimony of Foster, a city employee, the City "may have allowed two utilities in a 15-foot easement before," but that it was not ideal and would only be allowed on a temporary basis. (Pl.'s CSMF ¶ 28.) Hankins, lead project manager on The Parks development, testified that "[t]here was no need to run dry utilities along Brooke Street until the neighboring property owner (Oak Hill Settlement) decided to develop." (Hankins Aff. ¶ 4.) The same was true for the water connection. (Hankins Aff. ¶ 5.) Hankins also stated in his affidavit that the delays in the erosion control plan and proper grading of the site were occasioned by the City, not Plaintiff. (Hankins Aff. ¶ 6.)

In April 2006, Plaintiff received final bids from all interested developers. Plaintiff chose "Venture Properties (Venture) and signed an open ended purchase and sales agreement . . . to purchase 215 or 217 lots for $27,950,000 . . ." with an open-ended time frame for delivery and closing. (McDonald Aff. ¶ 6.) After the delays caused the market value of the lots to drop, Plaintiff ultimately sold 132 lots to Venture for approximately $16,425,000. (McDonald Aff. ¶ 7.)

On May 15, 2006, the parties entered into a Public Improvements Contract associated with The Parks development. (Defs.' CSMF ¶ 9.) The agreement stated: "Upon completion and acceptance the public improvement will become the property of the City and therefore must conform

OPINION AND ORDER                              12                                    {KPR}

to existing City standards." (Kuhn Aff., Ex. L at 1.) Further, the "City shall issue to Developer a permit allowing developer to construct the project subject to the terms and conditions contained in this Agreement and further subject to any special conditions specified in the attached Exhibit 'B.'" *Id.* (emphasis omitted). In general, the agreement required compliance with "current City Master Plans and Transportation System Plan[,]" as well as "the current standards and specifications of CWS, as may be modified or amended by the City," *Id.* at 2. It also contained a clause that integrated all prior agreements and governed future modifications. *Id.* at 12. Exhibit B to the agreement outlined special conditions that governed development of The Parks, in particular that "[a]ll work shall conform (as applicable) to . . . [t]he approved plans and specifications designed and prepared by LDC Design Group, Inc, of Hillsboro, Oregon," *Id.* at 14. McDonald testified that, despite ongoing problems with Defendants, Plaintiff signed the agreement to keep the project moving forward. (McDonald Depo. 102:21-103:3.)

According to the deposition testimony of Wood and Foster, the City took issue with the judgment of Plaintiff's engineers regarding the trunk sewer alignment and considered Plaintiff's ideas unimpressive and not "completely thought through." (Pl.'s CSMF ¶ 21.) Wood and Foster also exchanged emails about the prospect of talking to *The Oregonian* about The Parks development. Wood wrote that "given the current situation[,]" it wouldn't be a good idea to talk to the media at this point and also that he and Foster should discuss "the Brooke Street matter" prior to doing so. (Pl.'s CSMF ¶ 23.) The Brooke Street matter involved connecting "sewer and water through Brooke Street to satisfy the preliminary plat approval conditions" as well as the subdivision's need for "a second access for emergency vehicles only." (Pl.'s CSMF ¶ 24.)

In the midst of the planning process, Plaintiff sought to divide the project into two phases,

purportedly to resolve an issue with wetlands and, thus, avoid delay. Wood testified that Plaintiff's request for phasing passed through "community development" and was denied at that point. *Id.* at 9. Prior to this, developers Huttala and Spiesschaert had been permitted to "split their first phase into two construction phases . . . ." (Pl.'s CSMF ¶ 14.) At deposition, Wood recalled two developments in which a developer was permitted to split a single phase into two phases, specifically Oak Hill Settlement and Pacific Grove. He also stated, however, that "once [a development] is approved as a subdivision," any changes, including a phase split, "would have to be resubmitted completely" and "reevaluated by staff and Council." (Morasch Decl., Ex. A at 2-4.) However, Reitz, also in the planning division, testified that splitting a single phase development into two phases would not be an "issue," nor would it require planning approval because it was an issue for the engineering department. (Morasch Decl., Ex. C at 3.) Holan also testified that phasing was "[p]rimarily an engineering issue." (Morasch Decl., Ex. H at 3-4.)

Wood testified at deposition that a project similar to The Parks would typically take six or seven months. (Morasch Decl., Ex. A at 5.) In his opinion, the project was delayed for four reasons: "(1) difficulties in establishing the trunk sewer alignment; (2) issues related to David Hill Road and Brooke Street; (3) issues relating to the wetland crossing; and (4) issues pertaining to the Early Grading Permit and Stop Work Order." (Pl.'s CSMF ¶ 43.) Wood admitted that, after the stop work order was lifted, these issues caused no further delay, nor were there additional issues that caused delay. *Id.*

On February 13, 2007, Wood sent an email to McDonald and others regarding "newly installed trees[] along David Hill Road . . . ." (Morasch Decl., Ex. F at 1.) The email advised McDonald that the trees did not comply with a requirement that branches have a minimum height

of six feet and, therefore, must be removed and replaced with compliant trees. *Id.* McDonald testified that Defendants did not require that identical trees, similarly non-compliant, owned by Huttala/Speisschaert be removed and replaced. (McDonald Aff. ¶ 12.)

According to Martin, an LDC employee, although there were abnormal delays in reviewing and approving development plans, he did not witness or experience specific instances where he or others were treated differently or unfairly. Hankins testified that although he felt that the delays were unfair to Plaintiff, they were not of a personal nature. He stated that things became "heated" between Plaintiff and Defendants and it was a very "rough job," but that Defendants' actions were not retaliatory. He felt that rights-of-way and utility issues should not have been problematic, but dealing with Huttala and the Forest Grove School District created problems. (Kuhn Aff., Ex. R.)

As of April 2009, Plaintiff had sold approximately 193 lots and earned a net profit of approximately $4 million. "Additionally, Plaintiff still holds [twenty-four] lots which it eventually intends to sell." (Defs.' CSMF ¶ 16.) Plaintiff claims extensive damages arising from delay and increased construction requirements caused by the allegedly unlawful requirements imposed by the City. In addition to the alleged drop in the purchase price paid by Venture, Plaintiff also allegedly incurred additional interest payments on its loan, amounting to approximately $1,540,000, as a result of the delays. Plaintiff also claims additional unjustified costs of $300,000 paid to Huttala and Speisschaert for a right-of-way, $105,000 in additional construction costs, and $170,000 to install an electrical line along David Hill Road, though the same requirement was not made of Huttala and Speisschaert. (McDonald Aff. ¶ 10-11.) Finally, Plaintiff incurred additional costs when Defendants belatedly ordered construction of improvements along the south side of David Hill Road, rather than the north side, after construction of David Hill Road was already completed. (McDonald Aff. ¶ 14.)

<u>Discussion</u>

*Defendants' Motion for Summary Judgment*

I.    Contract Claim

Defendants argue that the dispute with Plaintiff should be governed by the parties' May 2006 public improvements contract. According to Defendants, "[t]he purpose of the public improvements contract was to have Plaintiff install the necessary public utility and transportation infrastructure to serve the proposed residential development and provide connectivity with existing and future public facilities." (Defendant's Memorandum ISO Motion For Summary Judgment ("Def.'s SJ Memo.") 4.) Upon completion, the contract provided that Plaintiff would return ownership of the improvements to the City, which would then be responsible for maintenance of the improvements. Defendants state that the contract ultimately agreed upon was the result of a series of drafts and revisions, and that the final document included an integration clause which guaranteed that prior agreements between the parties were no longer binding, to the extent they were not included in the public improvements contract. The clause stated, in full:

> All of the terms and provisions of this agreement are fully set forth herein, and no prior understanding or obligation not expressly set forth in this agreement shall be binding upon the parties, and no subsequent modification of this agreement shall be binding upon the parties unless it is in writing and executed with the same formalities as this agreement. Non-waiver by either party of any breach of any obligation of the other party shall not operate or be considered as a waiver of any other or subsequent breach.

(Kuhn Aff., Ex. L at 12.) Thus, Defendants contend, Plaintiff may recover only under the terms of this contract and claims arising from the preliminary plat approval are moot.

Plaintiff argues that the public improvements contract had the narrow purpose of ensuring that Plaintiff completed the agreed-upon improvements. Thus, the integration clause must be

construed with that narrow purpose in mind. Furthermore, Plaintiff argues that the City's duty to observe Plaintiff's constitutional rights is not an "understanding or obligation" that can be avoided by a contract term. Defendants object to Plaintiff's characterization of the scope of the public improvements contract. First, Defendants claim that the only evidence to this effect that Plaintiff provides is a single line from Wood's deposition. Second, Defendants argue that the contract should be interpreted on its face and that it does not limit its scope to ensuring that the improvements are completed.

