IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DAVID HILL DEVELOPMENT, LLC, an
Oregon limited liability company,

3:08-cv-266-AC

               Plaintiff,

OPINION AND ORDER

     v.

CITY OF FOREST GROVE, an Oregon
municipal corporation, STEVE A. WOOD,
individually and in his official capacity as
Project Engineer for the City of Forest
Grove, ROBERT A. FOSTER, individually
and in his official capacity as Engineering
Director and Public Works Director for the
City of Forest Grove,

               Defendants.

---

ACOSTA, Magistrate Judge:

1 -- OPINION AND ORDER

[LB]

*Pending Motion*

Following a seventeen-day trial in the above entitled matter, the jury returned a verdict in favor of David Hill Development, LLC ("David Hill"), on its claims against the City of Forest Grove, Steve A. Wood and Robert A. Foster (collectively "City"), for violations of the Takings Clause, including a Temporary Takings and Exacting Property; a violation of the Equal Protection Clause; a violation of David Hill's right to Substantive Due Process; and a violation of David Hill's right to Procedural Due Process. In addition, the jury determined David Hill filed this action in a timely manner, and it concluded David Hill was entitled to $6,539,176 in actual damages.

Pending before the court is Defendants' FRCP 50(b) Motion for Judgment as a Matter of Law and Alternative FRCP 59 Motion for New Trial. Pursuant to FED. R. CIV. P. 50(b), the City moves for judgment notwithstanding the jury's verdict on all claims decided in this action. Alternatively, pursuant to FED. R. CIV. P. 59, the City moves for a new trial on all claims decided by the jury. Finally, in the event the court denies the City's motion for judgment as a matter of law, and its alternative request for a new trial, the City moves for a reduction in the jury's award of damages, as excessive.

David Hill opposes all of the City's post-trial motions and contends the City has failed to articulate any legitimate basis for the court to reconsider its prior rulings. Additionally, David Hill maintains the City has failed to demonstrate the evidence was insufficient to support the jury's verdict. David Hill urges the court to deny the City's motions and leave the jury's verdict untouched.

On July 24, 2012, oral argument was heard on the City's motions, and for the reasons stated below, the City's FRCP 50(b) Motion for Judgment as a Matter of Law and Alternative FRCP 59 Motion for New Trial is granted, in part, and denied, in part.

*Overview and Trial Issues*

David Hill purchased several acres of farmland with the intention of creating a residential subdivision ("the Parks"). David Hill successfully petitioned the City for annexation of the farmland property within the urban growth boundary and received preliminary plat approval for its development. The Parks ran into problems, however, involving disagreements between David Hill and the City over the sewer line, easements, trees, and phasing.  David Hill maintains the City actively frustrated and delayed its development efforts, at least in part, due to a preference in favor of other area developers and personal animus toward one of its principals, Timothy McDonald ("McDonald").  In the meantime, the residential real estate market declined and David Hill received less money on the sale of lots within the development than originally anticipated.  David Hill incurred additional development costs as a result of specific actions and demands by the City.

At trial, David Hill claimed the City and its public officials, namely Foster, the City's Public Works Director, and Woods, the Project Engineer, wrongfully and unlawfully delayed the Parks by, among other things, improperly issuing and not timely withdrawing a Stop Work Order, refusing to approve David Hill's construction plans in a timely manner, imposing additional conditions of approval after the original conditions were issued, and requiring additional improvements or work beyond the original conditions of approval.  Based upon these actions taken by the City, David Hill claimed the City and its public officials violated David Hill's constitutional rights by:  (1) requiring David Hill to dedicate more land to the City beyond that required by the original conditions of approval (Takings - Exactions); (2) temporarily "Taking" David Hill's property by unreasonably delaying the project (Temporary Takings); (3) retaliating against David Hill for insisting the City

comply with the law (First Amendment Retaliation);[1] (4) treating David Hill differently than other developers (Equal Protection violation); (5) treating David Hill in a discriminatory, arbitrary, and capricious manner (Denial of Substantive Due Process); and, (6) depriving David Hill of its property rights without due process of law (Denial of Procedural Due Process).  As a result of these constitutional violations, David Hill claimed it suffered over $12 million in economic damages in the form of the takings of its property rights, delayed or lost sales, loss of property rights, and additional project and development costs.

At trial, the City denied it violated David Hill's rights or took its property.  Instead, the City contended David Hill's conditions of approval required it to submit more detailed construction plans, and construct public improvements such as sewer lines, streets and sidewalks, which satisfied the City's conditions, as well as the public improvements contract, and applicable local, state, and federal regulations.  According to the City, the development requirements David Hill claimed were illegal were actually consistent with the agreed-upon terms David Hill was required to satisfy before it could begin construction on the Parks.

The City also denied David Hill was delayed by its actions or inactions and, instead, maintained David Hill's expectations for completing its work were unreasonable and limited by its inexperience. The City contended that, to the extent the Parks was delayed, it was caused by David Hill's own lack of due diligence and failure to timely schedule, design, and construct the subdivision. Specifically, the City argued any delays in completion resulted from David Hill's failure to obtain

---

[1]On September 28, 2011, the court granted the City's Motion for Judgment as a Matter of Law on David Hill's First Amendment Retaliation Claim.

the utility easement it needed to develop the property, its failure to obtain required approvals from other government agencies, and its failure to properly supervise and manage its contractors.

The City also challenged David Hill's actions of accepting the benefit of the City's construction approvals, instead of appealing them. According to the City, this strategy allowed David Hill to sell off most of its lots before suing the City, while depriving the City of reasonable notice of the objections David Hill subsequently raised through its lawsuit. The City maintained David Hill's acceptance of City approvals and failure to raise timely objections barred David Hill from recovering through this action in federal court.

Finally, the City contended it did not cause David Hill to suffer any damages because David Hill sold its lots for a considerable amount of money, which satisfied its original expectations. The City further argued that any money David Hill spent was either necessary to complete the Parks, or stemmed from David Hill's own failure to control pricing with its contractor or enforce its rights against its contractor and, therefore, no basis existed for David Hill to recover money from the City or its engineering staff at trial.

*Legal Standards*

I.    Rule 50(b) Motion for Judgment as a Matter of Law

A jury verdict can be overturned and a post-trial motion for judgment as a matter of law granted "only if, under the governing law, there can be but one reasonable conclusion as to the verdict. In other words, the motion should be granted only if "there is no legally sufficient basis for a reasonable jury to find for that party on that issue.'" *Winarto v. Toshiba Am. Elecs. Components, Inc.*, 274 F.3d 1276, 1283 (9th Cir. 2001) (quoting FED. R. CIV. P. 50(a)). A motion for judgment as a matter of law must be denied, and the jury's verdict must be upheld, if the verdict is supported

by substantial evidence. *Johnson v. Paradise Valley Unified School Dist.*, 251 F.3d 1222, 1227 (9th Cir. 2001). "Substantial evidence is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion from the same evidence." *Id.* When evaluating a motion for judgment as a matter of law under Rule 50, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 150 (2000); *see also Johnson*, 251 F.3d at 1227 ("although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe").

II.    Rule 59 Motion for a New Trial

Even if the verdict is supported by substantial evidence, the court may grant a motion for a new trial under Federal Rule of Civil Procedure 59 "if the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or to prevent a miscarriage of justice." *Silver Sage Partners v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th Cir. 2001); *see also Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) ("Historically recognized grounds [for a new trial under Rule 59] include, but are not limited to, claims that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the moving party." (internal quotation and citation omitted)). The "district court may not grant a new trial simply because it would have arrived at a different verdict." *Silver Sage Partners*, 251 F.3d at 819. Rather, the "trial court must have a firm conviction that the jury has made a mistake." *Landes Constr. Co., Inc. v. Royal Bank of Canada*, 833 F.2d 1365, 1372 (9th Cir. 1987).

When evaluating a motion for new trial under Rule 59, the court may weigh the evidence, evaluate the credibility of the witnesses, and is not required to view the evidence from the

perspective most favorable to the prevailing party. *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). Finally, a new trial is warranted on the basis of an incorrect evidentiary ruling only "if the ruling substantially prejudiced a party." *United States v. 99.66 Acres of Land*, 970 F.2d 651, 658 (9th Cir. 1992).

*Discussion*

As a threshold matter, the City challenges whether there is substantial evidence to support the jury's finding that the City delayed David Hill's project by approximately one year. According to the City, the "one year 'delay' is the foundation on which all of [David Hill's] claims are based," including the causation element for David Hill's alleged damages. (Defs.' Mem. FRCP 50(b) J. Matter Law 18.)    Additionally, the City contests the jury's verdict on each of David Hill's constitutional claims in this case. Alternatively, the City asserts the individual defendants, Wood and Foster, are entitled to qualified immunity; and David Hill's claims were time-barred. Finally, the City contends there is no support for the jury's award of damages. The court will consider first whether there is substantial evidence to support a finding that the City's actions delayed David Hill's project by approximately one year, before turning to the other challenges raised by the City's motion.

I.    Sufficient Evidence of Delay

The City contends David Hill failed to present sufficient evidence at trial to establish the City's actions were the sole cause of the delay to the Parks. According to the City, the law requires David Hill to show the City's actions "affected activities on the critical path of the contractor's performance of the contract." (Defs.' Mem. FRCP 50(b) J. Matter Law 14 (*see* cases cited therein).) The City insists David Hill was required to present expert testimony to establish the delay at issue here was caused solely by the City. Moreover, the City maintains David Hill failed its burden to

disprove a concurrent cause for the delay that was not chargeable to the government.  *See Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed. Cir. 1982).  The City contends David Hill cannot recover for a delay if factors, unrelated to government actions or omissions, created a concurrent delay.  The City challenges the evidence produced at trial as insufficient to support two assertions relied upon by David Hill to prove its claims at trial; namely, that David Hill: (1) was entitled to receive a construction permit by September 21, 2005, just nineteen days after it received preliminary plat approval; and (2) would have completed the Parks eight months from preliminary plat approval.  (Defs.' Mem. FRCP 50(b) J. Matter Law 14.)

David Hill counters there was ample evidence presented at trial to show the City should have issued the permit to construct the subdivision by September 21, 2005.  Instead, David Hill did not receive the City's authorization until nine months later, on June 15, 2006.  Consequently, there is no need for an expert to conduct a "critical path analysis" because construction on the Parks could not begin until the permit issued.  Further, if David Hill had obtained the permit nine months earlier, in September 2005, it could have closed the original contract with Venture Properties to sell the Parks for $27,950,000.  David Hill also asserts there was substantial evidence presented at trial the Parks could be completed within 155 days.  Further, due to unlawful actions taken by the City after construction was underway, the project suffered additional delay.  According to David Hill, the evidence at trial showed that in the absence of these wrongful actions by the City, David Hill could have recorded the final plat by May 2006.

This is a permitting case involving a private contractor and the permitting municipality and the public contractor cases relied upon by the City for its argument that David Hill must perform a critical path analysis to take into account concurrent delays are inapplicable here.  Those cases are

government contract cases and they involve specific contractual provisions not present in this case.

Typically, in those instances, a contractor will bring a claim for additional costs incurred due to the

late completion of a fixed price government construction contract.  Under a standard "Suspension

of Work" clause often found in the government fixed-price construction contracts, 48 C.F.R. §

52.242-14 (2004), the United States may be liable for causing delays to contract work.  *See, e.g.,*

*George Sollitt Const. Co. v. U.S.*, 64 Fed. Cl. 229, 236-37 (2005).  In those cases, the general rule

is that the government must have been "the sole proximate cause of the contractor's additional loss,

and the contractor would not have been delayed for any other reason during that period."

*Triax-Pacific v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992).  In order to recover the additional cost

caused by the government delay the contractor must show "the government's actions affected

activities on the critical path[2] of the contractor's performance of the contract." *Kinetic Builder's Inc.*

*v. Peters*, 226 F.3d 1307, 1317 (Fed. Cir. 2000) (citations omitted).  In those instances, it is the

contractor's burden to establish the critical path of the project in order to justify an equitable

---

[2]The United States Court of Claims offered this definition of "critical path":

> Essentially, the critical path method is an efficient way of organizing and
> scheduling a complex project which consists of numerous interrelated separate
> small projects.  Each subproject is identified and classified as to the duration and
> precedence of the work . . . .  The data is then analyzed, usually by computer, to
> determine the most efficient schedule for the entire project.  Many subprojects
> may be performed at any time within a given period without any effect on the
> completion of the entire project.  However, some items of work are given no
> leeway and must be performed on schedule; otherwise, the entire project will be
> delayed.  These latter items of work are on the "critical path."  A delay, or
> acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 230 Ct. Cl. 148, 676 F.2d 584, 595 (1982).

adjustment based upon an extension of the completion date of the project. *See, e.g., CEMS, Inc. v. U.S.*, 59 Fed. Cl. 168, 233 (Fed. Cl. 2003) (denying recovery because plaintiff had not met this burden).

Clearly, David Hill does not seek to recover additional costs incurred due to the late completion of a fixed price government construction contract with the City. As such, expert analysis on that issue is not required.[3] Nor is a critical path analysis mandated, or even helpful, as David Hill's argument regarding delay caused by the City is quite straightforward: the nine-month delay in issuing the permit halted all work on the project. Rather, David Hill's action here was to remedy alleged constitutional violations by the City and the individual defendants. David Hill's asserted in its Amended Complaint that defendants were liable under 42 U.S.C. § 1983, based upon their conduct in violating David Hill's constitutional rights. Section 1983 has a causation requirement, with liability extending to those state officials who "subject[ ], or cause[ ] to be subjected," an individual to a deprivation of his federal rights. *See, e.g., Lacey v. Maricopa Cnty*, __ F.3d __, 2012 WL 3711591 (9th Cir. 2012) (en banc) ("The requisite causation can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." (Quotations and citation omitted)). At the close of trial the court gave the parties agreed upon "Causation" instruction.[4] (Court's Jury Inst. No. 25, September 29, 2011.)

---

[3]The court notes David Hill did elicit expert testimony at trial to explain why David Hill's projected completion dates were reasonable yet, ultimately, not met. This evidence was sufficient to reach the jury on the issue of whether the City's actions caused David Hill's harm.

[4]The court's Jury Instruction No. 25, Causation:

Moreover, the court agrees David Hill was required to establish the City was responsible for the delay in this case. Nevertheless, some evidence of concurrent delays, alone, is not sufficient to defeat David Hill's claims under section 1983. Even under the analysis set forth in the contractor cases and relied upon by the City, a contractor such as David Hill is entitled to present evidence to show a government delay, separate and apart from one attributable to other causes, caused the loss. *See, e.g., William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir. 1984) (case remanded to allow contractor an opportunity to prove how much of the delay was attributable to each party).

At trial, David Hill presented evidence the City should have approved the construction plans by September 21, 2005, approximately two months after those plans were originally submitted to the City. For example, Steve Dow, the general contractor who built the Parks, testified at trial that, typically, construction plans were approved within two to three weeks of the issuance of the early grading permit. (Trial Tr. 1524:14-1525:3) In fact, David Hill produced evidence that Wood told McDonald and Dow the construction permit would be issued a couple of weeks after preliminary plat. (Trial Tr. 1525:8-22 ("We were definitely told that we would have that – the utility plans approved within a couple of weeks of us getting started on the early grading permit.").) Dow further testified he would not have started the early grading without Wood's assurances. (Trial Tr. 1523:15-18.)