The document, containing the integration clause quoted above is titled "Agreement Allowing Developer to Construct Public Improvement," *Id.* at 1. The general recitals state that the developer will "construct public improvements on property" within city limits and "[u]pon completion and acceptance the public improvement will become" city property. *Id.* The contract provides that, to the extent the project involves "streets, storm drainage, sanitary sewer or waterlines, the design shall incorporate all required elements of current City utility Master Plans and Transportation System Plan." *Id.* at 2.

As Defendants term it, this is a turnkey contract, wherein the improvements are turned over to the City upon completion for ownership and maintenance. Additionally, Exhibit B to the contract also states that the improvements "shall conform (as applicable) to . . . [t]he approved plans and specifications designed and prepared by LDC Design Group, Inc. of Hillsboro, Oregon." *Id.* at 14. Both the nature of the contract and the fact that it incorporates plans and specifications already approved in the course of the permitting process contravenes Defendants' interpretation that Plaintiff's claims are controlled by the contract. Defendants provide no further analysis to explain why the contract undermines Plaintiff's claims. Secondly, as Plaintiff points out, the contract

Defendants rely on does not purport to release Defendants from their duty to observe Plaintiff's constitutional rights. In sum, the public improvements contract bears on disposition of Plaintiff's claims but is not dispositive of any of those claims and does not preclude Plaintiff's constitutional claims.

## II.   Takings

### A.   Ripeness

Defendants argue, as a preliminary matter, that Plaintiff's federal takings claim is not ripe. Defendants cite *State v. Kennedy*, 295 Or. 260, 262, 666 P.2d 1316 (1983) for the proposition that "all questions of state law be considered and disposed of before reaching a claim that this state's law falls short of a standard imposed by the federal constitution on all states." (Citations omitted.) Next, Defendants argue that, in order to state a takings claim under state law, Plaintiff must have "pursued and been denied just compensation under the applicable state compensatory procedures." (Defs.' SJ Memo 8.) In support, Defendants cite *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895 (9th Cir. 2007), in which the Ninth Circuit stated: "We require exhaustion of administrative remedies in the takings context as a matter of ripeness: Because the Takings Clause only prohibits the taking of property without just compensation, a takings claim is not ripe until the claimant has pursued and been denied just compensation under the applicable state compensatory procedures." *Id.* at 900.

Defendants do not identify which state compensatory procedures are available to Plaintiff, though presumably they refer to litigation in state court. Defendants write: "Because Plaintiff has not litigated its State Inverse Condemnation claim to finality, there is no Fourteenth Amendment deprivation." (Defs.' SJ Memo. 9.) As Plaintiff points out, it originally filed its claims in state court

and Defendants removed the action to federal court. Plaintiff otherwise agrees that the court must

first address the state takings claim and, in the event it finds no taking has occurred under state law,

the federal claim ripens and the court may address the claim at that time.

As Defendants offer no intermediate state administrative procedures that should have been

pursued by Plaintiff, outside of litigation in state court–which Plaintiff's initiated–the court agrees

that Plaintiff's federal claim becomes ripe should it fail under the requirements of the Oregon

Constitution.

B.    *Legal Standards*

The United States Constitution prohibits the taking of private property by the government

without just compensation. *See* U.S. CONST. amend. V (". . . nor shall private property be taken for

public use, without just compensation."). Application of this principle to a physical taking is fairly

straightforward. "When the government physically takes possession of an interest in property for

some public purpose, it has a categorical duty to compensate the former owner, regardless of whether

the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra*

*Preservation Counsel v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002). By contrast,

the Supreme Court has characterized analysis of regulatory takings by government as "essentially

ad hoc, factual inquiries . . . ." *Penn Central v. New York City*, 438 U.S. 104, 124 (1978). The Court

gave further guidance as to such inquiries: "The economic impact of the regulation on the claimant

and, particularly, the extent to which the regulation has interfered with distinct investment-backed

expectations are, of course, relevant considerations. So, too, is the character of the governmental

action." *Id.* (internal citation omitted).

The Oregon Constitution also proscribes government takings without compensation and

states: "Private property shall not be taken for public use . . . without just compensation . . . ." OR.

CONST. Art. I, Sec. 18. With regard to physical takings of private property, "Oregon law is identical

to Fifth Amendment 'physical' takings law." *Hoeck v. City of Portland*, 57 F.3d 781, 787 (9th Cir.

1995) (citing *Ferguson v. City of Mill City*, 120 Or. App. 210, 207 (1993)). With regard to

regulatory takings, however, Oregon law provides less protection to property owners than that

protection provided by the Fifth Amendment of the United States Constitution. *Id.* at 788.

A government may also effect a taking when it conditions development upon compliance

with a specific requirement. That is, "[u]nder the well-settled doctrine of 'unconstitutional

conditions,' the government may not require a person to give up a constitutional right . . . in

exchange for a discretionary benefit conferred by the government where the benefit sought has little

or no relationship to the property." *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994). In *Dolan*,

the court was referring to the right to be compensated for the taking of private property for public

use under the federal constitution. Thus, under such circumstances, where the government

conditions full use of private property on certain accommodations of the public interest by the

property owner, the court must determine whether the requested accommodation is sufficiently

related to the property in question to permit imposition of such condition.

The Court described the first step of this inquiry as "determin[ing] whether the 'essential

nexus' exists between the 'legitimate state interest' and the permit condition exacted by the city."

*Id.* at 386 (quoting *Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837 (1987)). If this

requirement is met, the court must then consider whether the expected impact of the development,

contrary to the public interest, bears some equivalence to the condition that burdens the landowner,

consistent with the public interest. The standard used to determine whether the exacted

requirements, which are termed "exactions," result in takings is one of "rough proportionality." In

*Dolan*, the Court wrote:

> We think a term such as "rough proportionality" best encapsulates what we hold to
> be the requirement of the Fifth Amendment. No precise mathematical calculation is
> required, but the city must make some sort of individualized determination that the
> required dedication is related both in nature and extent to the impact of the proposed
> development.

512 U.S. at 391.

Furthermore, the official entity that conditioned the development must carry the burden of

establishing compliance with the Fifth Amendment. *See J.C. Reeves v. Clackamas County*, 131 Or.

App. 615, 618 (1994) ("the 'burden' of showing compliance with the applicable Fifth Amendment

standard 'properly rests' on the governmental body that has 'made an adjudicative decision' to place

conditions on the approval of a permit for the development of particular property." (quoting *Dolan*,

at n.8)). The findings made by the governmental entity regarding the relationship between the

impact of development and the related exaction must be of "considerable particularity" to meet this

burden. *J.C. Reeves*, 131 Or. App. at 618.

In *J.C. Reeves*, the petitioner sought review of an administrative decision that approved an

application for development, but attached specific conditions to its approval. As to one condition,

the court remanded the determination to the county for lack of sufficient specificity where, in the

court's estimation, the county "simply posit[ed] the relationship between subdivision-generated

traffic and the need for the improvements." *Id.* at 622. As to another condition, the court found the

*Dolan* requirement satisfied:

> Little could seem clearer than that the location of a 21-lot subdivision with an
> internal roadway can have profound impacts on access and traffic. Here, the
> subdivision will necessitate the placement of a new street in proximity to the

southerly property, as well as the extension of an existing street to intersect with the new one. The hearings officer's findings are amply sufficient to demonstrate the requisite proportionality between the impact of the subdivision and the condition that the strip be eliminated. The condition is an appropriate device for providing the adjacent property with the access that the proposed development would otherwise eliminate or impair.

*Id.* at 323-24. The Oregon Court of Appeals concluded that the administrative findings were sufficiently specific to allow the court to determine that the relationship between the impact and the condition were roughly proportional and *Dolan*'s requirement was thus met.