---

In order to establish that the acts of Defendants deprived Plaintiff of its particular rights under the laws of the United States Constitution as explained in later instructions, Plaintiff must prove by a preponderance of the evidence that the acts were so closely related to the deprivation of Plaintiff s rights as to be the moving force that caused the ultimate injury.

The evidence also includes the testimony of Rick Vanderkin, the Public Works Superintendent for the City, that he and Wood had expended a combined 81.50 hours working on the Parks in August and September 2005. (Steve C. Morasch Decl. Ex. A at 47, Dec. 20, 2011.) According to Hann Lee, an expert in this case, that was plenty of time to review a set of construction plans. (Trial Tr. 2242:12-20 ("I believe that's more than plenty of time.").) Thus, there was substantial evidence presented at trial that McDonald's expectation of the issuance of a construction permit by September 21, 2005, was realistic, given he had submitted the construction plans on July 21, 2005.

Regarding the City's argument the construction could not have been completed within eight months from preliminary plat approval, there is substantial evidence in the record that a subdivision of this size could be completed within 155 days. Specifically, at trial Dow testified that 155 days to complete the job was a reasonable number and "we wouldn't have singed it if we wouldn't have thought that was a reasonable number." (Trial Tr. 1519:5-13.) Kelly Ritz, President of Venture Properties, the company that contracted to buy the lots prior to the delay, testified her company was able to complete a 215 lot subdivision in four-to-six months. (Trial Tr. 713:5-14.) Additionally, Gerald Williams, the City's Construction Management and Engineering expert, testified that between 200 and 225 days wold be a reasonable amount of time for a contractor to construct the residential subdivision. (Trial Tr. 3872:18-23.) Lee testified at trial that September to May for completion of the Parks was a reasonable expectation. Lee testified:

A.   Well, I think that looking at the size of the development, Mr. McDonald had plenty of time to build the project because it was pretty simple in nature. There wasn't anything significant on site that really required a lot of extra work. It was a very simple site to work on. The grade balanced, which

means you don't need to bring any extra dirt on site to fill in high spots or low spots or cut high spots significantly. There is no really large environmental issues. There is a minor issue with the wetland to the southeast. But there really wasn't anything complicated about the project.

Q.   So you think seven months was long enough to build the project and have the plat recorded?

A    Yes, I do. One thing you have to understand about construction, construction is really about motivation. If you have - - if you have a green light and you don't have constraints you can actually accelerate the construction process quite a bit. That's one of the things I advise my clients on in terms of how to accelerate their project, if they wish to do so.

(Trial Tr. 2243:5-24.) Even assuming the work would have taken eight months (240 days) to complete, David Hill produced evidence at trial to show it was reasonable to expect the plat would be recorded by May 1, 2006, given the permit was expected in September 2005.

In addition to the delay in issuing the permits, David Hill also produced evidence at trial that the City was responsible for construction delays after the project was underway. David Hill's evidence at trial included Dow's testimony that it took longer to construct the Parks because he had to demobilize and remobilize; he had to clean up the mess from the winter before; and he had to construct both sides of David Hill Road, including a median and the large electrical vaults, and had to reconstruct sewer lines after David Huttula, an owner of the Skyline Development property adjacent to David Hill's subdivision project, built his portion of Brooke Street at the wrong elevation.

Q.   Why? You said you'd get it done in 155 days.

A.   Well, we said we'd get $4.8 million done in 155 days, and the contract obviously went beyond that also.

Q.    Could you explain to the jury why you weren't able to get that done in 155 days?  What were the delays caused by?

A.    We had -- we had multiple delays on -- the ones that stick out in my mind would be the sanitary, that we were waiting on for the City to come up with a sanitary that fit their master sanitary.
        We had -- we had some timing issues with the storm that was installed by another  contractor on Brookwood (sic) that we needed to tie into.  That storm line was installed a foot higher than what our approved plan said it was to be installed, so that had to be reengineered.

Q.    Let me stop you there so I can make sure I'm understanding what you're saying.
        So at the time that you got your construction plans approved in June 15th, you already had purchased all of the manholes and sewer pipes for the sewer within The Parks Subdivision?

A.    We had purchased some of the stuff prior to that. And obviously before we started connecting, we would certainly order out manholes and piping to get started.

Q.    So what was the problem?  Why were you delayed? What was the problem with Brooke Street?

A.    There was another contractor building a subdivision next to us, and they were installing the storm line up to the property line for The Parks, and that storm line was installed a foot higher than what our approved plans had shown; therefore, our approved storm system no longer worked.

Q.    And where was that storm sewer?  Was it here through Brooke Street?

A.    It was, yes.

Q.    Okay.  Just so the jury can track you as you're saying that, you had a set of design plans for here (indicating), and they didn't match up with the set of design plans that Mr. Huttula was doing down here?

A.    That's absolutely correct.

Q.    And how was it that that slowed you down?

A.    That needs to be reeningeered, and then we had to order out different manholes and different pipe.

Q.    Looking at all of your time sheets after the fact, how much of a delay would you say that that caused you?

A.    It's been a long time, but off the top of my head, I would say we waited around at least probably 30 days for the design, and then maybe another couple weeks to get the manholes and new pipe out there.

Q.    About six weeks?

A.    Probably pretty close, yes.

. . . .

Q.    So there was that delay. Was there any -- I was there any problems with trying to get remoblized? In other words, you did do some work in the fall. You did a month's worth of work before there was a stop work order, right?

A.    Correct.

Q.    But the stop work order really didn't stop you down, did it?

A.    Yeah, I mean to a point. You know, we still, you know -- what stopped us the most was not being able to go on with utilities, to be honest with you.

Q.    Since you didn't get your construction permit, you were only able to work for a few -- maybe a month or so in September?

A.    That is correct.

Q.    So why don't we take a month away from this period here. In other words, didn't you get a jump start in June because you were already able to do some grading?

A.    Not really. And the reason why is that job went all the way through the winter with us not being able to move all of the dirt. So you're starting all the way back to square one again. You have to strip the site. We had to remove gravel that we had placed and redo the subgrades. So, to be honest with you, you're almost going backwards more than you would have gone forward.

15 – OPINION AND ORDER                                                    [LB]

Q.    Okay.  Another one was your original plans had you just building half of David Hill Road; is that correct?

A.    That's correct.

Q.    And you understood that Mr. McDonald was -- reached an agreement with Mr. Huttula where you had to build both sides of David Hill Road?

A.    That is correct also.

Q.    Did that add to the cost to Mr. McDonald?

A.    Oh, yeah.

Q.    Off the top of your head, any idea about what that was?

A.    I'd have to go back and look, but it's -- probably around $200,000.

Q.    And there was a lot of change work orders in this matter, right?

A.    There was.

Q.    What about -- I understand that that cost maybe another $200,000, but what about the time?  Did it take you longer to construct both sides of that than it would if you just had to construct just a half street?

A.    Oh, absolutely.

Q.    How long would you estimate it took you?

A.    About -- well, twice as long because it was twice as much work, but to do that much street right there, we're probably looking at about four weeks.

Q.    Additional?

A.    Correct.

Q.    Okay.  And we did -- on the sewer, there was a deal worked out with Mr. Matiaco, where you had to dig an extra deep sewer right here in this corner (indicating).  Do you remember that?

A.    I do.

Q.    Could you explain to the jury what that meant, an extra deep sewer. What did you have to do and how long did that take? How much additional time did that take?

A.    Yeah, that sewer was about 21 feet deep on -- which that's really, really deep, especially for Washington County soil. We had -- we had to bring out special trenching safety equipment to be able to go down that deep on that. I would say it probably took at least an extra two to three weeks to be able to do it.

Q.    It's just this little strip right here (indicating)?

A.    Yea, but 21 feet deep, you're lucky if you get five, six feet an hour when you're that deep, trying to do that and keep everybody safe.

Q.    There was also -- we've heard testimony about these large vaults that Mr. McDonald was forced to put in on David Hill Road. Did that cause -- I mean, did that cost Mr. McDonald some more money?

A.    It did.

Q.    What about you? Did that cost you some time?

A.    Oh, for sure, yeah, not to mention we waited for a long time just to have the approved set of plans for that power so we could go to work.

(Trial Tr. 1527:20-1533:9; *see also* Trial Tr. 2253:23-2254:3 (no evidence that Division of State Lands caused the delay (Lee testimony)); Trial Tr. 3865:13-3860:16 (U.S. Army Corps of Engineers did not delay project; Clean Water Services was not a cause of delay; Division of State Lands did not cause a delay; Washington County did not cause the delay; nothing "exogenous" caused the delay (Williams testimony)).) There is ample evidence in the record for the jury to determine no other agency caused additional delays for the project.

David Hill produced sufficient evidence at trial for the jury to determine it had a reasonable expectation it would receive a permit by September 2005. There is also adequate evidence to

support the conclusion that the City's conduct in not issuing the permit until June 15, 2006, and the stop work orders, caused the delay for David Hill's timely completion of the Parks by July 2006.

II.    <u>Sufficient Evidence of Constitutional Violations</u>

The City argues even if there was sufficient evidence it unreasonably delayed David Hill in "bringing the project to market," that evidence alone cannot establish a constitutional violation. (Defs.' Mem. FRCP 50(b) J. Matter Law 19.) According to the City, David Hill's constitutional claims "implicate stringent legal tests that are incredibly difficult to satisfy" and David Hill's evidence at trial was not "sufficient[ly] obvious" to overcome a defense of qualified immunity. (Defs.' Mem. FRCP 50(b) J. Matter Law 19.)

A.    *Takings – Exactions*

The City contends it is entitled to judgment as a matter of law on David Hill's claim that certain development conditions were unconstitutional "exactions" of David Hill's property. A plaintiff seeking to challenge a government action as an uncompensated taking of private property may proceed under the theory that a land-use exaction violates the standards set forth in *Nollan v. Cal Coastal Comm'n*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994). An exaction is a condition of development that local government places on a landowner to dedicate a real interest in the development property for public use. *See Nollan*, 483 U.S. 825; *Dolan*, 512 U.S. 374.

The conditions on the Parks development challenged by David Hill are: (1) an extra four feet in right-of-way width along David Hill Road, and additional construction including extra pavement width, (2) extending the City's main electrical trunk line, (3) the construction of a central median

on David Hill Road, and (4) the right-of-way and construction costs David Hill had to purchase from

Huttula. (Pl.'s Response 13.)[5]  The City argues a local government's requirement that the applicant

landowner spend money in the course of development is not an exaction of a real interest in the

development property. *See West Linn Corporate Park, L.L.C. v. City of West Linn,* 349 Or. 58, 240

P.3d 29 (2010); *see also West Linn corporate Park, LLC v. City of West Linn,* 428 Fed. Appx. 700

(9th Cir.) (Ninth Circuit relies upon Oregon Supreme Court's answers to certified questions,

including question of whether "a condition of development that requires a landowner to improve

off-site public property in which the landowner has no property interest constitutes an exaction?"),

*cert. denied,* 132 S. Ct. 578 (2011).  The City maintains the conditions of development in this case

are indistinguishable from those rejected by the Ninth Circuit and the Oregon Supreme Court in *West*

*Linn.*

        In *West Linn,* the property owner brought an action against the city alleging the conditions

it placed upon the approval of development of a corporate office park effected a taking of property

when the city required, as a condition of development, that the owner construct off-site public

improvements.  Specifically, the conditions of development called for West Linn Corporate Park

("WLCP") to construct several off-site public improvements with its personal property, *i.e.*, money,

piping, sand and gravel, but the conditions did not require WLCP to dedicate any interest in its own

real property.  Both the Oregon Supreme Court and the Ninth Circuit concluded the government's

---

[5]The City characterizes the "purported 'exactions' [as]:  (1) money spent gaining access
to utilities; (2) money spent on public improvements that serve its development; and (3) the
required dedication of 37 feet instead of 33 feet towards David Hill Road." (Defs.' Mem. FRCP
50(B) J. Matter Law 19.)  For purposes of this analysis, the court relies upon David Hill's
characterization of the alleged exactions.

requirement that a property owner commit money, or the functional equivalent, that is not roughly

proportional to the impacts of its development is not an unconstitutional condition under *Nollan* and

*Dolan*.  *See West Linn*, 349 Or. at 86-87; *West Linn*, 428 Fed. Appx. at 702 (conditions of

development "did not require WLCP to dedicate any interest in its own real property").  The City

charges David Hill "presented *no* evidence at trial that the City required it to dedicate lands to the

public as a condition of development." (Defs.' Mem. FRCP 50(B) J. Matter Law 19 (emphasis in

original).)

In response, David Hill contends the conditions here are distinguishable from those in *West

Linn* because "all of Plaintiff's *Dolan* claims became fixtures to the real property *before* they were

dedicated to the City because the infrastructure improvements were constructed on Plaintiff's land

and subsequently dedicated to the City when the plat was recorded."  (Pl.'s Response 12-13.)

According to David Hill, because it owned the property at the time the improvements were installed,

the improvements became a fixture to real property.  Thus, subsequently, when the final plat was

recorded in April 2007, there was a dedication, *i.e.,* exaction, of real property in the form of

improvements, *i.e.,* fixtures.  David Hill has argued throughout this litigation that an individualized

decision to compel a property owner to construct and deliver tangible physical improvements for

public benefit without demonstrating the requirements are "roughly proportional" to the impact of

the property owner's development constitutes unconstitutional exactions.  (*See, e.g.,* Pl.'s Resp.

Partial Summ. J. 19, March 1, 2011.)  While David Hill concedes the Oregon Supreme Court held

*Dolan* protection applies only to the dedication of real property and does not extend to other

conditions of development, *West Linn Corporate Park*, 349 Or. at 86-87, it insists "the Oregon

Supreme Court's contrary view should be given little or no weight by this Court. . . ." (Pl.'s Resp. Partial Summ. J. 24.) David Hill instead maintains "[t]here is no principled basis in federal law to distinguish between exactions requiring a property owner to dedicate its property and those which require a property owner to construct public infrastructure." (Pl.'s Resp. Partial Summ. J. 19.)

In opposition to the original summary judgment motion filed in this case, David Hill relied, in part, on the decision in *Clark v. City of Albany,* 137 Or. App. 293, 300, 904 P.2d 185 (1994),[6] to argue that exactions such as construction of right-of-way improvements were subject to the analysis in *Dolan,* even if the exaction did not require a dedication of real property. (Pl.'s Resp. Summ. J. 25-27, May 20, 2009.) At the time, the City opposed David Hill's *Dolan* claim, in part, by arguing the purported "exactions" were negotiated terms of a contract and, in any event, the challenged conditions pre-dated David Hill's subdivision project and were contained in the TSP. As such, the alleged exactions were actually "legislative" determinations and not subject to the "rough proportionality" test of *Dolan.* (Defs.' Reply 15-17, June 3, 2009.)