Where the regulation in question is a zoning regulation, analysis under the Oregon Constitution diverges from that analysis applied under the United States Constitution. The Oregon Supreme Court has held that if "a zoning designation allows a landowner *some substantial beneficial use* of his property, the landowner is not deprived of his property nor is his property 'taken,'" *Dodd v. Hood River County*, 317 Or. 172, 182 (1993) (quoting *Fifth Avenue Corp. v. Washington County*, 282 Or. 591, 609 (1978)) (emphasis in original). Such a claim is often referred to as a taking by inverse condemnation. *See Boise Cascade Corp. v. Board of Forestry*, 325 Or. 185, 197-98 (1997) (the court described the test for inverse condemnation: "The property owner must show that the application of the government's particular choice deprives the owner of all economically viable use of the property. If the owner has 'some substantial beneficial use' of the property remaining, then the owner fails to meet the test." (citing *Dodd*, 317 Or. at 184-86).)

Oregon courts have also recognized that a "temporary taking" may be compensable under certain circumstances. That is, "a 'temporary' taking of all economic use of a piece of property may constitute a 'taking' under the pertinent provisions of the state and federal constitutions." *Boise Cascade*, 325 Or. at 199. However, a regulation giving rise to a temporary taking must, on its face,

"prevent[] the owners from making *any* economic use of the property in question." *Id.* (emphasis in original). The court explained:

> We hold that, in order to assert a claim for a 'temporary taking' under the Oregon Constitution, the complaining party must allege that it has been denied all economic use of its property under a law, ordinance, regulation, or other government action that either is permanent on its face or so long lived as to make any present economic plans for the property impractical.

*Id.*

Furthermore, under Oregon law, a government action must be intentional in order to qualify as a taking without just compensation. The Oregon Supreme Court "long has held that a claim for inverse condemnation requires a showing that the governmental acts alleged to constitute a taking of private property were done with the intent to take the property for a public use," *Vokoun v. City of Lake Oswego*, 335 Or. 19, 27, 56 P.3d 396 (2002) (citing *Gearin v. Marion County*, 110 Or. 390 (1924)). However, the requisite intent may be established via inference, that is "the fact-finder may infer the intent-to-take element of a claim for inverse condemnation from the natural and ordinary consequences of the government's act," *Vokoun*, 335 Or. at 28 (citing *Morrison v. Clackamas County*, 141 Or. 564, 18 P.2d 814 (1933)).

Although Plaintiff generally frames its takings claim in the language and analysis of *Dolan*, Defendants point out that, under Oregon law, takings claims are not analyzed under *Dolan*, which applies only to inverse condemnation in violation of the United States Constitution. As a general matter, Oregon courts recognize that the criteria for evaluating takings under the Oregon Constitution are different than those used for claims arising under the United States Constitution. *See Schoonover v. Klamath County*, 105 Or. App. 611, 614, 806 P.2d 156 (1991) ("The Oregon Supreme Court has observed that the 'basic thrust' of the two constitutional provisions 'is generally the same' but has

cautioned that the 'criteria' used to determine if a 'taking for public use' has occurred within the meaning of the Oregon Constitution 'are not necessarily identical to those pronounced from time to time by the United States Supreme Court under the fifth amendment.'" (citing *Suess Builders v. City of Beaverton*, 294 Or. 254, 259 n.5, 656 P.2d 306 (1982))).

Further, the distinction advanced by Defendants was implicitly recognized in a recent Oregon Court of Appeals decision. In *Homebuilders Assoc. of Metropolitan Portland v. Tualatin Hills Park*, 185 Or. App. 729, 62 P.3d 404 (2003), the plaintiffs alleged an exaction, and thus a taking, had occurred when, in order to develop their property, the recreational district required them to pay a system development charge. This charge amounted to "a one-time fee imposed by a government unit on new developments, used to help offset financial costs resulting from the growth associated with those new developments." *Id.* at 731. The court first analyzed the claim under the Oregon Constitution and concluded that, because the regulation did not "render[] the real property devoid of all economically viable use[,]" the fee did not amount to a taking. *Id.* at 734. The court went on to analyze the parallel federal constitutional takings claim under the "rough proportionality" test set forth in *Dolan*. As *Homebuilders* makes clear, the analyses are distinct and should be treated as such. Accordingly, the court will analyze Plaintiff's takings claims first under the state framework and second under the federal framework.

Here, Plaintiff asserts four takings associated with the development in question, each of which falls into the category of "exactions," and is thus subject to analysis under *Dolan*. Plaintiff does not dispute that the exactions contained in the preliminary plat agreement were legitimate. Rather, Plaintiff objects to the expansion of the exactions in the final permit as inconsistent with what was in the preliminary plat agreement. Plaintiff also contends that Defendants failed to justify

the expanded exactions under the "rough proportionality" analysis in each case.

C.    *State takings analysis*

Oregon law dictates that a regulatory taking occurs only when a property owner is deprived of all beneficial use of its property by the government's allegedly unlawful actions. Here, Plaintiff was able to complete the development and sell the majority of the parcels of land. As Plaintiff admits, sales to date have netted approximately $4 million in profit. Accordingly, Plaintiff was not deprived of all beneficial use of the property and, thus, Plaintiff's state takings claim fails. Defendants' motion for summary judgment as to this claim is granted.

D.    *Federal takings analysis*

1.    The Fruits Affidavit

As a preliminary matter, Defendants move to strike[4] the affidavit of Eric Fruits ("Fruits") on the ground that rough proportionality analysis, of which the affidavit is primarily concerned, is irrelevant at the summary judgment stage. Furthermore, Defendants argue, this is a legal question upon which Fruits cannot testify and, were it an issue, it would be for the court to decide. Plaintiff argues that the Ninth Circuit has held that the question of rough proportionality is "a mixed question of fact and law," that may be put to a jury. *Del Monte Dunes v. City of Monterrey*, 95 F.3d 1422, 1430 (9th Cir. 1996) (*Del Monte II*). In that case, "the issue submitted to the jury was largely a reasonableness inquiry; whether the government's actions are 'reasonable' is often a jury issue." *Id.* (citing *Chew v. Gates*, 27 F.3d 1432, 1443 (9th Cir. 1994); *Parks v. Watson*, 716 F.2d 646, 654 n.4 (9th Cir. 1983)).

---

[4] Defendants also move to strike Paragraph 9 of Roy Hankins's affidavit on the ground that it contains inadmissible hearsay. The court does not rely on that evidentiary submission and, thus, need not rule on its admissibility at this point.

The court agrees with Plaintiff that this presents an issue of both law and fact. At summary judgment, the court must evaluate whether a reasonable jury could find that the exactions were not "roughly proportional" to the legitimate public purpose for which they were exacted. The court is not called upon to determine whether or not the exactions met the applicable standard but only to determine whether there is a genuine issue of material fact sufficient to put before a jury.

However, the court may not consider evidence that is otherwise inadmissible. Here, the Fruits affidavit purports to be lay witness testimony admissible under Federal Rule of Evidence ("FRE") 701. FRE 701 provides that a lay witness may provide opinion testimony so long as it is: "(a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EV. 701 (2009). It is clear from the affidavit that Plaintiff retained Fruits because his expertise in the area of real estate valuation purportedly makes him competent to testify specifically on the issue of rough proportionality. *See* Fruits Aff. ¶ 4 ("I have been retained by Plaintiff in the matter to evaluate damages and *Dolan*-type rough proportionality issues . . . at an hourly rate of $250[.]"). The affidavit states that Fruits is the president of a consulting group that "focuses on economics, finance, and statistics," (Fruits Aff. ¶ 2.) Fruits is also a professor at Portland State University who "teach[es] courses in real estate finance and investments, urban economics, and state and local public finance." *Id.*

The testimony offered by Fruits falls outside the ambit of that admitted under FRE 701 and is instead governed by FRE 702. On the record before it, the court cannot conclude whether Fruits is an expert and, thus, cannot admit the testimony under FRE 702. Furthermore, even if Fruits

qualified as an expert, his affidavit offers only legal conclusions and does not provide a foundation, factual or otherwise, upon which the court can evaluate those conclusions and, for this additional reason, is inadmissible. *See Nationwide Transp. Fin. v. Cass Info. Sys.*, 523 F.3d 1051, 1058 (9th Cir. 2008) ("'That said, an expert witness cannot give an opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law.'") (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (internal citations and quotation marks omitted)). Accordingly, Defendants' motion to strike the Fruits affidavit is granted.

### 2.    Exactions

In general, Defendants contend that there are no "exactions" upon which to apply the rough proportionality test because the actions Plaintiff alleges were "exactions" were actually legislative determinations that applied to a general area and not "adjudicative, individual determinations conditioning permit approval on the grant of property rights to the public." *McClung v. City of Sumner*, 548 F.3d 1219, 1226 (9th Cir. 2008). Plaintiff maintains that the alleged exactions were specific to Plaintiff and, thus, are subject to rough proportionality analysis.