---

[6]Subsequently, in *West Linn,* the Oregon Supreme Court considered the Oregon Court of Appeals' decision in *Clark,* and stated:

> *Clark* was decided in 1995, and, although *Nollan* and *Dolan* both had been decided, the Supreme Court had not had occasion to opine on their reach. In 1999, the Supreme Court decided *Monterey v. Del Monte Dunes at Monterey, Ltd.* . . . and stated that it had not extended the application of *Nollan* and *Dolan* "beyond the special context of [such] exactions." As a result of that statement, the Court of Appeals considered its decision in Clark "open to question." *Dudek v. Umatilla County,* 187 Or. App. 504, 516 n. 10, 69 P.3d 751 (2003). Then, in 2005, the Supreme Court decided *Lingle* and discussed, in the context of its disaggregation of due process and takings challenges, the jurisprudential underpinnings of *Nollan* and *Dolan.* We choose not to rest on a Court of Appeals case that predated *Lingle.*

349 Or. at 82.

Any analysis of whether a condition of development may constitute an unconstitutional exaction must adhere to the Supreme Court's reasoning and holdings in *Nollan* and *Dolan*. In *Nollan*, the California Coastal Commission conditioned the grant of Nollan's development/rebuilding permit of his beach side home on Nollan's dedication of an easement on the property to the public. *Nollan*, 483 U.S. at 828. The Supreme Court struck down the condition as an unconstitutional because there was no "essential nexus" between the adverse impacts of the development and the required easement. *Id.* at 837. In *Dolan*, the Oregon Land Use Board of Appeals conditioned the grant of Dolan's permit to expand a store and parking lot on Dolan's dedication of a portion of the relevant property as a "greenway" and bicycle/pedestrian pathway. *Dolan*, 512 U.S. at 379-80. In *Dolan*, the Court expanded upon its decision in *Nollan* to require an "essential nexus" and "rough proportionality" between the condition placed on the land and the extent of the impact of the proposed development. *Id.* at 391. The Court determined the exactions in *Dolan* were unconstitutional because the City failed to show the conditions were roughly proportional to the negative impacts caused by the development. *Id.* at 394-95.

*Nollan* and *Dolan* both arose from requests by the property owner for building permits to expand the structures located on their real property. In both cases, the government agencies approved the permits, but conditioned the approval on an exchange for real property belonging to the landowner. In both cases, if the landowners rejected the conditions, they would give up the permits and the right to develop their properties. In that way, the local governments were in a position to exploit their police power to obtain the easements without paying just compensation. Thus *Nollan* and *Dolan* involved Fifth Amendment takings challenges "to adjudicative land-use

actions," in those instances, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit. *See Lingle v. Chevron U.S.A. Inc*, 544 U.S. 528, 546 (2005). To date, the Supreme Court has not extended the *Nollan* and *Dolan* decisions beyond situations in which the government requires a dedication of private real property. *Id.* at 547. In fact, the decisions in *Nollan* and *Dolan* are the only instances thus far in which the Supreme Court has determined a land-use exaction was unconstitutional.

In the eighteen years since *Dolan* was decided, the Supreme Court has commented only twice on the scope of *Dolan*. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 702 (1999) (court emphasizes it has "not extended the rough-proportionality test of *Dolan* beyond the special context of exactions – land-use decisions conditioning approval of development on the dedication of property to public use"); *Lingle*, 544 U.S. at 547 ("*Nollan* and *Dolan* both involved dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings"). In each of these subsequent cases, the Supreme Court acknowledged the extraordinary circumstances of *Nollan* and *Dolan*. *See City of Monterey,* 526 U.S. at 702 ("beyond the *special context* of such exactions" (emphasis added)); *Lingle*, 544 U.S. at 547 ("a *special application* of the doctrine of unconstitutional conditions" (emphasis added) (quotations and citation omitted)).

Since the Supreme Court's decisions in *Nollan* and *Dolan*, state and federal courts have split on whether the essential nexus/rough proportionality test extends to conditions that do not involve the dedication of land or conditions imposed upon the land. One line of cases holds the *Nollan/Dolan* standard applies only to exactions involving land use dedications. *See, e.g., McClung*

*v. City of Sumner*, 548 F.3d 1219, 1227-28 (9th Cir. 2008) (distinguishes present case from *Nollan*

and *Dolan*, among other things, because plaintiff "gave up no rights to their real property");[7] *West*

*Linn*, 428 Fed. Appx. at 702 ("The Supreme Court has not extended *Nollan* and *Dolan* beyond

situations in which the government requires a dedication of private real property. . . . We decline to

do so here." (*citing Lingle*, 544 U.S. at 547)); *Clajon Prod. Corp. v. Petera*, 70 F.3d 1566, 1578

(10th Cir. 1995) ("In our judgment, both *Nollan* and *Dolan* follow from takings jurisprudence's

traditional concern that an individual cannot be forced to dedicate his or her land to a public use

without just compensation. That is, *Nollan* and *Dolan* essentially view the conditioning of a permit

based on the transfer of a property interest – *i.e.*, an easement-as tantamount to a physical occupation

of one's land."); *West Linn*, 349 Or. at 86-87 (*Nollan* and *Dolan* do not apply to monetary

obligations or requirements that a property owner construct off-site improvements; rather  the

functional equivalent of a monetary obligation); *B.A.M. Development, L.L.C. v. Salt Lake County*,

707 Utah Adv. Rep. 16, ___ P.3d ___, 2012 WL 1564340, *3 (May 4, 2012) ("A development exaction

is a government mandated contribution of property imposed as a condition of approving a

developer's project."); *St. Johns River Water Management Dist. v. Koontz*, 77 So. 3d 1220 (Fla.

2011) (Florida Supreme Court finds the rules articulated in *Nollan* and *Dolan* apply only when the

condition or exaction involves dedication of real property in exchange for a permit that actually

issues), *cert granted*, ___ S. Ct. ___, 2012 WL 1966013 (Oct. 5, 2012); *Sea Cabins on the Ocean IV*

*Homeowners Ass'n v. City of N. Myrtle Beach*, 345 S.C. 418, 548 S.E.2d 595, 603 n. 5 (2001) (South

Carolina Supreme Court stated *Dolan* "rough proportionality" test applied only to physical

---

[7]David Hill contends the Ninth Circuit's decision in *McClung* is "narrowly directed to
*legislatively-mandated* regulations." (Pl.'s Resp. Summ. J. 21 (emphasis in original).)

exactions). *See also Starr Intern Co., Inc. v. United States*, __ Fed. Cl. __, 2012 WL 2512920 (July 2, 2012) ("In light of the Supreme Court's reluctance to apply the Nollan/Dolan test "beyond the special context" of land use exactions – even in a case involving land restrictions, Del Monte Dunes, 526 U.S. at 702 – and the repeated clear statements that the test is meant to apply only in cases involving land use exactions, the Court declines to extend the test to the unique facts of this case.").

Another line of cases, relied upon by David Hill, holds the *Nollan/Dolan* test extends beyond the context of the imposition of property conditions on the landowners' real property. For example, the California Supreme Court held non-real property conditions can constitute a taking where the condition is imposed on a discretionary, individualized basis. *See Ehrlich v. City of Culver City*, 12 Cal. 4th 854, 911 P.2d 429 (1996) (California Supreme Court holds rough proportionality test applied to nonpossessory exactions, in the form of individual and discretionary monetary fees). Additionally, in the *Town of Flower Mound v. Stafford Estates L.P.*, the Texas Supreme Court expanded application of the test by holding *Nollan* and *Dolan* can apply to certain non-real property conditions arising from generally applicable regulations. 47 Tex. Sup. Ct. J. 497, 135 S.W.3d 620 (2004) (holding both monetary and dedicatory exactions will be evaluated under *Nollan/Dolan*, finding "no important distinction" between the two).

Turning now to the alleged exactions in this case, oddly, David Hill does not distinguish the City's condition requiring an extra four feet of right away along David Hill Road, *i.e.*, an interest in real property, from the other purported exactions, *i.e.*, monetary obligations. Even the City concedes the required dedication of four feet of real property may arguably qualify as an exaction under existing case law, but contends David Hill did not oppose this condition prior to the City issuing the

conditions of approval. (Defs.' Reply 6.) The court finds the City's requirement that David Hill dedicate 37 feet on the north half of David Hill Road while allowing Lyle Spiesschaert and Dave Huttula to dedicate only 33 feet for the south half of that road constituted an exaction under *Nolan* and *Dolan*. Thus, at trial, the City was required to prove there was an essential nexus between the exaction and the impact of the development; and the exaction was roughly proportional to the projected impact of the proposed development. The City now asks the court to find it satisfied this burden at trial and the court declines to do so. In its Rule 50(b) motion, the City simply concludes, with no citations to the record, the testimony of Ben Schonberger and Mike Ard was sufficient to show the exactions were necessary and proportional. (Defs.' Mem. FRCP 50(B) J. Matter Law 21.) On such bare allegations, the court is unable to conclude there was no legally sufficient basis for the jury to find on behalf of David Hill on the question whether the condition for an additional four feet of property to construct David Hill Road was necessary and proportional.

With respect to the remaining alleged exactions – extending the electrical trunk line, constructing a median, and construction costs – David Hill does not argue these purported exactions fall directly within the purview of *Nollan* and *Dolan*. Rather, it simply concludes there is "no difference between a forced dedication of an interest in real property . . . and a compelled requirement that a landowner construct and deliver to the government tangible physical improvements which become part of the real property upon which they are installed, such as the street improvements at issue in this case." (Pl.'s Resp. Partial Summ. J. 22.) Despite David Hill's conclusory assertion otherwise, there are significant differences between the facts of *Nollan* and *Dolan* and the circumstances of this case. For example, in *Nollan* and *Dolan*, the government action

resulted in a compelled dedication of real property (belonging to the landowner) for public use in exchange for issuance of the permit. "Such public access would deprive [the landowners] of the right to exclude others, 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.'" *Dolan*, 512 U.S. at 384 (citation omitted). Here, the purported exactions required David Hill to construct physical improvements to property, including off-site improvements to Brooke Street. *See West Linn*, 349 Or. at 86-87 (no unconstitutional exaction or condition under the Fifth Amendment when government requires monetary obligation that is not roughly proportional); *West Linn,* 428 Fed. Appx. at 703 (there can be no cognizable Fifth Amendment takings claim absent a required dedication of an interest in real property). In addition, ownership of the real property upon which the improvements were constructed was subsequently transferred to the City when the plat was recorded and, therefore, David Hill was never deprived of the essential right to exclude others as a result of the City's development conditions.[8] In *Nollan* and *Dolan*, the property owners retained ownership of their property, but were forced to accept the easement and lose their important right to exclude the public. David Hill does not argue that, outside of the exaction context, the conditions here would constitute a "per se physical taking" as appears to be required under current Supreme Court precedent. *See Lingle*, 544 U.S. at 547.

Thus, contrary to David Hill's assertion that there is no difference between the compelled dedication of easements across private property in *Nollan* and *Dolan*, and the conditions in dispute here that a developer construct various on-site improvements as a condition of its permit, David Hill is arguing for a significant extension of the Supreme Court's holding in *Nollan* and *Dolan*, an

---

[8]David Hill does not argue the transfer of ownership of David Hill Road to the City constituted an exaction.

extension that, presently, is unsupported by either Supreme Court or Ninth Circuit precedent and unwarranted by the evidence admitted at trial. *See Lingle*, 544 U.S. at 547; *City of Monterey*, 526 U.S. at 702; *McClung*, 548 F.3d at 1228; *West Linn*, 428 Fed. Appx. at 702.[9] *See also Skoro v. City of Portland*, 544 F. Supp. 2d 1128, 1133-34 (D. Or. 2008) (court finds the City's requirement that property owner dedicate portions of his property for the City to use for sidewalks as a condition for development is a *Nollan/Dolan* exaction). Indeed, these "differences" David Hill so quickly dismisses have been considered and analyzed by both state and federal courts since the Supreme Court's decision in *Dolan* in 1994. Moreover, as evident from the growing divide in authority, briefly outlined above, the collective judiciary has grappled with the application of *Nollan* and *Dolan* to various individually applied development conditions, and the results have been wide ranging. While the authority in the Ninth Circuit is not directly on point, when considered along with the Supreme Court's decisions in *Nollan, Dolan, Lingle,* and *City of Monterey*, the extension urged by David Hill in this case goes too far. Thus, the remaining conditions for development were not unconstitutional exactions as a matter of law, and those conditions were not properly before the jury for a determination of whether they were necessary and proportional. The City's request for an entry of judgment against David Hill's takings claims grounded in the requirements that David Hill:

---

[9]David Hill attempts to distinguish this case from *West Linn* on the ground that all of the purported exactions became fixtures to the real property before the real property and those fixtures were dedicated to the City when the plat was recorded. According to David Hill, these circumstances are "categorically" different from the situation in *West Linn* where a developer was required to spend money to build infrastructure in an existing dedicated right-of-way. (Pl.'s Resp. 12-13.) Even assuming *West Linn* is distinguishable in this instance, there is no controlling precedent for the expansion of *Nolan/Dolan* propounded by David Hill in this case.

[LB]

(1) extend the City's main electrical trunk line; (2) construct a central median on David Hill Road; and (3) incur the right-of-way and construction costs purchased from Huttula is granted.

The court's decision that certain requirements of development were not properly before the jury as exactions requires the court to set aside the jury's verdict on David Hill's Takings - Exactions Claim. While it is possible the jury would have found for David Hill on that claim based solely on the conduct of the City requiring David Hill to dedicate the additional four feet of land, the court is unable to invade the province of the jury and make that finding as a matter of law. In fact, it is equally plausible the jury considered all four challenged conditions of development, cumulatively, to reach its verdict on David Hill's Exactions Claim.

The court must next consider what impact the decision to set aside the jury's verdict in favor of David Hill on its Takings - Exactions Claim has on the other claims in this case and the damages award. The City contends a reversal as to any portion of the jury's findings necessitates a new trial on all claims as to liability and damages. Conversely, David Hill insists that even if the court strikes a portion of the jury's verdict, a new trial is not necessary because the Verdict Form here contained special interrogatories for each claim and David Hill's damages were essentially the same for each of David Hill's claims.

The court declines to order a new trial on the remaining claims. As set forth below in Section B, C, and D, there is substantial evidence to support the jury's verdict on all of the remaining claims. Moreover, the jury answered special interrogatories on each theory of liability submitted for decision. As such, there is no possibility the jury found liability for the City on a legally defective claim. *See Webb v. Sloan*, 330 F.3d 1158, 1167 (9th Cir. 2003) ("Because of the special interrogatories, there

is no danger that the jury found liability only on a legally defective theory. The only aspect of the verdict that is 'general' is the damages award, which was not apportioned among the claims.")