First, Plaintiff challenges the city's requirements that it "include an extra four feet in right-of-way width along David Hill Road." (Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp. Memo.") at 25.) This requirement, Plaintiff claims, is contrary to the right-of-way included in the preliminary plat approval, which "required a [thirty-three] foot wide right-of-way dedication on David Hill Road," but was increased to thirty-seven feet "during the construction permitting process[.]" *Id.* at 25-26. Defendants claim that this requirement, like the other alleged exactions, was actually imposed under the City's Transportation System Plan ("TSP") and, thus, could not amount to exactions. Defendants cite to a portion of the plan itself but

the cited portion does not appear to support Defendants' argument, and Defendants do not provide additional analysis to explain their evidentiary support. As Plaintiff points out, Defendants bear the burden of demonstrating compliance with the rough proportionality standard. Because Defendants neither substantiate the claim that this exaction was actually a part of the TSP, nor perform the rough proportionality analysis, there is a genuine issue of material fact as to whether this requirement was a compensable taking under the Fifth Amendment.

Second, Plaintiff challenges the additional right-of-way construction requirements imposed by the City, namely extra pavement width, the extension of the electrical trunk line, and construction of a central median. Again, Defendants provide no rough proportionality analysis and rely on the premise that all requirements were included in the TSP and, thus, cannot be compensable takings. Therefore, for the reasons stated above, there is a genuine issue of material fact as to whether this requirement was a compensable taking under the Fifth Amendment.

Third, Plaintiff challenges Defendants' requirement that it obtain a utility easement involving Brooke Street at a cost of $405,000, despite the fact that the preliminary plat approval authorized a temporary utility easement from the school district. Defendants later refused to allow the placement of utilities pursuant to a temporary easement. Again, Defendants provide no rough proportionality analysis and rely on the premise that all requirements were included in the TSP and, thus, cannot be compensable takings. Therefore, for the reasons stated above, there is a genuine issue of material fact as to whether this requirement was a compensable taking under the Fifth Amendment.

Fourth, Plaintiff challenges the required improvements along David Hill Road where the road abuts school district property which created additional staging costs after David Hill Road had already been constructed. Again, Defendants provide no rough proportionality analysis and rely on

the premise that all requirements were included in the TSP and, thus, cannot be compensable takings. Therefore, for the reasons stated above, there is a genuine issue of material fact as to whether this requirement was a compensable taking under the Fifth Amendment.

Accordingly, Defendants' motion for summary judgment on Plaintiff's federal takings claim is denied.

III.    First Amendment Retaliation

A.    *Legal Standard*

Plaintiff alleges that Defendants retaliated against it when it exercised its First Amendment right "to petition the Government for a redress of grievances." U.S. CONST. amend. I. Specifically, Plaintiff alleges that it was retaliated against for "refus[ing] to extend the sewer to the north, rather than the west," contrary to the wishes of the City, but consistent with the City's master sewer plan. (Complaint 2-3.)  Plaintiff claims that Defendants took several retaliatory actions including increasing the right of way dedication on David Hill Road by several feet; requiring a half-street improvement on David Hill Road next to property owned by the school district; holding in abeyance Plaintiff's sewer plan; and refusing to approve a temporary easement for utility installation related to Brooke Street, among others detailed below.

Defendants assert that this claim must be analyzed under the same framework that governs a claim raised by an employee of a public entity against its employer. Defendants cite *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917 (9th Cir. 2004) for this proposition. In that case, the Ninth Circuit wrote:

> When a business vendor operates under a contract with a public agency, we analyze its First Amendment retaliation claim under § 1983 using the same basic approach that we would use if the claim had been raised by an employee of the agency.

> Accordingly, the contractor must establish that (1) it engaged in expressive conduct that addressed a matter of public concern; (2) the government officials took an adverse action against it; and (3) its expressive conduct was a substantial or motivating factor for the adverse action.

*Id.* at 923 (internal citations omitted). If this burden is met, the government may still avoid liability under the balancing test set forth in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968), or mixed motives analysis set forth in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Plaintiff counters that this case concerns not a contract for services, but a regulated entity raising a claim against a regulatory authority. Analysis of a First Amendment claim in the context of this relationship differs from analysis of that of a government employee in that it does not require that the speech be a matter of public concern, nor does it implicate either the *Pickering* balancing test or the *Mt. Healthy* mixed motives analysis. Rather, a regulated entity seeking to establish retaliation

> for the exercise of constitutionally protected rights must initially show that the protected conduct was a "substantial" or "motivating" factor in the defendant's decision. If the plaintiff makes this initial showing, the "burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct." To meet this burden, a defendant must show by a preponderance of the evidence that it *would* have reached the same decision; it is insufficient to show merely that it *could* have reached the same decision.

*Carepartners LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008) (emphasis in original) (quoting *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314-1315 (9th Cir. 1989)). In *Carepartners*, the court distinguished the claim of a regulated entity from that of a public employee. "Analysis of a government employee's speech-based retaliation claim is similar to speech-based retaliation claims by regulated entities . . . but adds two additional criteria[,]" namely that the speech be related to a

matter of public concern and the *Pickering* balancing test. 545 F.3d at 880.

The key question, then, is whether the relationship between Plaintiff and Defendants was that of "a business vendor operat[ing] under a contract with a public agency," *Alpha Energy*, 381 F.3d at 923, or a regulated entity and a regulating agency, *Carepartners*, 545 F.3d at 877. The court concludes that the relationship was that of a regulated entity and a regulating agency. First, there was no employment relationship between Plaintiff and Defendants. Second, the contract between the parties did not involve the provision of services by Plaintiff in exchange for compensation by Defendants. Third, Plaintiff sought permission from Defendants to develop its property, i.e., the relationship between the parties was governed by the permitting process. Defendants argue that Plaintiff, at least in part, acted as a public improvement contractor and that its claims "revolve around its obligations to construct public improvements to City standards." (Def's Reply 9.) The court disagrees that the claims arise solely from the public improvements contract. Rather, the claims arise from the permitting process, in particular, the events occurring between issuance of the preliminary plat approval and the public improvements contract. Furthermore, even if the claims were governed solely by the public improvements contract, it would not convert the parties' relationship into one of business vendor and contracting agency. Accordingly, the court applies the analytical framework set out by Plaintiff.

B.    *Analysis*

Plaintiff must show that its refusal to comply with the City's demands regarding the sewer trunk line, i.e., its petition for redress of grievances, was a substantial or motivating factor in Defendants' allegedly retaliatory conduct, namely, delaying and otherwise frustrating the goals of Plaintiff with regard to The Parks. To establish retaliatory motive, a plaintiff must prove the

defendant had knowledge of the protected conduct, as well as: "(i) establish proximity in time between [the plaintiff's] expressive conduct and the allegedly retaliatory actions; (ii) produce evidence that the defendants expressed opposition to his speech, either to him or to others, or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual." *Alpha Energy*, 381 F.3d at 929 (citing *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003) and *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751-752 (9th Cir. 2001)).

Defendants argue that "Plaintiff's informal insistence on contractual rights does not amount to a petition of grievances . . . ," Defs.' SJ Memo. 12, and thus Plaintiff cannot state a prima facie case for this claim. Defendants cite three cases in support of this proposition. The first, *Alpha Energy*, addressed "the scope of constitutional protection afforded to public contractors who serve as witnesses in judicial and administrative proceedings." 381 F.3d at 920. In that case, a public contractor had agreed to testify against the agency in a federal discrimination suit and had initiated an investigation by the county on his own behalf regarding unfair treatment. The court found that this was "expressive conduct," relevant to the analysis of a retaliation claim by an entity operating under a contract with the agency. This case differs from the present case, for the reasons articulated above, namely, that the Plaintiff is not in a contract for services with Defendants, but rather is a regulated entity seeking redress from a regulating agency.

The second case cited by Defendants, *Rendish v. City of Tacoma*, 123 F.3d 1216 (9th Cir. 1997), involved a city employee seeking redress under section 1983 for violations of her First Amendment right to free speech. Again, a different standard applied there because there the parties had an employment relationship. Accordingly, the *Rendish* court's conclusion that the right to

petition, like the right to free speech, must implicate a matter of public concern to qualify for protection under section 1983 is inapplicable here.