More difficult is whether the "general" damages award in this case should stand despite the court's decision to set aside the verdict on David Hill's Takings - Exactions Claim.[10]  Typically, a general jury verdict will be upheld only if there is substantial evidence to support each and every theory of liability submitted to the jury. *See Syufy Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986).  "An exception to this rule exists, however, when we are able to construe a general verdict as attributable to a theory submitted to the jury that was viable . . . ." *Webb*, 330 F.3d at 1166–67 (citing *Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc.*, 62 F.3d 280, 285–86 (9th Cir. 1995)).  In deciding whether to exercise discretion and apply this exception, courts consider:  (1) the potential for confusion of the jury; (2) whether the losing party's defenses apply to the count upon which the verdict is being sustained; (3) the strength of the evidence supporting the count relied upon to sustain the verdict; and (4) the extent to which the same disputed issues of fact apply to the various legal theories. *Traver v. Meshriy*, 627 F.2d 934, 938-39 (9th Cir. 1980); *accord Webb*, 330 F.3d at 1166-67; *see also Cochran v. City of Los Angeles*, 222 F.3d 1195, 1202

---

[10]David Hill contends the City has waived any objection to the general verdict on damages by requesting only a single line for damages on its proposed Verdict Form despite a special interrogatory for each claim submitted to the jury.  Conversely, David Hill's proposed Verdict Form sought a line for damages specific to each claim. *See, e.g., Saman v. Robbins*, 173 F.3d 1150, 1155 & n.5 (9th Cir. 1999) (a party complaining about the wording of the questions submitted to the jury "must object to the form of special interrogatories in the trial court in order to preserve the issue for review on appeal.").  While the court did use the City's requested Verdict Form with a single line for David Hill's "total damages", the court must nevertheless determine whether the jury's finding of liability on the remaining claims is sufficient to uphold the damages award.

(9th Cir. 2000) (court has discretion to uphold verdict "if it is likely the jury was not confused and the evidence for the plaintiff was strong on the remaining theory").

The court will exercise its discretion and construe the general damages award as attributable to the remaining theories of recovery, *i.e.*, David Hill's Temporary Takings, Equal Protection and Due Process Claims. The Amended Complaint seeks the same damages for each of David Hill's claims - Takings Claims (Exactions and Temporary), Equal Protection and Due Process Claims. (Am. Compl. ¶¶ 46, 60, 66.) Additionally, the facts underlying each of David Hill's theories are substantially the same. For example, during closing argument Bradley Andersen, counsel for David Hill, relied upon the purported exactions as evidence to establish the Equal Protection Claim:

> But the equal protection. Here are some other examples. You probably, back there, will come up with some more examples how Mr. McDonald was treated differently than the other developers. The Parks, required to dedicate four extra feet on road shared with Oak Hill. Oak Hill not required. Remember Mr. Huttula came in here and said: I wasn't going to give them any more than the 33 feet.
>
> . . . .
>
> I don't think there is any doubt -- if you look at Exhibits 35 and 36 and -- even she admitted she didn't have the median on hers either. There is therefore no doubt that on August 30th, when they met, they agreed that there wasn't going to be a median. But the City changed its mind later on, which was in an effort to try to force my client to deal with Dave Huttula. The next one is the electrical main. I think this is one of the most glaring examples. Dave Huttula had the same conditions of approval when it came to electrical mains as Tim McDonald. You saw the pictures. He had to put in four or five of those great big stations at a cost of $180,000. Why would they make him put it on his side? Why would they make him pay for it when Mr. Huttula wasn't required at least do half of that? Does that make any sense? Why were they going after my client? Was it because that was the first time in the City of Forest Grove? Is that a rational basis to the make my client do something that the others don't have to do?

(Trial Tr. 4455:7-4457:3.) As mentioned, there is ample evidence to support an award to David Hill based upon those theories of liability. The City's statute of limitations defense was applied to all claims. There is no evidence in the record of jury confusion and the special interrogatories ensured the jury considered whether the City was liable on each of the claims asserted by David Hill. The jury's general damages award of $6,539,176 is unchanged by the court's decision to set aside the jury's verdict on David Hill's Takings - Exactions Claim. (*See also* "Section IV. Verdict On Damages", below.)

      B.     *Takings – Temporary Taking*

The City next challenges the legal and factual sufficiency of David Hill's Temporary Takings Claim. According to the City, whether there was an unconstitutional taking is a legal question for the court and, regardless, "there is no evidence of a temporary taking." (Defs.' Mem. FRCP 50(b) J. Matter Law 21.) Specifically, the City contends David Hill failed to establish an extraordinary delay, as required, for a compensable taking of property and, regardless, David Hill's Temporary Takings Claim must fail under the balancing test of *Penn Central*. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). Finally, the City renews its estoppel/exhaustion/ ripeness challenge because the evidence shows David Hill accepted the City's conditions of approval, signed a public improvements contract, accepted final approval, and never pursued an appeal. (Defs.' Mem. FRCP 50(b) J. Matter Law 23.)

In paragraph 46 of its Amended Complaint, David Hill alleges the City's delay of the Parks grounded in:

    David Hill's refusal to acquiesce in the construction of a trunk sewer line in a different location and elevation than what was approved in the preliminary plans and

called for in the City's master sewer plan constitute an unlawful interference with Plaintiff's investment backed expectations and at least a temporary taking of the entire property for a public purpose without payment therefore in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

(Am. Compl. ¶ 46.)  David Hill seeks just compensation in the amount of $11,991,629 for this temporary taking.  At trial, David Hill proceeded on the theory that the City's delay in issuing David Hill the approvals and permits necessary to proceed with and complete the project resulted in the City temporarily taking David Hill's property for public use without providing just compensation. *See Penn Central*, 438 U.S. 104.[11]  The jury found the City's actions constituted a temporary taking of David Hill's property in violation of the Takings Clause.

Almost ninety years ago, in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), the Supreme Court determined "government regulation of private property may, in some instances, be

---

[11]In its opposition to the City's FRCP 50(b) Motion, David Hill argues the City's action in refusing to approve its initial sewer plan was actually a permanent taking that was subsequently rescinded and, as such, was a categorical (*per se*) taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992).  (Pl.'s Response 14-16.)  It is clear from Jury Instruction No 27. given in this case, that David Hill's Temporary Takings Claim was submitted to the jury under the theory for recovery set forth in *Penn Central*.  (Court's Jury Instructions No. 27 (Docket #270); *see also* David Hill's Proposed Jury Instructions 82-83 (Docket #124) (citing *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), as authority for David Hill's requested Temporary Takings Instruction ("This proposed instruction addresses Plaintiff's Temporary Takings theory based on the ruling and analysis in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).  This case [*Penn Central*] set forth the framework for analyzing a temporary takings.  The elements put forth in this instruction are pulled from various case law, including the *Penn Central* case, along with *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), and *Tahoe-Sierra Preservation Counsel v. Tahoe Regional Planning Agency*, 535 U.S. 302 (2002)").)  David Hill offers no authority, or even justification, for now arguing an alternative theory of liability, *i.e.*, *Lucas*, grounded in the City's delays in issuing the requisite permits; a theory that was never presented to the jury.  Accordingly, the court will decide whether there is sufficient evidence to support the jury's verdict for David Hill's Temporary Takings Claim in accordance with Jury Instruction No. 27, based upon the factors set forth in *Penn Central* and *Tahoe-Sierra*.

so onerous that its effect is tantamount to a direct appropriation or ouster-and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle*, 544 U.S. at 537 (citing *Mahon*, 260 U.S. at 415). The Supreme Court has established two categories of regulatory action that, generally, are considered *per se* takings under the Fifth Amendment. *Id.* at 538. In the first instance, government must provide just compensation where it requires an owner to suffer a permanent physical invasion of his property, however minor. *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking)). A second *per se* takings occurs where a regulation "completely deprive[s] an owner of '*all* economically beneficial us[e]'" of his property. *Id.* (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis in original)). A regulatory takings challenge that falls "outside these two relatively narrow categories" must be analyzed under the standards set forth in *See Penn Central*, 438 U.S. 104; *Lingle*, 544 U.S. at 538.[12]

Under *Penn Central*,[13] the primary factors the court is to consider are:

> [t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.

---

[12]The "special context" of land-use exactions discussed above provides an additional basis to challenge a regulatory taking, but is not implicated by David Hill's Temporary Takings Claim. *See Lingle* 544 U.S. at 538.

[13]*Penn Central* involved the question of whether the designation of New York City's Grand Central Terminal as a historical landmark, and the restrictions on development the designation imposed, so adversely affected plaintiffs' economic interests in the property as to constitute a taking requiring just compensation under the Fifth and Fourteenth Amendments. 438 U.S. at 107. In deciding the regulation at issue did not amount to a taking, the Court held that no set formula exists to determine when a regulation will constitute a taking, but it articulated "several factors that have particular significance" in the analysis. *Id.* at 124.

> In addition, the character of the governmental action-for instance whether it amounts
> to a physical invasion or instead merely affects property interests through some
> public program adjusting the benefits and burdens of economic life to promote the
> common good-may be relevant in discerning whether a taking has occurred.

*Lingle*, 544 U.S. at 538-39 (quotations omitted) (citing *Penn Central*, 438 U.S. at 124); *see also*

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002).

The *Penn Central* analysis involves "a complex of factors" and test is the same whether the

regulation is permanent or temporary in nature, although in the latter situation, the court must

carefully consider the duration of the restriction under the economic impact prong. *See Tahoe-*

*Sierra*, 535 U.S. at 342 (in a temporary regulatory takings case, "the duration of the restriction is one

of the important factors that a court must consider"). A requirement that a property owner obtains

a permit "before engaging in a certain use of his . . . property does not itself" constitute a

compensable taking. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985);

*see also Agins v. City of Tiburon*, 447 U.S. 255, 263 n. 9 (1980) ("Mere fluctuations in value during

the process of governmental decision making, absent extraordinary delay, are 'incidents of

ownership.'" (internal quotations and citation omitted), *abrogated on other grounds by Lingle*, 544

U.S. 528. In *Tahoe-Sierra*, the court declined to adopt a categorical rule for how long governmental

action must preclude use of property before a taking occurs. *See id.* at 335. A taking may result,

however, when there is an extraordinary delay and a careful weighing of the factors set forth in *Penn*

*Central* dictates a finding that a taking has occurred.

At oral argument, the City once again insisted that even a year long delay, as argued by David

Hill, is insufficient as a matter of law to establish a temporary taking. The court disagrees. Whether

a delay is extraordinary depends both on its length and the reasons for the delay. "[T]he duration of

the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe–Sierra*, 535 U.S. at 342.   Nevertheless, no categorical rule establishes how long governmental action must preclude use of property before a taking occurs. See id. at 335.   While delays that qualify as extraordinary typically last for a substantial length of time, "[t]he question of whether a delay is extraordinary is not a simple matter of the number of months or years taken by the Government to make its decision . . . ." *Bass Enterprises Production Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004) (citing *Tahoe–Sierra*, 535 U.S. at 333, 337–38). "Instead of such an easy guidepost, courts must evaluate a number of factors to determine whether the delay is extraordinary," including the reasons for the delay and whether the delay is proportionate to the nature of the government process. *Bass Enterprises*, 381 F.3d at 1366.   Courts recognize "delay is inherent in complex regulatory . . . schemes" and they therefore "must examine the nature of the . . . process as well as the reasons for any delay." *Wyatt v. United States*, 271 F.3d 1090, 1098 (Fed. Cir.2001).  In assessing the reasons for the delay, courts may consider whether the government acted in good faith, and some courts have been reluctant to find extraordinary delay in the absence of bad faith by the government. *See id.*

There is no question a determination of whether certain regulatory actions constitute a compensable taking is difficult even for the most experienced jurists. *See, e.g., Eastern Enterprises v. Apfel*, 524 U.S. 498, 541 (1998) ("Cases attempting to decide when a regulation becomes a taking are among the most litigated and perplexing in current law"); *Penn Central*, 438 U.S. at 123 ("The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a

problem of considerable difficulty"). Nevertheless, in this case it was for the jury[14] to determine

whether the City's actions in issuing the permit constituted an extraordinary delay under the

circumstances. *See, e.g., Resource Investment, Inc. v. U.S.*, 85 Fed. Cl. 447, 509 (2009) ("But,

because the [c]ourt cannot even determine if there was delay, let alone an extraordinary one, the

[c]ourt cannot decide extraordinary delay on summary judgment and therefore will not proceed to

the *Penn Central* test for this claim. The issue will have to wait for disposition at trial."). In fact,

given the *ad hoc* nature of takings inquiries, the relevant issues normally are fact issues that must

be determined either on the entirety of a complete record or at trial. *See, e.g., Moden v. U.S.*, 404

F.3d 1335, 1342 (C.A. Fed. 2005) ("due to the fact-intensive nature of takings cases, summary

judgment should not be granted precipitously"); *Whitney Benefits, Inc. v. U.S.*, 752 F.2d 1554, 1560

(Fed. Cir. 1985); *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed. Cir.1983); *accord*

*Mehaffy v. U.S.*, 102 Fed. Cl. 755, 762 (Fed. Cl. Jan. 10, 2012); *Resource Investments*, 85 Fed. Cl.

at 466.

At trial, David Hill presented evidence that, against the express advice of the City's attorney,

the City required David Hill to reroute its sewer line after the City had approved David Hill's sewer

---

[14]The court notes the City's reliance on *Wyatt v. United States*, for its assertion that
whether the permit delay constituted a temporary taking is a question of law for the court to
resolve. 271 F.3d 1090, 1096 (Fed. Cir. 2001) ("Whether or not a taking has occurred is a
question of law based on factual underpinnings.") While the City provides no other argument or
analysis in support of this contention, presumably, it is arguing David Hill's Temporary Takings
claim should not have been submitted to the jury for decision. The City, however, fails to
address or distinguish the Supreme Court's holding in *City of Monterey. See* 526 U.S. 687
(question of whether a property owner was deprived of all economically viable use of his
property was a predominantly factual question appropriate for the jury, and question of whether
the challenged land use decision bore a reasonable relationship to its proffered justification, a
mixed law-fact issue, similarly was properly submitted to the jury).

plans, which delayed issue of the permit from approximately September 21, 2005, until June 15, 2006. In addition, David Hill presented evidence there was no legal basis for the requirement and, in fact, the reason the City demanded David Hill reroute the sewer was grounded in its bias for Steve Matiaco's development project. There was also evidence presented that after construction was underway on the Parks there were additional delays resulting from the extra time it took to build the infrastructure the City demanded subsequent to the preliminary plat approval which included, but was not limited to, both sides of David Hill Road, a median, and the electrical vaults. Additionally, David Hill presented evidence it paid a premium, *i.e.*, development value, to acquire property inside the Urban Growth Boundary and, thus it held investment backed expectations in the issuance of a permit that was neither delayed disproportionately to other similar projects or for improper reasons. Finally, David Hill presented evidence the delay lasted over a year and the impact of the delay was significant due to the market eroding and mounting loan interest payments. *See Lingle*, 544 U.S. at 540 ("Penn Central inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests").

At trial, the court adopted the City's proposed jury instruction on David Hill's Temporary Takings claim and, consequently, the City does not now challenge the legal sufficiency of that instruction. Specifically, as requested by the City, the court instructed the jury first to determine whether the delay in issuing the permits in this case was extraordinary; and was then asked to consider all of the factors set forth in *Penn Central*, and whether "the adverse economic effect of the delay on Plaintiff outweighed the City's legitimate interest in causing the delay . . . ." (Court's

Instructions to the Jury 27.)  Based upon the evidence presented, the jury determined the *delay by the* City in making its permit decision constituted a temporary taking under the Fifth Amendment.