The third case cited by Defendants is the only case cited that employs the analytical framework applicable to the present case. In *Soranno's Gasco, Inc. v. Morgan*, the plaintiffs alleged that the defendants retaliated against them for "publicly criticizing the defendants and initiating litigation against them." 874 F.2d at 1313. There, the plaintiffs owned a business "selling and distributing petroleum products in central California." *Id.* at 1312. The plaintiffs' plants "operated under permits issued by" local regulatory entities. *Id.* Mr. Soranno publicly criticized the regulatory entities at public hearings and through litigation and, subsequently, the permits were cancelled. Based on the circumstances of the regulatory entities' actions, the court stated: "It is clear that 'state action designed to retaliate against and chill political expression strikes at the heart of the First Amendment.'" *Id.* at 1314 (quoting *Gibson v. United States*, 781 F.2d 1334, 1338 (9th Cir. 1986)). The court determined that both public criticism and initiation of litigation qualified as protected conduct for purposes of a retaliation claim.

Plaintiff cites *Carepartners* for the proposition that "the right to insist that public officials comply with the law in the regulatory context is conduct protected by the First Amendment." (Pl.'s Opp. Memo. 33.) In *Carepartners*, the plaintiff engaged in five actions that the district court identified as falling "within the First Amendment's protection of the rights to free speech and to petition for a redress of grievances." 545 F.3d at 876. The actions included pursuing an administrative appeal, lobbying the legislature, "advocacy related to his interpretation of the building codes[,]" statements to the press, pursuit of administrative review, and a stay of his license revocation. Here, Plaintiff argues that it "exercised [its] right by repeatedly insisting that the City

regulators comply with the City's Sanitary Sewer Master plan and other codes regulating the location of the sewer and trunk line through The Parks subdivision." (Pl.'s Opp. 33.) Under *Carepartners*, the First Amendment protects this right to insist on proper application of the law by public officials. Thus, there is a question of fact whether Plaintiff engaged in protected speech when it objected to the requirements imposed by Defendants after issuance of preliminary plat approval and insisted that Defendants comply with applicable permitting codes.

Next, Defendants argue that Plaintiff did not suffer adverse retaliatory action because, although Plaintiff has a right to air its grievances, it does not have a right to redress of its grievances if they are not legitimate. According to Defendants, the public improvement contract governs the rights of the parties because, in signing the agreement, Plaintiff agreed to its conditions, including those that were contrary to the requirements contained in the preliminary plat approval. Defendants assert that the preliminary plat approval was conceptual only and subject to more definite specifications prior to final approval. Therefore, Defendants argue, they acted appropriately in withholding final approval pending Plaintiff's compliance with all of the City's conditions. In the event the court finds there was adverse action, Defendant argues that Plaintiff cannot prove a retaliatory motive because, first, Plaintiff proffers only conclusory allegations and, second, alleged retaliation preceding the protected act cannot act as evidence of retaliatory motive. Defendant provides no analysis of these arguments, however.

Plaintiff argues that it may prove retaliatory motive by direct or circumstantial evidence and that an inference may be drawn in light of the circumstances surrounding the City's actions. Plaintiff contends that "Defendants were unhappy and frustrated with [P]laintiff's refusal to capitulate to the City's demands for the sewer. The timing of the City's other unlawful demands (like the width and

configuration of David Hill Road, and the Brooke Street easement issues) demonstrates an inference of retaliation," (Pl.'s Opp. 35.) Because of the highly factual nature of the dispute, this question should be decided by a jury.

Plaintiff cites *Soranno's Gasco* in which the court recognized that where a reasonable "fact finder could infer a retaliatory motive," summary judgment is inappropriate. 874 F.2d at 1315. In that case, the county suspended a "vapor recovery device" installation contract after the plaintiffs had publicly criticized and initiated litigation against them. The court recognized that a veiled threat to "somehow get even" with the plaintiff, the suspicious "timing and nature of the suspension and notice" received by plaintiff, as well as the county's dissemination of the plaintiffs' suspension to their customers, were sufficient to raise an inference of retaliation that should be evaluated by a finder of fact. *Id.* at 1315-16.

Here, Plaintiff contends that Defendants acted in ways that did not conform to its own codes and for which Defendants have no innocent explanation. In particular, Plaintiff states that Defendants acted without justification regarding the sewer issue and contrary to the advice of the City's attorney. Plaintiff contends that Defendants offered no justification for applying its codes in an arbitrary manner and placing special burdens on Plaintiff not placed on other developers in the area. Further, Plaintiff points out that Defendants must not only establish that they could have acted lawfully, but must also establish that they would have acted in the same manner in the absence of protected conduct. Defendants counter that the City would have taken the same actions, regardless of Plaintiff's allegedly protected activity, because it acted only to ensure compliance with all applicable rules.

The record, with all inferences drawn in favor of Plaintiff, contains several instances of

Defendants' alleged retaliation. Defendants initially approved but later disapproved of Plaintiff's proposed sewer alignment. Defendants did not raise objections to the fifteen-foot temporary utility easement prior to approving the preliminary plat but objected only after Plaintiff first began to speak out about Defendants' allegedly improper handling of the process. The sewer routing proposed by Plaintiff should have been a concern for Defendants only if it presented maintenance issues that would affect the City in the future, but other evidence supports the inference that Defendants' disapproval of Plaintiff's proposed sewer alignment was influenced by the interests of other developers. There also is evidence that Defendants were unresponsive to Plaintiff's efforts to resolve the wetlands issue, namely their refusal to phase the development and failure to sign and forward a letter prepared for Holan regarding the wetlands issue. The record further demonstrates that Defendants held McDonald in low esteem and wished to thwart his efforts. Various people involved in the development have allegedly expressed their apprehension about testifying against Defendants and in favor of Plaintiff. A string of emails also suggests that Defendants wanted to find a way to legally deny building permits to Plaintiff for as long as possible. Finally, Defendants ordered Plaintiff to remove and replace trees with an inappropriate branch height, despite the fact that other developments were allowed to keep trees that were not in compliance.

In sum, the record supports a reasonable inference that Defendants treated Plaintiff differently with regard to granting a fifteen-foot utility easement, the required width of an emergency access road, the required width of a median in David Hill Road, and enforcement of the branch height requirements. The evidence suggests that Defendants were responsible for the delays of the project, and not Plaintiff or another regulatory entity. Thus, the court agrees that a reasonable factfinder could infer from the facts presented that Defendants retaliated against Plaintiff for opposing those

requirements contrary to the terms of the preliminary plat agreement.  Accordingly, summary judgment on this issue is denied.

IV.    Equal Protection

     A.    *Legal Standard*

Plaintiff asserts a "class of one" equal protection claim.  The Supreme Court described such a claim in *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000):

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  In so doing, we have explained that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.

(quoting *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445 (1923) (citations omitted)).

Disparate treatment by a governmental entity is permissible so long as it bears a rational relationship to a legitimate state interest. *Patel v. Penman*, 103 F.3d 868, 875 (9th Cir. 1996).  And, without more, selective enforcement of valid laws is insufficient to show that there was no rational basis for the action. *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004).  On the other hand, "there is no rational basis for state action 'that is malicious, irrational or plainly arbitrary.'" *Id.* (quoting *Armendariz v. Penman*, 75 F.3d 1311, 1326 (9th Cir. 1996) (en banc)).  Thus, such a claim may arise where the law is selectively enforced and "a plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for 'an impermissible motive.'" 375 F.3d at 946 (quoting *Armendariz*, 75 F.3d at 1327).  In *Squaw Valley*, the plaintiff alleged that "it was singled out for unique regulatory and enforcement treatment," with regard to

treatment by two employees of a local water review board who "subjected [it] to selective and over-zealous regulatory oversight . . . ." 375 F.3d at 944, 938. Thus, the class of one equal protection claim has been recognized in the land use regulation context.

Furthermore, where the defendant asserts a rational basis for such treatment, the plaintiff may rebut the proffered basis as pretextual. "In this circuit it is clearly established that a plaintiff may pursue an equal protection claim by raising a 'triable issue of fact as to whether the defendants' asserted [rational basis] . . . was merely a pretext' for differential treatment." *Squaw Valley*, 735 F.3d at 945 (quoting *Armendariz*, 75 F.3d at 1327)). Thus, a plaintiff may rebut a proffered rational basis on the grounds that the rational basis is "objectively false," or by proving the defendant acted with "an improper motive." *Id.* at 946 (citing *Patel*, 103 F.3d at 876; *Armendariz*, 75 F.3d at 1327; and *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990)).