In reviewing the jury's decision, the court is cognizant the evaluation of a regulatory takings is an "essentially ad hoc" process. *Penn Central*, 438 U.S. at 124.  As such, it is necessary to weigh all of the relevant circumstances in context to determine whether a takings has occurred. *Palazzolo v. Rhode Island*, 533 U.S. 606, 636 (2001) (O'Connor, J., concurring) ("The court below therefore must consider on remand the array of relevant factors under *Penn Central* before deciding whether any compensation is due."); *accord Tahoe-Sierra*, 535 U.S. at. 335.  In determining whether a temporary takings had occurred, the jury was permitted to consider the length of the delay caused by the City's actions, how long the process should have taken, the nature and character of the City's conduct, *i.e.*, whether it acted in bad faith, and the economic impact to David Hill from that delay. There was sufficient evidence presented at trial for the  jury to determine the City's actions constituted a Temporary Takings of David Hill's property.  Further, the jury's decision is in accordance with the balancing required by *Renn Central* and *Tahoe-Sierra*.  The court declines to now reverse the jury's determination the *Penn Central* factors were met. *See, e.g., Penn Central*, 438 U.S. at 124 ("[W]e have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely upon the particular circumstances in that case." (internal quotations and citation omitted)).

Finally, the City renews its arguments that estoppel, exhaustion, and ripeness are jurisdictional bars to David Hill's Temporary Takings Claim.  The court previously addressed these precise issues and it declines to reconsider its prior rulings on these challenges. *See David Hill*, 688

F. Supp. 2d 1193, 1205 - 1207 (D. Or. 2010) ("Defendants offer no intermediate state administrative procedures that should have been pursued by Plaintiff, outside of litigation in state court – which Plaintiff's initiated . . . ."); *see also David Hill*, 3:08-cv-266-AC, Opinion and Order (D. Or. June 1, 2011) (Docket # 107) (court declines to reconsider earlier ruling on ripeness because no intervening change in substantive law and defendants had previously conceded its exhaustion argument during oral argument on summary judgment). The City's request for judgment as a matter of law against David Hill's Temporary Takings Claim is denied. Similarly, the City's request for a new trial on this claim is denied.

C.    *Equal Protection*

Next, the City renews its motion for judgment as a matter of law against David Hill's Equal Protection Claim because David Hill failed to identify "substantially similar" developers as required for a class of one challenge. (Defs.' Mem. FRCP 50(b) J. Matter Law 24-28.) Alternatively, the City insists it had a rational basis for its actions with respect to the permitting process for the project, and the City reminds the court that it, not David Hill, would ultimately hold responsibility for the public improvements built to service David Hill's development.

In its Amended Complaint, David Hill alleged it was treated differently from other similarly situated land owners and developers in violation of the Equal Protection Clause. Specifically, the City delayed the construction of the subdivision and David Hill's final plat recording by approximately twelve to fourteen months, and refused to follow the approved preliminary plans or the conditions of approval imposed upon the preliminary approval of the Parks. (Am. Compl. ¶ 57.) David Hill further alleged the City's actions were irrational and arbitrary and motivated by

animosity, ill will, and vindictiveness because David Hill exercised its First Amendment rights. (Am. Compl. ¶ 58.)

An individual singled out for differential treatment in an "irrational and wholly arbitrary" manner may bring a substantive due process or "class of one" equal protection claim. *See, e.g., Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 601-03 (2008); *Village of Willowbrook v. Olech*, 528 U.S. 562, 565 (2000); *Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 955 (9th Cir. 2006); *Squaw Valley Dev. Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004), overruled (on other grounds) recognized by *Action Apart. Ass'n, Inc. v. Santa Monica Rent Control Bd.*, 509 F.3d 1020 (9th cir. 2007). In order to claim an Equal Protection violation in a class of one case, plaintiff must establish defendant intentionally, and without rational basis, treated plaintiff differently from others similarly situated. *See Village of Willobrook*, 528 U.S. at 564; *accord North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (9th Cir. 2008). Disparate treatment by a governmental entity is permissible provided it bears a rational relationship[15] to a legitimate state interest. *See, e.g., New Orleans v. Dukes*, 427 U.S. 297, 303-04 (1976); *Lockary v. Kayfetz*, 917 F.2d 1150, 1155 (9th Cir. 1990). In fact, without more, selective enforcement of valid laws is insufficient to show there was no rational basis for the action. *See, e.g., Squaw Valley*, 375 F.3d at 944; *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1188 (9th Cir.1995) ("Selective enforcement of valid laws, without more, does not make the defendants' action irrational."). To establish an Equal Protection claim, the asserted rational basis for selectively enforcing the law must also be a pretext for an impermissible motive.

---

[15]Here the parties agree the court must analyze the City's conduct using a rational basis standard because neither a suspect classification nor a fundamental right is implicated in this matter. *See, e.g., Pennell v. City of San Jose*, 485 U.S. 1, 14 (1988).

*Freeman*, 68 F.3d at 1188.  Conversely, "there is no rational basis for state action 'that is malicious, irrational or plainly arbitrary.'"  *Squaw Valley*, 375 F.3d at 944 (quoting *Armendariz v. Penman*, 75 F.3d 1311, 1326 (9th Cir. 1996) (*en banc*)).

In sum, a violation of the Equal Protection Clause, grounded in a class of one, may occur when a law is selectively enforced and "plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for 'an impermissible' motive.'"  *Squaw Valley*, 375 F.3d at 946 (quoting *Armendariz,* 75 F.3d at 1327).  Where defendant asserts a rational basis for such treatment, plaintiff may rebut the proffered basis as pretextual.  "In this circuit it is clearly established that a plaintiff may pursue an equal protection claim by raising a 'triable issue of fact as to whether the defendants' asserted [rational basis] . . . was merely a pretext' for differential treatment."  *Squaw Valley,* 375 F.3d at 945 (quoting *Armendariz,* 75 F.3d at 1327).  Thus, a plaintiff may rebut a proffered rational basis on the grounds that the rational basis is "objectively false," or by proving defendant acted with "an improper motive."  *Id.* at 946 (citing *See Patel v. Penman*, 103 F.3d 868, 876 (9th Cir. 1996); *Armendariz,* 75 F.3d at 1327; and *Lockary,* 917 F.2d at 1155).

As a threshold matter, the City insists David Hill failed at trial to show it was similarly situated to other developers and, therefore, the City was entitled to judgment as a matter of law against David Hill's Equal Protection Claim.  The City relies on the Seventh Circuit's decision in *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002), to argue David Hill was required to prove it was treated differently from another who was "prima facie identical in all respects," and it failed to do so here. (Defs.' Mem. FRCP 50(b) J. Matter Law 25.)  Specifically, the City contends David Hill's reliance at trial on a comparison with Pacific Crossing as similarly

situated was misplaced because of the differences between David Hill's project and Pacific Crossings's development efforts. For example, David Hill planned to develop a single phase, 217 lot subdivision on 60 acres of land abutting a county road, the urban growth boundary, and a wetlands. (Defs.' Mem. FRCP 50(b) J. Matter Law 26.) In contrast, Pacific Crossing involved two phases of a four-phase development. The two phases totaled 148 lots, and 26 acres of excavation. Pacific Crossing did not abut any county roads or the urban growth boundary, nor did it impact any wetlands. (Defs.' Mem. FRCP 50(b) J. Matter Law 26.) According to the City, the Pacific Crossing development had fewer agencies involved in review process, and fewer issues to address through its plans. Nor did Pacific Crossing's proposed development involve the same sewer access issues implicated by David Hill's development. (Defs.' Mem. FRCP 50(b) J. Matter Law 26; Trial Tr. 1614-1630 (Brent Fitch testimony).)

The law in this Circuit does not require David Hill to show it and the other developers are identical in all relevant respects; rather, it must establish only that they are alike. *See Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause . . . keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."); *Honolulu Weekly, Inc. v. Harris*, 298 F.3d 1037, 1047 (9th Cir. 2011) ("The Equal Protection Clause directs that 'all persons similarly circumstanced shall be treated alike.'" (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)); *see also Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) (requiring comparators be similar in "all material respects"); *Lynn v. Deaconess Med. Ctr.*, 160 F.3d 484, 487 (8th Cir. 1998) (requiring comparators be "similarly situated in all relevant respects" (internal quotation marks omitted)), abrogated on other grounds by *Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir.

2011) (*en banc*). The City has cited no precedential authority for this court to require David Hill to show it was treated differently from others *identically* situated, rather than *similarly* situated, and the court declines to adopt such a standard of its own accord.

At trial, David Hill produced evidence of three developers who were treated more favorably than David Hill: Matiaco, Huttula/Spiesschaert, and the developer of the Pacific Crossings subdivision. Testimony at trial established Pacific Crossings was allowed to install sediment ponds and rock its roads under an early grading permit without receiving a stop work order, whereas rocking the roads was one of the reasons the City gave for issuing a stop work order to David Hill. (Trial Tr. 1581:13 – 1582:20, 1595:22 – 1596:15 (Fitch testimony); Trial Ex. 7.) Moreover, the issuance of the Pacific Crossings' construction permit in the beginning of January 2006, allowed work on the Pacific Crossings project to proceed through the winter while David Hill's project was halted. (Trial Tr.1 606:13 - 1607:2 (Fitch testimony).)

An additional reason provided by the City for issuing a stop work order was David Hill's failure to obtain an approved construction permit prior to installing pipe. The evidence showed, however, that Huttula was able to lay sewer pipe for his neighboring Oak Hill development without any approved construction plans. Despite the lack of approved plans, Huttula did not receive a stop work order. (Trial Tr. 4185:7-16 (Irina Leschuk testimony); Morasch Decl. Ex. A at 32-34 (Trial Ex. 206).)

David Hill presented direct evidence that Matiaco was treated more favorably than Plaintiff when the City shut down the Parks construction at the insistence of Matiaco's attorney, Bob Browning:

Q.    And I know you haven't been here for this case, and you're just a witness, but one of the themes, if you will, of the plaintiff's case is that somehow the City favored you and Mr. Browning over Mr. McDonald in this sewer issue. Is that your impression, from what you've told us?

A.    Well, Bob Browning had power over the City to stop until we get an answer. Okay? So I guess we shut him down. But we just felt like we were left out there floating. You know, where is our sewer elevations? Is this going to be okay? Is it going to work?

Q.    But do you feel that the City bent over backwards to help you and Mr. Browning in some way?

A.    If they shut down Tim McDonald, I sure would think they would.

Q.    And do you know anything about the stop work order that was issued?

A.    I don't know the details of it. I heard some of it and forgot it. But all I know is my attorney was calling and hammering the City, the city managers and Rob Foster about, you know, "Where are we at with this sewer? Where are we going with it?" You know, "McDonald doesn't have a grading permit," or whatever he was doing.

Q.    So you don't know right now as you sit here whether the stop work order issued against Mr. McDonald was legitimately based on his contract or his failure to comply with the erosion control plan?

A.    From my understanding, it was from the pounding that Bob Browning did on them.

(Trial Tr. 1809:25 – 1811:2 (Steve Matiaco testimony).)

Finally, David Hill also presented evidence of disparate treatment grounded in the City's demand for an increased right of way dedication and improvements, *i.e.*, median and electrical

vaults, not required of Huttula/Spiesschaert, the developer to the south. *See Olech*,[16] 528 U.S. at

564-65 (Equal Protection Clause protects against intentional and arbitrary discrimination).

    The court finds the above comparators were sufficient evidence for the jury to consider

whether the City had a rational basis for treating David Hill differently from the three "similarly

situated" developers. While the City can point to distinguishing features between David Hill and

the others, the comparators are sufficiently alike in relevant areas -- Pacific Crossings installing

sediment ponds and rock its roads under an early grading permit and January 2006 permit; Huttula

laying sewer pipe without any approved construction plans and no increased dedication and

improvements; and shutdown of David Hill's project at the insistence of Matiaco's attorney. Thus,

David Hill submitted evidence that its circumstances were similar enough to those of the other

---

[16]The Olechs wanted the Village to connect their home to the municipal water system.
The Village agreed, but only on condition that the Olechs grant it not the customary 15-foot-wide
easement to enable the Village to service the water main but a 33-foot-wide easement to enable
the Village to widen the road on which the Olechs lived. The Olechs rejected the condition, and
after several months of disagreement the Village relented, admitted it had no good reason to
demand the wider easement, and agreed to hook up the Olechs' home to the water main in
exchange for the standard 15-foot easement. The Olechs sued for the damages they had
sustained by being without water during the period in which the Village was demanding the
larger easement. They claimed the Village had no justification for treating them differently from
other property owners -- it had done so to punish them for having successfully sued it for
negligently installing culverts near their property.

    The district court dismissed the Olechs' suit for failure to state a claim and the Seventh
Circuit reversed that decision. *See Olech v. Village of Willowbrook*, 160 F.3d 386, 388 (7th Cir.
1998) ("troubled . . . by the prospect of turning every squabble over municipal services . . . into a
federal constitutional case," the court considered that "the 'vindictive action' class of equal
protection cases requires proof that the cause of the differential treatment of which the plaintiff
complains was a totally illegitimate animus toward the plaintiff by the defendant"). The
Supreme Court granted certiorari and affirmed the Seventh Circuit's decision that a homeowner
could assert an equal protection claim as a class of one. 528 U.S. 562.

developers such that its different treatment required a legitimate explanation, *i.e.*, a rational basis for the City's actions.

Turning next to the City's contention it had a rational basis for its actions, David Hill can show there was no rational basis for the City's actions by presenting evidence the "asserted rational basis was merely a pretext for different treatment." *Squaw Valley*, 375 F.3d at 945-46 (internal quotations omitted). Such pretext may be shown by demonstrating "either: (1) the proffered rational basis was objectively false; or (2) the defendant actually acted based on an improper motive." *Id.* at 946. As to the second prong, reasons that are "malicious, irrational or plainly arbitrary" cannot provide a rational basis. *Armendariz*, 75 F.3d at 1326; *see also City of Cleburne, Tex v. Cleburne Living Ctr.*, 473 U.S. 432, 448-50 (1985) (*abrogated on other grounds*).

David Hill presented evidence that its proposed sewer plan was in compliance with the City's Code and the City pushed forward with the additional sewer demands against the advice of the City Attorney, Andrew Jordan. Specifically, at trial, David Hill presented an email exchange among City officials, including the following excerpt sent to Michael Sykes, the City Manager, from Woods on November 2, 2005:

> Problem is . . . LDC (consultant for The Parks - Tim McDonald) has presented a design that shows compliance with CWS regulations, relevant to extending the City's trunk sewer through their client's property, the next upstream tract of land. With Rob's approval, I spoke with Andy Jordan regarding this matter. Andy agreed, that the LDC plan met the intent of CWS rules . . . and, as a result . . . City would be ill-advised to 'force' Tim McDonald to pay higher costs (and significantly so, in this case) simply to more easily accommodate another, upstream developer.

(Morasch Decl. Ex. A at 29 (Trial Ex. 136).)

Moreover, David Hill presented evidence at trial that the City's actions were simply unfair.

For example, Foster testified:

Q.    Does it seem fair that Oak Hill Settlement only had to dedicate 33 feet and you made The Parks dedicate 37 feet?

A.    That doesn't seem fair.

Q.    Is there any code difference between these two applications that would apply differently to Oak Hill to reduce the burden on them?