B.    *Analysis*

Plaintiff alleges Defendants treated it differently from other similarly situated developers. For the reasons enumerated by the court in its retaliation analysis, *supra* at 33-34, there is a genuine issue of material fact of disparate treatment sufficient to survive summary judgment. Accordingly, the court must now address Defendants' purported rational bases for the disparate treatment Plaintiff experienced. Defendants also fail to meet this burden on summary judgment. Defendants provide no justification for their alleged conduct outside of primarily conclusory allegations that Plaintiff itself caused the delays that frustrated the development of The Parks. Further, Defendants do not address the numerous instances alleged by Plaintiff in which Plaintiff was treated differently from other developers, was treated in a manner contrary to the usual practice or the building code, or was consistently subjected to heightened requirements subsequent to preliminary plat approval. At best,

Defendants insist that the preliminary plat approval was not binding and conclude that any conduct by Defendants that was consistent with the public improvements contract should be addressed as a matter of contract law. However, this is not sufficient to establish summary judgment on this claim as there is a genuine issue of material fact as to whether Defendants' conduct had a rational basis, based on record evidence that Defendants acted in, at least, an irrational or arbitrary, if not malicious, manner. Accordingly, Defendants motion is denied.

V.    Due Process

Plaintiff alleges claims of both substantive and procedural due process violations. Under both theories, Plaintiff must first show that it had a property interest subject to constitutional protection. *See Wedges/Ledges of California v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir. 1994) ("A threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution.") (citing *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972); *Kraft v. Jacka*, 872 F.2d 862, 866 (9th Cir. 1989). Where the asserted protected property interest is a government benefit, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents*, 408 U.S. at 577. The Supreme Court has emphasized that property interests arise only when the relevant state law provisions make conferral of the benefit truly mandatory. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005). In other words:

> A protected property interest is present where an individual has a reasonable expectation of entitlement deriving from existing rules or understandings that stem from an independent source such as state law. A reasonable expectation of entitlement is determined largely by the language of the statute and the extent to which the entitlement is couched in mandatory terms.

*Wedges/Ledges*, 24 F.3d at 62.

Here, Plaintiff alleges that it "had a protected property interest based on the September 2, 2005, preliminary plat approval." (Pl.'s Opp. 40.) According to Plaintiff, this intermediate approval triggered a property interest because the code articulates a standard sufficient to give rise to a reasonable expectation of entitlement. In Plaintiff's estimation, Defendants' discretion to review the final plan for the development did not supercede Plaintiff's property right arising from the preliminary plat approval.

Defendants argue that the preliminary plat approval did not confer a protected property interest on plaintiff. Defendants cite *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988), where the plaintiff claimed a protected property interest in a proposed plat application and, that in denying approval of this proposal, the city deprived the plaintiff of this interest contrary to his right to procedural due process. The court examined the statute governing such applications, noting that it "granted to the Nevada Gaming Commission full and absolute authority to deny any application for any cause deemed reasonable by such commission," and gave the agency "unbridled discretion . . . ." *Id.* at 1305 (quoting *Parks v. Watson*, 716 F.2d 646, 657 (9th Cir. 1983); citing *Jacobsen v. Hannifin*, 627 F.2d 177 (9th Cir. 1980)) (internal quotation marks omitted). Here, however, Plaintiff does not claim entitlement to a grant of the preliminary plat approval. Rather, Plaintiff claims a property interest in the preliminary plat approval that had already been granted.

Preliminary plat approval, although "not constitut[ing] final acceptance of the plat of the proposed subdivision or partition for recording[,]" is, under Oregon law, "binding upon the city or county for the purposes of the preparation of the subdivision or partition," and may only be changed by the city or county to the extent that such changes are "necessary for compliance with the terms

of its approval of the tentative plan for the proposed subdivision or partition." OR. REV. STAT.

92.040 (2007). Plaintiff points to *Bienz v. City of Dayton*, 29 Or. App. 761, 566 P.2d 904 (1977),

in support of its claim that the preliminary plat approval created a protected property interest. In

*Bienz*, the court described the significance of preliminary plat approval:

> The land use decision is made at the time of the approval or disapproval of the tentative plan. The actions following approval are to implement the tentative plan. Before the subdivider can submit a final plat, he must prepare a detailed survey, obtain certain permits concerning water and sewage, comply with any conditions imposed by the city in its approval of the tentative plan and pay certain fees. The subdivider is not required to submit the final plat for 12 months following approval of the tentative plan. The city engineer must not only review the final plat, but make an on-sight inspection to ensure that it complies with the tentative plan approval. More significant, approval of the tentative plan is binding on the city under ORS 92.040 and there is nothing in ORS 92.010 to 92.160 which would prevent the subdivider from then proceeding with construction. The filing and recording of the final plat is only necessary to enable the subdivider to sell the property. Indeed the city ordinance expressly contemplates that after approval of the tentative plan, the subdivider may proceed with the construction of the streets and other improvements or he may file the final plat subject to an agreement and bond to perform the required work. The decision to approve or disapprove a tentative plan is "a final [order] . . . which determines the rights of the parties so that no further questions can arise before the court rendering it, except such as are necessary to be determined in carrying it into effect . . . ."

29 Or. App. at 768 (quoting *Winters v. Grimes*, 124 Or. 214, 264 P. 359 (1928); citing ORS 92.010-

92.060, 92.100, 92.160; Ord. §§ 16-22). The court explained that preliminary approval is made

binding so that the developer can move forward with construction of the project, "with the assurance

the city cannot later change its mind." *Id.* at 769. The court made clear that the preliminary plan is

binding on the city, but not the subdivider; in fact, the subdivider can consent to change the plan,

abandon the plan altogether, revise the plan and reapply for preliminary approval, or apply for

modification of the plan, subject to the procedural process required to approve the original

preliminary plan. *Id.*

Defendants dispute the finality of the preliminary plat approval, but do not directly address the significance of *Bienz* to the instant case. Defendants argue that the approval was not final until Plaintiff gained approval of a sewer plan and provided proof of an easement, at which time Plaintiff would be entitled to begin construction. This position is contrary to *Bienz*, which states that construction may begin once preliminary approval is granted and that preliminary approval assures the developer that "the city cannot later change its mind," 29 Or. App. at 769. Furthermore, Oregon courts have repeatedly declared that "[t]he approval of a preliminary plat for a subdivision is a final appealable order, which may be challenged by writ of review." *Emerson v. Deschutes County Board of Commissioners*, 46 Or. App. 247, 249 (1980). Similarly, the Land Use Board of Appeals has "characterized the filing of the final plat in the clerk's office as a ministerial act." *Hammer v. Clackamas County*, 190 Or. App. 473, 478, 79 P.3d 394 (2003). Accordingly, having established the threshold requirement of a protected property interest, the court will analyze the alleged substantive and procedural due process violations in turn.

A.    *Substantive Due Process*

Under the due process clause of the Fourteenth Amendment, "state action which 'neither utilizes a suspect classification nor draws distinctions among individuals that implicate fundamental rights' will violate substantive due process only if the action is 'not rationally related to a legitimate governmental purpose.'" *Matsuda v. City and County of Honolulu*, 512 F.3d 1148, 1156 (9th Cir. 2008) (citing *Brewster v. Bd. of Educ.*, 149 F.3d 971, 982-983 (9th Cir. 1998). This presents an "extremely high" burden for the plaintiff. *Del Monte Dunes v. Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990)). The plaintiff must establish a deprivation of property that "'shocks the conscience' or 'interferes with rights implicit in the concept of ordered liberty.'" *Nunez v. City of Los Angeles*, 147

F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746 (1987)).  More specifically, "[w]hen executive action like a discrete permitting decision is at issue, only egregious official conduct can be said to be arbitrary in the constitutional sense:  it must amount to an abuse of power lacking any reasonable justification in the service of a legitimate governmental objective." *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008) (internal quotation marks omitted).  Also, a legally erroneous interpretation is not necessarily arbitrary, in the constitutional sense. *Id.* at 1089.

Defendants argue that each of Plaintiff's claims is premised on the public improvements contract and, therefore, because they agreed to the contract itself, they cannot claim a violation of their constitutional property rights.  In the alternative Defendants argue that the alleged conduct of the county employees is not sufficiently egregious to meet the high standard.  Defendant maintains that because the City actions were rationally based on the terms of the contract, as well as the City's desire to fulfill its duties to the public, their conduct cannot be viewed as shocking the conscience. According to Defendant, Plaintiff has not produced sufficient evidence to create a genuine issue of material fact; rather, Plaintiff has made only conclusory allegations that the City was arbitrary and capricious.  Finally, Defendants assert that Plaintiff itself was responsible for the delays in construction and, therefore, the City cannot be held liable for said delays.