A.    No, not that I know about.

Q.    Do you know why it was done that way?

A.    I can't tell you specifically. All I know is that the median was proposed and was accepted by The Parks.

Q.    I wasn't asking you about the median; I was asking you about the median width. Do you know why David Hill had to dedicate 37 feet and why Oak Hill only had to dedicate 33 feet?

A.    Well, in trying to answer that question, the 13 right-of-way -- the total right-of-way is influenced by having the median. So we proposed to The Parks to build this boulevard with a center median, and that would require 37, and they accepted it. So had we had some opposition from them, that might have been a different story. We may not have pushed it.

Q.    Do you recall one way or another whether they ever objected?

A.    I don't. I don't remember them objecting.

Q.    But you don't recall for sure whether they did or not?

A.    Right. I couldn't tell you absolutely whether they objected or not, but it was my feeling that everybody liked the idea of having this beautiful boulevard as an entrance to these new subdivisions: Landscaped, irrigated, turn lanes. It seemed to be received well.

(Trial Tr. 2187:18-2189:3.)

David Hill also produced emails from the City to illustrate there was no lawful basis for the City to delay David Hill's project or to impose additional costs on David Hill, thereby giving preferential treatment to another developer whose attorney had a "unique relationship" with the City. The evidence showed a clear difference in treatment between David Hill and both Matiaco and Huttula/Spiesschaert with respect to the so called "to and through" sewer requirement to provide an upstream sewer connection. The City allowed Huttula/Spiesschaert to block David Hill's access to sewer through use of a phasing scheme, and then acted contrary to its own attorney's advice by attempting to force David Hill to reroute the sewer through the Parks to make the upstream connection more convenient for Matiaco.

The court is satisfied David hill adequately established at trial it was treated differently from the other developers and/or the City's actions were motivated by an improper purpose. *See, e.g.,* *Squaw Valley*, 375 F.3d at 945, 947 (finding no similarly situated comparator but still finding for plaintiff under a class-of-one theory because defendant "harbor[ed] actual 'hostility' and 'antagonism' " for plaintiff). The Supreme Court clearly stated in *Olech* that an individual may bring a class of one Equal Protection claim when the government has singled them out for arbitrary and irrational treatment, 528 U.S. at 565, making an identically situated comparator difficult to find. There was sufficient evidence for the jury to find David Hill was treated differently from other developers and the City's explanations for its actions were insufficient, *i.e.*, there was no rational basis for the difference in treatment. The City's request for judgment as a matter of law against David Hill's Equal Protection Claim is denied. Similarly, the City's request for a new trial on this claim is denied.

D.    Due Process

In its Fourth Claim for Relief, David Hill alleged the City's "arbitrary and capricious" actions did not "substantially advance an important governmental interest" and, thus, violated Substantive and Procedural Due Process under the Fourteenth Amendment.  (Am. Compl. ¶ 15.)  The jury rendered a verdict in favor of David Hill on its Substantive and Procedural Due Process Claims.  The City, however, contends it is entitled to judgment as a matter of law on both of these claims.  With respect to substantive due process, the City insists David Hill failed both to identify a deprivation of a protectable property interest and to establish clearly arbitrary or egregious conduct by the City. Regarding procedural due process claim, the City maintains "it is beyond doubt that the facts of this case do not implicate the procedural components of the Due Process Clause." (Defs.' Mem. FRCP 50(b) J. Matter Law 30.)

1.    Substantive Due Process

Based on case law construing the protections afforded by the Fourteenth Amendment, the Substantive Due Process Clause "forbids the government from depriving a person of life, liberty or property in such a way that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (internal quotations and citation omitted).  The threshold requirement for a substantive due process claim is a showing the government deprived plaintiff of life, liberty or property. *Id.* at 871.

At summary judgment, this court considered the binding effect of a preliminary plat approval and concluded David Hill "established the threshold requirement of a protected property interest[.]" *David Hill*, 688 F. Supp. 2d at 1217-19.  Thus, prior to trial, the court determined as a matter of law

that David Hill possessed a sufficient property interest to satisfy the threshold requirement for its

Substantive Due Process Claim. Further, the court's jury instructions regarding Substantive Due

Process, stipulated to by the City,[17] asked the jury to determine only whether the City "took action

against David Hill that was not rationally related to a legitimate government purpose" and whether

"the action taken was an abuse of power lacking in reasonable justification[.]" (Court's Instructions

to the Jury 40.) By its Rule 50(b) motion, the City essentially seeks reconsideration of the court's

ruling on summary judgment that David Hill had a protected property interest in the preliminary plat

approval. In the absence of any new legal authority or analysis by the City, the court declines to do

so now.

     The City next challenges the second element David Hill's Substantive Due Process Claim;

namely, whether the municipality's conduct was "clearly arbitrary and unreasonable without

substantial relation to governmental interests." (Defs.' Mem. FRCP 50(b) J. Matter Law 29.)

According to the City, it is "fairly debatable" that its conduct was rationally related to a legitimate

government interest and, thus, David Hill's Substantive Due Process Claim must fail. *See Halverson*

*v. Skagit County*, 42 F.3d 1257, 1262 (9th Cir. 1994) ("If it is at least fairly debatable the County's

conduct is rationally related to a legitimate governmental interest, there has been no violation of

substantive due process." (internal quotations and citation omitted)). The City contends it was

rational for it to examine alternative sewer routes to evaluate the impact of the project on the other

---

[17]The City did object, however, to the Procedural Due Process jury instruction on several
grounds, including the language: "David Hill had a constitutionally protected property interest in
the development of the Parks subdivision and therefore the first element has been satisfied."
(Trial Tr. 4305:16 - 4310:18.)

developers; and to require David Hill to secure an easement prior to proceeding. (Defs.' Mem. FRCP 50(b) J. Matter Law 30.)

To prevail on its Substantive Due Process Claim, David Hill was required to present sufficient evidence at trial that a reasonable juror could infer the City's decision to require the sewer reroute, among other things, was arbitrary and irrational. *See, e.g., Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990). In *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988), the city council voted not to issue a building permit even though the applicant had satisfied all the requirements for the permit. *Id*. at 1302. The City declined to issue the permit despite the City Attorney's warning the decision would almost certainly be overturned in court and would expose the city to substantial civil liability. *Id*. The Ninth Circuit held that the city council's vote was an "arbitrary administration of the local regulations, which single[d] out one individual to be treated discriminatorily" and constituted a deprivation of substantive due process. *Id*. at 1303.

Here, there was ample evidence at trial for the jury to conclude the City acted in an arbitrary and unreasonable manner and in doing so its motives were improper. As in *Bateson*, the City acted contrary to the advice of its own attorney. Additionally, the City issued demands and levied burdens not faced by other developers but, instead, were unique to David Hill. Although the City contends it acted simply to ensure compliance with all the applicable rules, the evidence presented at trial suggested other, improper, motives. For example, the evidence presented at trial suggested the City's actions were peculiar to David Hill and not supported by the applicable codes and regulations. Consequently, the record is sufficient to support the jury's determination that the City's actions against David Hill were not rationally related to a legitimate government purpose, but were an abuse

of power lacking a reasonable justification. The City's request for an entry of judgment as a matter of law against David Hill's Substantive Due Process Claim is denied. Similarly, the City's request for a new trial on this claim is denied.

      2. Procedural Due Process

Next, the City challenges the jury's verdict in favor of David Hill's Procedural Due Process Claim. The City insists the evidence adduced at trial is insufficient even to implicate procedural due process, let alone enough for David Hill to prevail on that theory. Specifically, the City contends David Hill could not hold a property interest in constructing the Parks and, in any event, David Hill never availed itself of the available processes or procedures.

"The Due Process Clause forbids the governmental deprivation of substantive rights without constitutionally adequate procedure." *Shanks v. Dressel*, 540 F.3d 1082, 1090-91 (9th Cir. 2008). To prevail on a procedural due process claim plaintiff must establish: (1) a constitutionally protected liberty or property interest; (2) a deprivation of that interest by the government; and (3) the lack of adequate process. *Id.* at 1090.

A property interest sufficient to support a claim for procedural due process arises through, and is defined by, "existing rules or understandings that stem from an independent source such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Under Oregon law, preliminary plat approval, although "not constitut[ing] final acceptance of the plat of the proposed subdivision or partition for recording[,]" is "binding upon the city or county for the purposes of the preparation of the subdivision or partition," and may only be changed by the city or county to the

extent that such changes are "necessary for compliance with the terms of its approval of the tentative plan for the proposed subdivision or partition." OR. REV. STAT. § 92.040(1); *see also Bienz v. City of Dayton*, 29 Or. App. 7641, 769, 566 P.2d 904 (1977) (construction may begin once preliminary approval is granted and that preliminary approval assures the developer "the city cannot later change its mind"); *Emerson v. Deschutes County Board of Commissioners*, 46 Or. App. 247, 249, 610 P.2d 1259 (1980) ("The approval of a preliminary plat for a subdivision is a final appealable order, which may be challenged by writ of review."). The court determined at summary judgment David Hill possessed a legitimate property interest in the preliminary plat approval under state law and, in the absence of additional legal authority or analysis, the court declines to reverse this prior determination.

In *Soranno's Gasco v. Morgan*, 874 F.2d 1310, 1317-18 (9th Cir. 1989), the Ninth Circuit held "random and unauthorized acts" of a government employee in an administrative permitting process could form the basis of a procedural due process claim unless there was an opportunity for "prompt post-deprivation hearings." Due process requires the government to provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *accord Jones v. Flowers*, 547 U.S. 220, 226 (2006). Unlike California, which has a specific statutory procedure providing for a prompt hearing for the types of permits at issue in *Sorrano's Gasco*, there is no clear opportunity for such a hearing for the engineering construction permits at issue here.

Under Oregon's land use system, the main issues of contention are to be ironed out at the preliminary plat approval stage, which does have a statutory process for both local hearings and a post deprivation hearing at the Land Use Board of Appeals (LUBA). Under Oregon statute, "[g]ranting approval or withholding approval of a final subdivision or partition plat . . . is not a land use decision or a limited land use decision, as defined under ORS 197.015." OR. REV. STAT. § 92.100(7). Furthermore, also not included in the definition of "land use decision," are decisions that "determine final engineering design, construction, operation, maintenance, repair or preservation of a transportation facility that is otherwise authorized by and consistent with the comprehensive plan and land use regulations;" or "approves or denies approval of a final subdivision or partition plat[.]" OR. REV. STAT. §§ 197.015(b)(D) and (G). Accordingly, such decisions are not within the jurisdiction of LUBA, as LUBA only reviews final land use decisions. *See* OR. REV. STAT. §§ 197.835(1) ("The Land Use Board of Appeals shall review the land use decision or limited land use decision and prepare a final order affirming, reversing or remanding the land use decision or limited land use decision."). Thus, David Hill could not have taken its dispute to LUBA and, instead, it took steps to pursue its state remedies by filing this action in state court.

The City also argues David Hill failed to take advantage of an appellate procedure within the City's Land Division Ordinance. (Defs.' Mem. FRCP 50(b) J. Matter Law 30.) At trial, however, David Hill presented some evidence that there was no avenue to appeal decisions by the City's Engineering Department through the Planning Commission. David Hill also presented evidence at trial that it was never informed of a right to appeal an Engineering Department decision to the Planning Department. The City's Community Development Director, Jon Holan, testified:

Q.     So how can you say that the practice has been this is the way that it goes if it has never happened?

A.     You asked me for an interpretation, and that's the interpretation I've provided.

Q.     Sir, you do not make decisions on whether or not construction plans meet the minimum standards, correct?

A.     Correct.

Q.     So once the land use decision is final, you no longer are making any decisions about whether or not the construction plans are approved or not, right?

A.     Right.   Although the question that was asked of me before was: Are there interpretations of the conditions of approval?

Q.     Okay.  My point is that you're not one that makes a decision as to whether or not a particular -- after the final land use decision is made -- you don't decide whether plans meet the master sewer plan, right?

A.     That would be the responsibility of engineering.

Q.     Okay.  This doesn't say -- ordinance 9.116 doesn't say anything about appealing the engineer's decision to the planning commission, now does it?

A.     It depends on what the engineer's decision is.

Q.     A decision about whether or not they should or should not approve construction plans because they meet the master sewer plan.  That decision is not one you take to the planning commission, is it?

A.     I can see an argument where it could.

Q.     Mr. Holan, you have never officially appointed the engineer or anyone in the engineer's office to act on your behalf.

A.     As I indicated before, there has been no formal action identifying anybody in the engineering department or other departments as a designee.

Q.     Because you just made this up to try to create an appeal process that really doesn't exist, isn't that right, sir?

A.    No.

(Trial Tr. 4232:1-4233:12 (Jon Holan testimony).)  In sum, David Hill could not have taken its

dispute over the construction and engineering permits to LUBA and the evidence presented at trial

was that there were no other processes available to David Hill to pursue a recourse for the City's

actions with respect to those permits.  Accordingly, it was appropriate for the jury to determine

whether David Hill was deprived of its property interest by one or more defendants and whether

those defendants also failed to provide adequate notice and hearing.

Based upon the evidence adduced at trial -- including evidence of the City's actions with

respect to the sewer reroute; the inconsistent and arbitrary application of its own rules; favoring other

developers and placing special burdens; and testimony the City never provided David Hill notice of

any appeal rights -- there is substantial evidence to support the jury's verdict in favor of David Hill

on its Procedural Due Process Claim.  Accordingly, the City's request for judgment as a matter of

law against David Hill's Procedural Due Process Claim is denied.  Similarly, the City's request for

a new trial on this claim is denied.

III.    Qualified Immunity

The City once again argues Wood and Foster are entitled to qualified immunity, as a matter

of law, for their actions during the pendency of the permit process for the Parks.  Alternatively, the

City contends the individual defendants were entitled to a jury instruction on qualified immunity and

the court's refusal to so instruct mandates a new trial.  The City relies on the recent decision by the

Ninth Circuit in *Mattos v. Agarano*, 661 F.3d 433, 442-43 (9th Cir. 2011) (*en banc*), to argue this

court was required to identify whether *the particular conduct* as opposed to a more general

constitutional proposition was clearly established at the time. *See also Ashcroft v. al-Kidd,* __ U.S. __, 131 S. Ct. 2074, 2083-84 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." (Internal quotations and citation omitted)). The City maintains this case involved very fact specific and complex development rights for which the constitutional contours were not clearly established in 2005 and 2006.

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (internal quotations and citation omitted). The defense applies even if the government official's error is a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact. *Id.* Thus, the defense protects a public official from lawsuits unless the official's conduct violated a clearly established constitutional right. *Id.* at 232. A two-step process is used to determine whether the qualified immunity doctrine will insulate a government official from suit: first, the court must decide whether plaintiff's factual allegations state a violation of a constitutional right; second, the court must decide whether the right at issue was "clearly established" at the time of defendants' alleged misconduct. *Id.* The steps may be addressed in any order "in light of the circumstances of the particular case at hand." *Id.* at 236.

At summary judgment the court determined David Hill stated claims against the individual defendants for various constitutional violations and there were questions of fact whether the

individual defendants violated David Hill's constitutional rights. *See David Hill Development,* 688 F. Supp. 2d 1193. Subsequently, a jury determined numerous constitutional violations did occur; namely, violations of the Takings Clause of the Fifth Amendment (Exactions and Temporary Takings), a violation of the Equal Protection Clause of the Fourteenth Amendment, and violations of Substantive and Procedural Due Process under the Fourteenth Amendment.