In *Del Monte Dunes*, cited by Plaintiff, the court denied a motion for summary judgment where "the city council had given approval to the 190-unit project, with [fifteen] conditions that [plaintiff] substantially met and that the City's professional planning staff agreed they had substantially met; yet the same members of the city council abruptly changed course and rejected the plan, giving only broad[,] conclusory reasons." 920 F.2d at 1508.  Plaintiff argues that Defendants acted similarly by "sudden[ly] chang[ing] course in March 2006 by refusing to follow the

preliminary plat approval conditions." (Pl.'s Opp. 40.)

Plaintiff cites *Bateson*, 857 F.2d at 1303, for the proposition that where all permitting requirements are met, yet the government refuses to issue a permit, a substantive due process violation has occurred. In *Bateson*, the City of Billings had adopted the Uniform Administrative Code which, in relevant part, provided that upon demonstrating compliance with the building code, the city must issue a permit to an applicant. Because the regulations did not provide for any review prior to issuance, the city's denial of a permit to a qualified applicant was the "sort of arbitrary administration of the local regulations, which singles out one individual to be treated discriminatorily, [and] amounts to a violation of that individual's substantive due process rights." *Id.*

The court recognizes that Plaintiff bears a particularly high burden with respect to this claim. That said, Plaintiff has alleged, and the record supports the reasonable inference of, a sustained course of treatment consisting of various and myriad efforts by Defendants to frustrate development of The Parks and further the interests of other developers at Plaintiff's expense. Defendants have failed to establish that there is no genuine issue of material fact to this end and, therefore, Defendants' motion for summary judgment on this claim should be denied.

B.    *Procedural Due Process*

"A section 1983 claim based upon procedural due process . . . has three elements:  (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). As determined above, Plaintiff possessed a property interest protected by the Constitution.

The Supreme Court has stated that "where a deprivation of property is the 'result of a random and unauthorized act by a state employee,' meaningful predeprivation process is not possible, and that due process requirements may therefore be satisfied by adequate post-deprivation procedures for obtaining a remedy." *Soranno's Gasco*, 874 F.2d at 1317 (quoting *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986) (internal citation omitted)). Plaintiff argues that there is no such provision in Oregon for prompt post-deprivation hearings and, therefore, its procedural due process rights were violated.

Defendants argue that Plaintiff does not have a protected property interest because its interest in the preliminary plat approval was insufficiently central to its interests to call for constitutional protection. Defendant relies on *San Bernardino Physicians' Services Medical Group, Inc. v. County of San Bernardino*, 825 F.2d 1404 (9th Cir. 1987). In that case, the Ninth Circuit pointed out the primacy of employment contracts when it came to the type of contracts giving rise to protected property interests arising from contract. *See id.* at 1409 ("The prime protected category, which has supplied nearly all of the successful contract-based section 1983 actions, is that of employment contract."). The court did not, however, foreclose other types of contracts from giving rise to due process protection. As above, the court finds that the preliminary plat approval is a protected property interest.

Finally, Defendants argue that Plaintiff was not denied process because Plaintiff could have availed itself of state judicial processes, which would have satisfied its due process rights. Defendants cite Ninth Circuit precedent that an adequate state remedy will bar a procedural due process claim in federal court, until that avenue is exhausted. *See Lake Nacimiento Ranch Co. v. County of San Luis Obispo*, 841 F.2d 872, 879 (9th Cir. 1987) (although the state law remedies were

different from those available under section 1983, the procedural due process claim was "barred because there [was] an available state remedy."). However, Plaintiff took steps to pursue its state remedies when it originally filed this case in state court; it was Defendants that subsequently removed the case to federal court. Defendants write: "Because Plaintiff has neither pursued process nor been denied process, Plaintiff's procedural due process claim fails as a matter of law." (Defs.' Memo, 23.) But, Plaintiff did pursue relief in state court and Defendants provide no analysis as to why this is an insufficient effort on Plaintiff's part to avail itself of state remedies, or why Defendants should be able to avoid such a claim by removing the case to federal court.[5] Thus, there is a genuine issue of material fact as to whether Plaintiff was deprived of procedural due process and Defendants' motion for summary judgment on this claim is denied.

6.    Damages

A.    *Legal Standard*

Defendant argues that, to the extent Plaintiff's section 1983 claims are allowed to proceed to trial, Plaintiff's damages should be limited under the standard set forth in *North Pacifica, LLC v.*

---

[5] Defendants fail to specify an intermediate process that Plaintiff should have pursued prior to filing in state court. Furthermore, Plaintiff argues, and Defendants do not dispute, that this claim is not one appropriately brought before the Land Use Board of Appeals ("LUBA"). Under Oregon statute, "granting approval or withholding approval of a final subdivision or partition plat . . . is not a land use decision or a limited land use decision, as defined under ORS 197.015." OR. REV. STAT. 92.100(7). Furthermore, also not included in the definition of "land use decision," are decisions that "determine final engineering design, construction, operation, maintenance, repair or preservation of a transportation facility that is otherwise authorized by and consistent with the comprehensive plan and land use regulations;" or "approves or denies approval of a final subdivision or partition plat[.]" OR. REV. STAT. 197.015(b)(D) and (G). Accordingly, such decisions are not within the jurisdiction of LUBA, as LUBA only reviews final land use decisions. *See* OR. REV. STAT. 197.835(1) (2007) ("The Land Use Board of Appeals shall review the land use decision or limited land use decision and prepare a final order affirming, reversing or remanding the land use decision or limited land use decision.").

*City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). The standard allows compensatory damages in section 1983 suits only where actual injury is shown. Further, "[t]he measure of damages for an equal protection claim alleging that a discriminatory zoning decision temporarily deprived the plaintiff's land of its development potential is reasonable interest on the reduction in value to the project created by the zoning decision, but only for the period of time the condition actually delayed the development of the project." *Id.* (citing *Herrington v. County of Sonoma*, 12 F.3d 901, 905 (9th Cir. 1993)).

Plaintiff agrees that section 1983 calls for compensatory damages only where there is actual injury and cites the Supreme Court in *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 307 (1986): "Congress adopted this common-law system of recovery when it established liability for 'constitutional torts.' Consequently, 'the basic purpose' of [section] 1983 damages is 'to *compensate persons for injuries* that are caused by the deprivation of constitutional rights.'" (citing *Carey v. Piphus*, 435 U.S. 247, 254 (1978) (emphasis added in *Memphis Community*)). However, this case differs from *North Pacifica* in an important respect. In *North Pacifica* the court held that no actual damage occurred because a pending action before the California Coastal Commission barred development, and thus the disputed condition imposed by the City did not cause actual damage by delaying development because the development was otherwise barred. Here, there is no overarching prohibition on development such that Plaintiff was otherwise unable to develop The Parks, notwithstanding Defendants' acts allegedly in violation of section 1983. It follows that Plaintiff is not precluded from establishing actual damages consistent with those claims.

Plaintiff further argues that the damage calculation articulated by *North Pacifica* and attributed to *Herrington* was merely the damage calculation applicable under the facts of that

particular case. The court agrees that the formula set forth in *North Pacific* purporting to be the "measure of damages for an equal protection claim alleging that a discriminatory zoning decision temporarily deprived the plaintiff" of full development value is not supported by the actual text of *Herrington*, which sets forth an extremely complex and fact-specific formula for calculating damages.[6] Accordingly, the court finds that the issue of damages is fact-specific and should be determined by the fact-finder, the formula for which shall be established based on the specific facts of this case.

### *Plaintiff's Motion for Partial Summary Judgment*[7]

Plaintiff moves for summary judgment on several of Defendants' affirmative defenses. In response, Defendants have withdrawn three of these defenses, with leave to reassert them if appropriate in the future. Defendants specifically withdraw the affirmative defenses related to mandatory arbitration, exhaustion of administrative remedies, and the notice requirements of the Oregon Tort Claims Act. Plaintiff moves for summary judgment on the remaining affirmative defenses, namely, that the claims are barred by the statutes of limitation, the public improvement contract as a whole, and section 6(w) of the public improvements contract. Defendants oppose the

---

[6] The following amounts to the *Herrington* court's claimed simplification of the damages calculation: "Boiled to its essence, the formula may be summarized as follows: The court first multiplied the maximum value of the Property (i.e., assuming approval of the 32-unit application, $1.3 million) by one-third (i.e., the district court's calculation of the probability of the application's approval). The court then subtracted from the product the purported undeveloped value of the Property ($490,000.00). Next, the court multiplied the difference by the product of the interest rate (i.e., based on the amount the money could have earned) and the duration of the delay. Finally, the court added to the product whatever increased development costs were likely to have resulted from the delay." *Herrington*, 12 F.3d at 905

[7] Citations hereunder, unless otherwise specified, cite to the materials filed in association with Plaintiff's motion for summary judgment (Dkt. #20).

remainder of Plaintiff's motion.