The court previously addressed whether these rights were clearly established at the time of the alleged misconduct and found:

> There can be little dispute that the constitutional principles at issue in this case have been clearly established for many years. Plaintiff's legal claims – retaliation in violation of the First Amendment, violation of the Fifth and Fourteenth Amendments through unlawful exactions and unjust temporary takings, violation of equal protection, and violation of substantive and procedure due process – all are well-established legal principles. Numerous reported cases address the legal claims plaintiff asserts in this case, and do so in the context of land use, zoning, and permitting processes between governmental entities, and developers and landowners. These cases make clear that government officials may not engage in conduct intended to deprive developers and landowners of these rights or to penalize them for asserting these rights. A reasonable official thus would know that the alleged conduct here, if true, was unlawful. Accordingly, the qualified immunity defense does not apply in this case to preclude plaintiff's lawsuit from proceeding to trial against the individual defendants.

(Order on Motions in Limine 3, Aug. 31, 2011.)

Moreover, the City's reliance on the decision in *Mattos* does not change the court's analysis here. In *Mattos,* the Ninth Circuit, sitting *en banc,* held that while the use of tasers constituted constitutionally excessive force in the circumstances of that case, the officers did not violate clearly established law because at the time of their actions there were three circuit courts of appeals cases rejecting claims that the use of a taser constituted excessive force, and there were no circuit-level

taser cases finding a Fourth Amendment violation. *Mattos*, 661 F.3d at 448. Thus, because there were no Supreme Court or Ninth Circuit decisions addressing defendants' specific conduct at the time it occurred, the court concluded the law was not sufficiently clear at the time of the incident to render the alleged violation clearly established. In contrast, all of the case law relied upon by David Hill for its constitutional claims was promulgated prior to 2005 and 2006 and, thus, the relevant laws were well-established at the time of the violating conduct.

Next, the City contends the issue of qualified immunity should have been submitted to the jury in this case. Here, the jury was asked to determine whether certain constitutional violations had occurred, which is their only role in a qualified immunity analysis. *See, e.g., Torres v. City of Los Angeles*, 548 F.3d 1197, 1212 (9th Cir. 2008) (material issue of fact existed as to whether reasonable officers would have relied on information in detectives' possession without further verification). Whether a constitutional right violated was clearly established at the time of the conduct, step two of the analysis, is solely within the province of the court. *See Tortu v. Las Vegas Metropolitan Police Dept.*, 556 F.3d 1075, 1085 (9th Cir. 2009) ("Step two serves the aim of refining the legal standard and is solely a question of law for the judge." (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The City's request for qualified immunity for Woods and Foster or, alternatively, for a new trial because the court failed to instruct on this issue is denied.

IV. <u>Verdict on Damages</u>

The City contends the damage award by the jury in this case is "grossly excessive and not supported by the evidence," accordingly, the City insists the court "should vacate the award and order a new trial on *all* . . . claims." (Defs.'Mem. FRCP 50(b) J. Matter Law 34 (emphasis in

original).) Specifically, the City makes three challenges to the damages award: (1) change in market value was not an appropriate measure of damages; (2) lost opportunity costs were not recoverable damages; and (3) there was insufficient evidence to support numerous elements of the claimed damages.

### A.    *Change in Market Value*

The City maintains the appropriate measure of damages for all[18] of David Hill's claims is the fair market rental value of the property. *See, e.g., First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987) ("Where this burden results from governmental action that amounted to a [temporary] taking, the Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use of the land during this period."); *N. Pacifica LLC*, 526 F.3d at 486 ("The measure of damages for an equal protection claim alleging that a discriminatory zoning decision temporarily deprived the plaintiff's land of its development potential is reasonable interest on the reduction in value to the project created by the zoning decision, but only for the period of time the condition actually delayed the development of the project.") According to the City, any damage caused by a temporary taking is cut-off when the taking ends and an intervening change in market value of the property is simply an incident of property ownership. *See Agins*, 447 U.S. at 263 n.9 ("Mere fluctuations in value during

---

[18]David Hill contends the City's damages arguments "are directed solely at Plaintiff's temporary takings claims." (Pl.'s Resp. 26 ("If Defendants are allowed to re-litigate this issue, it could only – at best – affect Plaintiff's temporary takings claim, and none of the other claims.").) The City makes clear in its FRCP 50(B) Memorandum that its arguments regarding change in market value apply to all of David Hill's claims. (Defs.' Mem. FRCP 50(b) J. Matter Law 35 ("This rule of logic and causation applies to *all* of Plaintiff's claims, as all were based on the delay in getting the property to market." (emphasis in original)).)

the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership." (internal quotations and citation omitted)).

In *First English Evangelical*, the Supreme Court recognized a constitutional right to damages for a temporary regulatory taking, but the court did not articulate the proper measure of damages. Throughout this litigation, the City has requested damages be limited to the fair market rental value of the property for the period of the alleged taking, the measure ordinarily applied in temporary physical takings cases. *See, e.g., Kimball Laundry Co. v. United States,* 338 U.S. 1, 7 (1949); *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1581 (Fed. Cir. 1990).

In *Yuba,* the Federal Circuit refused plaintiff's request for market decline damages primarily because there was "clear and convincing evidence of the fair rental value of the property." 904 F.2d at 1582. In fact, plaintiff in *Yuba* was awarded $580,555.40 rental value for the property. The circumstances in *Yuba* are distinguishable from the present case because there is no "rental value" for an uncompleted subdivision and the City's proposed compensation for the temporary taking would leave David Hill without a remedy despite the evidence of significant interference by the City with David Hill's investment-backed expectations. *See Kimball Laundry Co.*, 338 U.S. at 7 (Government "federalized" a laundry business, *i.e.,* a temporary taking, during wartime and court rejected a decline in market value because "there might frequently be situations in which the owner would receive no compensation whatever.").

The City focuses on a single, narrow measure of compensation for David Hill's claims in this case – the difference in rental value for undeveloped property. Obviously, under this theory of recovery, David Hill is awarded no damages despite prevailing on all five constitutional claims

submitted to the jury. It is well-established, however, that the Constitution requires compensation for a temporary regulatory taking. *See, e.g., First English Evangelical*, 482 U.S. at 318-19 ("'temporary' takings which . . . deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation"). The more difficult question is how to calculate the compensation owed when such a taking has occurred. Certainly the most important inquiry in that determination is simply: What has the owner lost?

At trial, David Hill sought damages for market decline as well as for the harm resulting from the City's interference with potential sales to specific buyers, and other increased costs due to the delay, including opportunity costs. David Hill stipulated to a jury instruction requiring it to prove "extraordinary delay" in order to prevail on its temporary takings claim. Now successful on that claim, David Hill is entitled to recover compensatory damages as a measure of just compensation for that claim. *See First English Evangelical,* 482 U.S. at 318-19; *see also Schneider v. County of San Diego,* 285 F.3d 784, 790 (9th Cir. 2002) ("change in the market value in the property" during a period of delay between valuation and the tender of payment was a legitimate element of a just compensation under the takings clause).

Based upon this court's reading of the relevant legal authority, the court is permitted to rely on a formula appropriate to the circumstances of a particular case to ensure plaintiff receives "just compensation" for a wrongful government taking. *See, e.g. Kirby Forest Indus., Inc. v. U.S.*, 467 U.S. 1, 10 n.14 (1984) ("Other measures of 'just compensation' are employed only when market value is too difficult to find, or when its application would result in manifest injustice to the owner or the public." (quotations and citation omitted)). In this case, the court previously determined "the

issue of damages is fact-specific and should be determined by the fact-finder, the formula for which shall be established based on the specific facts of this case." *See David Hill,* 688 F. Supp. 2d at 1222. In its present request, the City cites no new legal authority or additional analysis such that the court is persuaded it should reverse its prior rulings on this issue. David Hill's damages for the significant constitutional violations in this case are not limited to the fair market rental value of the property.

   *B.    Opportunity Costs*

   The City maintains David Hill's expert "presented the jury with a misleading and inaccurate calculation of Plaintiff's purported damages." (Defs.' Mem. FRCP 50(B) J. Matter Law 37.) Specifically, the City contends David Hill's request for approximately $5.8 million in "lost opportunity costs" was a claim for prejudgment interest and such a claim is not properly presented to a jury because the Local Rules provide "a specific mechanism and measure" for prejudgment interest. *See* L.R. 1055-1 ("Unless otherwise ordered by the Court, and award of prejudgment interest will be compute at the rate authorized in 28 U.S.C. § 1961." (Local Rules of Admiralty Practice and Procedure)). Moreover, the seven percent rate used by the expert for the damages calculation is inflated and not in accordance with the statutorily mandated rate set forth in § 1961.

   David Hill responds that the opportunity cost represents more than "interest." David Hill's economist, Eric Fruits, Ph.D, testified at trial there have been opportunities over the past few years for developers with cash, particularly in the multi-family and commercial real estate markets in which David Hill holds considerable experience. For example, Dr. Fruits testified:

   Q.    My last question is: I understand that there was a recession for a year, and the real estate market went down. But were there opportunities in that market for developers who had cash and didn't need to rely on bank credit as much?

A.     Well, that's correct. The thing is, too , when you look at the average, it really
       avoids the idea that there were some people who, as Mr. Kuhn said, went
       bankrupt. But there were opportunities for people out there.
              One of the things I was teaching my classes at the time: Cash is king.
       If you are sitting on a pile of cash, and you have an opportunity to make
       investments, now is the time to do it. A lot of people out there didn't have
       the cash, and that's one of the reasons why there was a crunch.

(Trial Tr. 2516:16-2517:6; *see also* Trial Tr. 3960:10-13 (testimony McDonald was experienced in

commercial and multi-family projects).)

       Moreover, there was evidence presented at trial that during the relevant time periods,

financing opportunities were limited and developers with cash were in a significantly better position

to take advantage of market opportunities. Specifically, David Hill's expert testified the seven

percent figure was a forward-looking figure and was appropriate to use in these circumstances when

it is impossible to know what market opportunities David Hill would have invested had it not been

damaged by the City's actions in this case. The testimony from Fruits provided:

A.     Sure. Everyone has heard of interest, but there is really a lot more to the time
       value money than just what we think of as the interest rate. You can really
       think of it as kind of the opportunity cost of money. In other words, what's
       the cost of having something that you wouldn't have had otherwise or not
       having something that you would have had otherwise. So the idea is that
       when -- if you have a case like this, for example, where I am to assume that
       plaintiffs were deprived of money for a period of time, there is a value to that
       money, because the value of a dollar today is much higher than the promise
       of a dollar tomorrow that we -- that when someone takes that asset away from
       you or you give up that asset, that has a cost to you. So we measure that cost.
       So the opportunity costs them money. Some people call it interest.

Q.     How did you measure that cost in this case? How did you come up with the
       7 percent number?

A.     Well, I used the number that Office of Management and Budget uses, which
       is 7 percent. They use it for public investment purposes and for regulation
       purposes when they are measuring the costs and benefits associated with a
       regulation or a government investment. That seemed like an appropriate

number to me, because we were talking about, in some sense, a regulation here and a cost or a benefit associated with that regulation. So the 7 percent number seemed appropriate relative to what the federal government uses.

Q.     How does 7 percent compare to the typical rate that a developer would be seeking to obtain in a development project?

A.     Well, I understand that developers usually go into a project with an expectation of returns in the 20s. That doesn't mean that they may actually get that 20 percent. So it is much lower than the expectations going in. When all is said and done, it could be more than 20 percent, higher than 20 percent and so forth.

Q.     And do you believe the 7 percent number is reasonable under these circumstances?

A.     I think that's a fairly reasonable number. It may even be somewhat conservative.

Q.     Why is that?

A.     Well, for example, Oregon PERS system recently went through a long discussion about what sort of rate of return were they going to assume on their investments going forward. This is billions of dollars worth of investments with retiree funds. They made the determination that an 8 percent return going forward was an appropriate rate of return. So not only do you have the federal government using a 7 percent rate of return, which seems appropriate, you also have PERS saying that maybe an 8 percent rate of return is appropriate too. So that seems to buttress the argument to me that 7 percent is probably a fair and reasonable estimate for the opportunity cost of bonds.

(Trial Tr. 2456:2-2458:6.)

A.     Yeah. I will read it out loud first, and then I will explain. It says, "Base case analysis. Constant dollar benefit cost analysis for proposed investments and regulations should report net present value and other outcomes determined using a real discount rate of 7 percent. This rate approximates the marginal pretax rate of return on an average investment in the private sector in recent years. Significant changes in this rate will be reflected in future updates of this circular."

        So what that means is that when you are looking at the impacts of government regulation or a government investment, and there is going to be

66 – OPINION AND ORDER                                                              [LB]

costs and benefits associated with that, and those costs and benefits are going to go out into the future, when the Government is calculating those cost benefit analysis to see what the impact is going to be on the private sector, you use a 7 percent rate of return, a 7 percent opportunity cost of money, because that's the rate of return that on average across all industries the OMB has determined to be the average rate of return you see over time in the private sector.

Q.    Why do you view this as being the appropriate rate in this case rather than looking back at what the interest rates in somebody's savings account is over this time period?

A.    Well, it seems to make sense for a number of reasons. One, we are looking at government regulations, and it clearly states right here that the rate is applied to government regulations. The other issue is that this is a fairly old document now, 1992. They have had many opportunities to update it, and it has been updated many times. But the 7 percent has not been updated; that is, the last time I checked, and that was a couple of months ago. So it has been more than 15 years or so without being changed. The other thing, too, is that it seems to apply nicely to the case. We are talking about where we are looking at a regulation. So it is kind of an apples-to-apples comparison to the two types of returns.

(Trial Tr. 2514:18-2516:6.) Evidence to establish what return David Hill could have achieved with a sizeable amount of cash had it chosen to pursue other investment opportunities was admissible and appropriate for the jury's consideration of damages in this case.

C.    *Substantial Evidence*

Finally, at trial, the City objected to and/or moved for a directed verdict on many of David Hill's specific items of damages, totaling $2.5 million, for lack of sufficient evidence, and the City renews those motions here. The court finds there was substantial evidence to support the jury's damages verdict in this case. At trial, David Hill produced itemized statements of costs, along with witness testimony to establish the category of damages sought. (*See, e.g.,* Trial Tr. 2438:20 - 2472:10 (Eric Fruits testimony); Pl.'s Trial Ex. 601-605.) For example, there was evidence

presented that: (1) if the Parks had been completed on time, David Hill would not have incurred the additional interest owed on the construction loans; (2) David Hill was required to build the electrical main, despite the conditions mandating only that David Hill provide an easement for the electrical line, and Huttula was not subject to the same requirement; (3) the City's delays caused the Parks to endure two winters and the attendant erosion control; (4) David Hill incurred $200 thousand in additional costs from the City's decision that 15 feet was not wide enough for the easement, thereby, necessitating David Hill get a right-of-way from Huttula at a total cost of $400,000 to buy the easement and build Brooke Street, rather than the projected $200,000 for a temporary easement across school district property; and (5) the City's rate of $139 per hour for engineering costs was excessive and, in any event, some of those charges were incurred by City engineers expending time working with Browning on matters contrary to David Hill's interests.