1.      Statute of Limitations

Plaintiff urges the court to decide, as a matter of law, that its claims are not barred by the applicable statues of limitation. Plaintiff's primary contention is that the claims did not accrue until March 3, 2006, when Steve Wood sent an email to Tim McDonald, informing him of a variety of decisions made by the City regarding development of The Parks. According to Plaintiff, prior to this email there was no reason to suspect that Defendants were acting to frustrate Plaintiff's development plans. Consequently, the email marks the date of discovery of the injury and governs the statute of limitations determination. Defendant argues that the statute of limitations determination presents a question of fact and that the March 3, 2006, email is an insufficient basis for this determination.

The parties do not dispute the applicable statute of limitations or the standard for determining when the time period begins to run. Plaintiff's state law takings claim[8] is subject to a six-year statute of limitations. *See* OR. REV. STAT. 12.080(4) ("An action for taking, detaining or injuring personal property, including an action for the specific recovery thereof, . . . , shall be commenced within six years."). All other claims are premised on section 1983 and are thus subject to a two-year statute of limitations. *See Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1140 (9th Cir. 2000) (stating that the statute of limitations for section 1983 actions is governed by the state statute of limitations for personal injury claims which, in Oregon, is two years). The standard for when this the statute of limitations accrues is determined by federal law, *See Bailey v. Shelton*, No. CV 07-1905-CV, 2009 U.S. Dist. LEXIS 574, at *8-9 (D. Or. Jan. 6, 2009) ("The question of when a claim accrues is governed by federal law.") (citing *Johnson v. California*, 207 F.3d 650, 653 (9th Cir. 2000)). Under

---

[8] The court has granted Defendants' motion for summary judgment on this claim.

federal law, the period begins "when a plaintiff knows or has reason to know of the injury which is the basis of his action." *McCoy v. San Francisco, City & County*, 14 F.3d 28, 29 (9th Cir. 1994) (quoting *Hoesterey v. Cathedral City*, 945 F.2d 317, 318-19 (9th Cir. 1991)) (internal quotation marks omitted).

Plaintiff cites *Norco Constr., Inc. v. King County*, 801 F.2d 1143 (9th Cir. 1986) for the proposition that the statute of limitations does not begin to run until the government has given final approval for the development. In *Norco*, the county's ruling on the developer's preliminary plat application was unlawfully delayed by the county for approximately five years. Shortly after the county finally approved the preliminary plat application, the developer filed suit for damages incurred as a result of the delayed approval. The Ninth Circuit held that, prior to the ruling as to the preliminary plat application, the developer's claim for damages was not ripe. Therefore, the statute of limitations could not have been triggered prior to that date because "[c]ourts have held consistently that a cause of action does not accrue until a party has a right to enforce the claim." *Id.* at 1146 (citations omitted). On this premise, Plaintiff asserts that its claims did not accrue until the final permitting decision was made on June 15, 2006.

Defendants respond that they do not contend that the state inverse condemnation claim is time-barred. Additionally, Defendants point out that it is their argument that the federal inverse condemnation claim is not ripe and not that it is time-barred. Therefore, the statute of limitations defense is not asserted against the takings claims. Next, Defendants point out that Plaintiff's remaining claims did not hinge on a final determination by the City, citing *Carpinteria Valley Farms, Ltd. v. County of Santa Barbara*, 344 F.3d 822 (9th Cir. 2003). In *Carpinteria*, the Ninth Circuit distinguished the developer's takings claims and his other claims arising from Constitutional

violations by the county. It wrote: "Similarly, Nesbitt's alleged First Amendment, procedural due process, and equal protection injuries stem from the retaliation he claims. As in *Harris*, these alleged injuries are separate from any purported taking. They are also independent of whether or not the County's decision-making has been completed." *Id.* at 831 (referring to *Harris v. County of Riverside*, 904 F.2d 497, 501 (9th Cir. 1990)). The court agrees with Defendant that the claims at issue are not subject to the *Norco* finality requirement.

On the core issue of when the claims accrued for statute of limitations purposes, Plaintiff goes to great lengths, and with great factual detail, to outline the conditions giving rise to its conclusion that the March 3, 2006, email first revealed the City's unlawful actions with respect to development of The Parks. Plaintiff characterizes its relationship with Defendants as positive prior to the receipt of the email, citing issuance of an early grading permit, efficient resolution of a stop-work order that was based on an innocent misunderstanding between the parties, and Plaintiff's assumption that the difficulties regarding the sewer alignment were typical to the permitting process. Only upon receiving the email, Plaintiff maintains, did it realize that Defendants had no intention of relying on the preliminary plat approval. Plaintiff then describes the various purported nefarious activities going on behind the scenes prior to the March 3, 2006, email, discovered subsequently as a result of discovery in this matter.

However, the question before the court is simply whether a reasonable finder of fact would necessarily conclude that Plaintiff first learned of Defendants' intent to deviate from the preliminary plat approval and frustrate Plaintiff's development in favor of the interests of third parties only when McDonald received the March 3, 2006, email. Under the applicable legal standard, the court must draw all reasonable inferences in favor of the non-moving party. Here, the extensive factual record

contains sufficient evidence that the difficulties between the parties were present long before the March 3, 2006, email. One such example of this is the attendance sheet at a September 2005 meeting on which a city employee misspelled Bill Cox's name in an inappropriate and offensive manner. Another example is the City's treatment of the wetlands issue by being unresponsive to Plaintiff's attempts to resolve the issue and avoid delay. In November 2005, Wirth forwarded a letter to the City for Holan's signature to send to the relevant agencies in an attempt to avoid a major hurdle. The letter was never sent and, on the record before the court, otherwise ignored. The court recognizes that Plaintiff has the difficult task of proving a lack of knowledge prior to March 3, 2006, however, Plaintiff fails to meet the high burden that the court requires to grant summary judgment and prevent Defendants from asserting the statute of limitations as an affirmative defense.

Accordingly, the court agrees with Defendants that this is an intensely factual determination, and, on the record before it, the court cannot conclude that no reasonable jury would disagree with Plaintiff's position. Plaintiff's motion as to this affirmative defense is denied.

II.    The Public Improvements Contract

Defendants assert that the terms of the public improvements contract bar some or all of Plaintiff's claims. Plaintiff seeks summary judgment on this affirmative defense on the ground that its claims are constitutional in nature and, therefore, not governed by this contract. Defendants respond that Plaintiff's claims "directly implicate[] many of the express terms of the May[] 2006 public improvements contract." (Defs.' Opp. 9.) As discussed above, the existence of the public improvements contract, though alone not dispositive of Plaintiff's claims, may be relevant to the asserted claims. *See supra* pp. 14-16. Therefore, Plaintiff's motion for summary judgment on this affirmative defense is denied.

III.    Section 6(w) of Public Improvements Contract

Section 6(w) of the public improvements contract states:

The City of Forest Grove is not responsible for oversights of City's reviewer or omissions by the Developer's engineer that may have occurred during the project design or the City's plan review process. It is the intent of the plan approval and this Agreement that the project be constructed in conformance with the specifications referenced or contained herein.

(Plaintiff's Memo., Ex. J at 29.) Again, while not dispositive of Plaintiff's claims, this court does not find as a matter of law that the clause has no bearing on disposition of Plaintiff's claims. Thus, Plaintiff's motion for summary judgment on this affirmative defense is denied.

*Conclusion*

For the reasons above stated, Defendants' motion for summary judgment (#16) on Plaintiff's state law takings claim is GRANTED. Defendants' motion for summary judgment on Plaintiff's federal takings claim, First Amendment retaliation claim, equal protection claim, substantive due process claim, and procedural due process claim is DENIED. Plaintiff's motion for summary judgment (#20), to the extent that the affirmative defenses were not already withdrawn without prejudice, is DENIED in its entirety. Defendants' motion to strike (#48) is GRANTED as to the Fruits Affidavit and deemed moot as to the Hankins Affidavit.

DATED this 23rd day of February, 2010.


JOHN V. ACOSTA
United States Magistrate Judge