In addition to expert testimony from David Hill's economist and engineers in support of its requested damages, McDonald testified:

> Q.    And maybe you could describe to the jury -- I mean, this is back in October of 2005. You're trying to get the subdivision built.
> What's going on with the people, business, or home builders interested in buying your property? What was -- what was the status of the negotiations during that period of time?

> A.    Again, like I said, lots at that point were a rarity, and being able to have access to those lots was a big deal.
> So we had lots of preliminary offers that people were coming through with us, offering on the lots, wanting to know when we could -- when we could deliver these lots as finished lots.
> So the activity, I guess, would be -- is very high, as far as interest.

> Q.    Describe the -- the buyers that -- that were interested in the property. Who -- who were some of them?
> Are they small builders? Large builders? What were they?

A.    We had small builders all the way up to very large builders. Venture Properties was one, Holt Homes was one. I believe we had talked to Pacific Lifestyle Homes. And a lot of local builders interested in buying either the whole subdivision, ten lots, three lots, two lots.

Q.    What were you interested in? Were you interested in selling the whole thing, or in smaller chunks?

A.    Initially, we were interested in selling to a large group of builders. But that -- that went away as we kept delay -- as -- when we didn't get our permit to construct in a timely manner, the little builders started going off as we couldn't deliver them within the time frame they wanted to build in.

Q.    I'm going to show you what's been marked as Exhibit No. 94.
          In April -- you eventually entered into an agreement with Venture Properties in, I think, April -- April of 2006. Is that right?

A.    I think it was April 6 or 7th of 2006.

Q.    Okay. And just -- why did you decide to go with Venture Properties?

. . . .

Q.    What is this document, Mr. McDonald?

A.    This is just a summary document of the people that were interested in our project in April of '06, that I compiled with Mr. Maitland, to decide what our options were on selling the property. Who we would sell the property to.

Q.    Did you have written offers from some of these folks?

A.    We had -- yes, we had written offers from some of these folks and written letters of intent from others.

Q.    I see -- let's just go through this, and maybe you can explain to the jury what the different terms mean.
          Obviously the one on the left is the name of the companies?

A.    Correct.

Q.    And then the next one, what number does this represent? On Exhibit 94?

A.    Exhibit 94, are you --

69 – OPINION AND ORDER                                                    [LB]

Q.    I'm circling the -- 215.

A.    Oh, that's Venture Properties' offer.
      And he's -- they're going to buy 215 lots.  There's going to be one closing.  That means they're going to purchase all 2 -- 215 at one time.  And the closing would happen within 30 days.
      The average -- moving along over there, the average lot price would have been 130,000 dollars per lot.  The total sellout is 27,950,000.
      200,000 dollars down, and -- that was sort of the conditions on the end, where it says 6-inch max stripping on lots.  That was just conditions they had put in their offers.

Q.    When you say 200,000 dollars down, what are you referring to?  What -- is -- in a contract, what does that -- is it referred to as?

A.    A down payment.  So --

Q.    Explain that to the jury.  What does a down payment mean?

A.    What they do on a purchase and sale agreement, if you're interested, is, No. 1, you put down a certain amount of money.  In this case it looked like it was a little less than 1 percent on that.
      That said, Look, I'm interested.  And if you meet these bullet points, if you will, in the purchase and sale agreement, then we get to keep the down payment.  And if you don't close within 30 days, that's what we keep.

Q.    1 percent, is that -- is that standard in the industry?

A.    Well, at that time -- you know, normally, on houses, nobody ever does 1 percent.  They do pretty close to 5 or 10 percent.
      But on -- on projects of this size over here, when you're going to close rather quickly, the down payment doesn't count as much as your ability to pay.

Q.    It looks -- so that's that last number that we're looking at there.  Is that right?  So it looks like most of the down payments are about the same, that were being offered?

A.    They are.  They're all about the same.

Q.    Okay.

A.      Except as you look, the percentages are going to go up and down because --
let's take No. 6, JLS.  Obviously he was only buying 112 lots, and he was
putting down 112,000 dollars.
        So that's a little more.  He was buying roughly half the lots for, you
know, half the price, so --

Q.      Can you have a contract as a seller that requires specific performance?

A.      Yes, I believe you can.

Q.      Why didn't you use that type of contract in this case?
        Is that standard in subdivisions?  Or buying large lots?

A.      Sometimes it is, sometimes it isn't.
        We have got -- sometimes we can put that clause in there, and
sometimes you don't.  It just depends on what your purchase and sale
agreement that you both come together on includes.

Q.      Okay.  Moving to Exhibit 226.
        So off that list we just saw, who did you finally agree to sell the lots to?

A.      We finally decided to sell the lots to Venture Properties, the number -- the
first person on the list.
Q.      Why?

A.      At that point the market -- we looked at -- again, we all -- we all think we can
use a crystal ball, but at that point we were looking at the market and looking
at when we could bring the lots to completion over there.  And we didn't
think that any of the other ones had the ability to wait for us to wait as long
as we did.  And Morissette had the money and the ability to start building
right away when we did finish lots.

Q.      So what was the purchase price?  What did they agree to?

A.      They agreed to the purchase price of 27,950,000.

Q.      Mr. McDonald, are these cookie-cutter lots?  Are they all the same size?

A.      They're cookie-cutter lots, but they're not all the same size.  They -- I'm
again referring to Exhibit 611.
        Generally what we have is we have larger lots up here; 7, 8, to 10,000.
Medium-size lots here; again, 7 to 6,000.

And then smaller lots down over here, 5500 to 7,000-square-foot lots down over here.

Q.  What -- what were the more valuable -- sounds like an obvious question, but what were the more valuable lots?  Could you point those out to the jury.
     And -- I mean, they were willing to pay 130,000 dollars for all of the lots, but which ones were the more valuable versus the least valuable?

A.  The more -- obviously, the valuable lots are the ones that are bigger. The more valuable lots were these up here, which would have been priced at a higher price than 130,000 dollars,  had they not bought the whole -- you know, had they not made an agreement to buy the whole thing.

Q.  What about the lots down here, if you had to sell them separately?  Would they have been worth 130,000?

A.  The lots down over here might have been worth closer to 120,000 at that point.

Q.  Are you familiar with the bulk rate or discount rate?

A.  Absolutely. When you buy the whole thing, all the big builders expect you to discount, have a discount or a bulk rate on lots.

Q.  I'm going to show you what has been marked as -- well, actually, when were you supposed to close on this agreement?  Do you remember what the terms said?
     I could show it to you.

A.  Yeah.  I believe it was within 30 days.

. . . .

Q.  From when?

A.  From the date of satisfaction of 6.1, 2, and 3.

Q.  Well, 11.6.

A.  Oh, excuse me. 6.1 and 2, and 11.6.

. . . .

[LB]

Q.    So 30 -- you had 30 days from when, to do the closing?

A.    6.2 is when the actual subdivision plat was recorded and the construction was substantially complete.

Q.    Did you -- did you close -- did Venture Properties buy all 215 lots from you?

A.    No, they did not.

Q.    Why not?

A.    I was unable to produce the lots in a timely manner, and as the market in 2006 and 2007 -- the market increased for 2006 and it was waning in 2007. They didn't think they could buy all the lots at that point.

Q.    I'm going to show you what has been marked as Exhibit No. 231.
        Let's go ahead and blow up just the first -- this is a letter from you. Correct?

A.    Yes, that's correct.

Q.    Okay. And let's go ahead and do the body of the letter.
        So it's dated October 6th of 2006.
        About what -- about when did Kelly Ritz of Venture Properties indicate to you that they weren't going to close on all -- or they weren't going to follow through on the contract?

. . . .

A.    Yeah, would you repeat it.

Q.    Sure.
        Looking at the body of this letter, when did Venture Properties indicate to you that they weren't going to close on all 215 lots?

A.    I believe a few days before this letter, on October 4th, we had a meeting and discussed that they weren't going to close on all of the lots.  And my recollection of the meeting was due to the market conditions at that time.

Q.    And so what -- what did you guys do then, you and Venture Properties?
        You still had a purchase and sale agreement.  What happened to that?

. . . .

73 – OPINION AND ORDER                                                    [LB]

A.    What we did was amend the agreement.

Since I didn't have finished lots, I was -- I didn't have -- I had no negotiating power. I couldn't say, Look, you'll have to buy all of the lots now or, you know, walk away from the deal.

And then -- so what I did at that point was I went back out to the market to see if there was any interest and that perhaps the other builders would want to step in in Venture Properties' place, and at what price point over there.

And at that --

Q.    What did you find out?

A.    At that point I found out that the -- the interest was really not there anymore, by the end of 2006, as it was in April.

Everybody, again, was pulling out their crystal ball, looking at -- that they thought 2007 might be an iffy year. And so -- so nobody was interested in making an offer at that point. That was the bottom line.

And so going back to Kelly, we just agreed to amend the purchase and sale agreement, wanting to keep some sort of sales on the books, and then continuing on and trying to drum up other sales at that point.

(Trial Tr. 567:10-576:25.)

Additionally, Kelly Ritz, President of Venture Properties, the company that contracted to buy the lots prior to the delay, testified:

Q.    And how many of the lots were you willing to buy?

A.    All of them.

Q.    Why? Could you explain that to the jury.

Is that -- is that common, typical, to buy all of them in a single phase?

A.    It is -- well, it was sort of relative.

Again, what's common, and normal now is substantially different than what was common and normal then, which was different than what was common 15 years before that. And it's very market driven. And if there's a lot of demand, then the seller can demand a lot and the purchaser, if they want to be the -- the successful one, you know, they're going to have to meet those terms.

So -- so this purchase and sale agreement assigned -- or I mean signed by themselves, I must have been comfortable with the 130. I believe I was.

> It was a lot of lots.  But we were primarily a westside home builder, and there was a real thought, because the -- the house prices and the land prices just kept going up and up, that -- that we were going to run out of land.
>
> And there was really a lot of competition.  There were a couple of national companies. There were some companies coming -- I think they were trying to come down from Seattle, who were trying to get a presence.

(Trial Tr. 692:2-25.)

David Hill sought $12.5 million in total damages and the jury awarded slightly more than one-half that amount.  The court is satisfied the jury followed the court's instructions on damages and carefully considered the appropriate items for compensation owed by the City's wrongful conduct in this case.  Moreover, as set forth above, there is substantial evidence to support the jury's damages award.  Accordingly, the City's request to reduce or set aside the damage award in this case is denied.  Similarly, the City's request for a new trial to determine damages is denied.

V.    Time-Barred Claims

The City renews its argument that all allegations of misconduct occurring prior to February 7, 2006 – two years before David Hill filed its original Complaint in state court – are time-barred. The issue of whether David Hill filed its Complaint beyond the relevant limitations period was submitted to the jury on a stipulated jury instruction.  It was the City's burden to prove by a preponderance of the evidence that David Hill knew or should have known the basis for its claims over two years before it filed this action.  At trial, David Hill offered testimony from its attorney, Bill Cox, that as of February 22, 2006, he did not have enough information to understand the nature or character of the City's actions.  At that time, Cox was still attempting to discern the legal justification for the City's conduct.  For example, Cox testified:

Q.      So this is a fax, looks like a fax you sent to Mr. McDonald on the same day that you sent the 17 pages to Mr. Jordan.

A.      Yes.

Q.      Can you read what you wrote there in that fax?

A.      Oh, yes. "I have had a long and sometimes heated discussion with the city attorney. He contacted me. Apparently Sykes" --

Q.      Do you know who that is, that Sykes?

A.      He was, I think, the city manager. I think I misspelled it, now that I've seen it. "Apparently Sykes called him about my threat to bring action against the City if it doesn't do anything. The attorney doesn't think we have a case. Also, they are reluctant to accept a dedication deed before improvements, due to their labor agreement policies."

Q.      Let's start with that last sentence. Can you tell me what the City was telling you there about why were they reluctant to accept a dedication deed? First of all, what dedication deed were you talking about there?

A.      You know, I don't recall. I could -- I really would have to have my memory jogged. I don't recall.

Q.      Okay. That's fine. In the first line, it talks about long and heated discussions with city attorney Andy Jordan. Do you remember having long and heated discussions with the city attorney Andy Jordan?

A.      Yes.

Q.      And do you remember telling him in those discussions basically the same points you were making at the end of that March 22nd letter that we looked at a little earlier, Exhibit 3 -- excuse me, Exhibit 451?

A.      Yes. I've known Jordan -- Mr. Jordan for a long, long time. He used to appear before me at LUBA, and we've worked on several things together and in opposition to each other. I think we have a pretty respectable relationship with each other.

Q.      Okay. But you were -- when you were talking about the issues pertaining to The Parks project, when you had these long discussions --

76 – OPINION AND ORDER                                                        [LB]

A.    Oh, yes. It was about those same issues, the ones that we've already talked about.

Q.    And that was the upstream sewer routing, the -- this issue of getting an easement across Huttula's property and the median. Those were all issues you were talking about in February with Mr. Jordan?

A.    Yes. More developed by this time because they kept -- we kept asking the same questions and getting different answers, but none of them made any rational sense. They didn't seem -- they, in my opinion, weren't legally sufficient.

Q.    And I think you said in this thing -- you threatened to bring action against the City. What kind of action were you talking about at that point?

A.    Well, it would have been an attempt either to take it in -- we were going to try to find somebody, some body that would force the City to comply with the law. And at that point, it would have been the circuit court. I think one of the choices would have been to try to go to the city council to see if in fact their staff was implementing their plan -- I mean their policies, but we had to take it -- I mean, I took it as they were doing whatever they were being told to do. So I was thinking, well, the only place we could go would be the circuit court. This kind of a matter is not something that LUBA would handle. It would be the circuit court.

Q.    And at that time you were thinking of like a mandamus action or something like that?

A.    Yes.

Q.    Did you have in your mind that the City had committed any constitutional violations, like equal protection and the kinds of things we're talking about here in this case today?

A.    Not at that point. You know, I wasn't -- I knew that something was wrong and there was some non-discussed, in my opinion, agenda, but I didn't know what it was. There must have been some reason for them to continue to cause these kind of delays and these kinds of problems, but I didn't know what it was.

Q.    Okay. So you didn't have enough information to form a reasonable belief as an attorney that you needed to file a constitutional lawsuit against the City at that point?

A.    No, I did not have that information.

(Trial Tr. 2089:22-2093:4.) In its Rule 50(b) Motion, the City points to no evidence to refute the

testimony of Cox. Construing the facts in David Hill's favor, there was sufficient evidence presented

for the jury to determine the City failed in its burden to establish its affirmative limitations defense.

The City's request for judgment as a matter of law precluding all of David Hill's claims as time

barred or, in the alternative, for a new trial with "untimely components removed from the evidence"

is denied.

### Conclusion

Based upon the foregoing, Defendants' FRCP 50(b) Motion for Judgment as a Matter of Law

and Alternative FRCP 59 Motion for New Trial (doc. #211) is GRANTED, in part, and DENIED,

in part. The Jury's verdict in favor of David Hill's Takings - Exactions Claim is set aside and that

claim is dismissed, without prejudice.

IT IS SO ORDERED

DATED this 30th day of October 2012

_____
John V. Acosta
United States Magistrate Judge